Jonathan S. Ball (SBN 264107)
BALL LAW CORPORATION
One Market / Spear Tower, 36th Floor
San Francisco, CA 94105
Telephone: 415-349-0721
Facsimile: 415-520-6864
Email:     jb@ball-lawcorp.com


Adam B. Wolf (SBN 215914)
PEIFFER ROSCA WOLF ABDULLAH
CARR & KANE, APLC
9696 Culver Blvd., Suite 301
Culver City, CA 90232
Telephone: 415-766-3545
Facsimile: 415-402-0058
Email:     awolf@prwlegal.com

[Additional counsel in signature block]

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

RIVERSIDE DIVISION

| | |
|---|---|
| **DANIEL DEVOR**; **JOHN SHERMAN**; **IRVING RICHARDS AND REGINA RICHARDS**, as co-trustees of the **RICHARDS FAMILY TRUST**; **BRIAN WEIDE AND ROBERTA WEIDE**, as co-trustees of the **WEIDE FAMILY TRUST**; **JUDITH S. BALL**; **THOMAS L. HEENEY**; **TERUKO TAKAHASHI**; **EARL MCKINNEY**; **JAMES HAMILL**; **OTTO _____** | Case No. _____<br><br>COMPLAINT<br>DEMAND FOR JURY TRIAL |

**COMPLAINT**

1  LEUSCHEL; RICHARD
   ADELMAN; JAMES LIPPMAN, as                )
2  trustee of the JAMES AND LINDA            )
   LIPPMAN 1998 TRUST; DR.                    )
3  JOHN RICHARDS AND CHRIS                    )
   STEIG RICHARDS; KEITH                      )
4  JANZEN, as trustee of the J.               )
   EMERSON CHISHOLM TRUST                     )
5  DTD 7/18/97; JAMES R. GUY, JR.;            )
   and THE HON. JOSEPH WAPNER                 )
6  AND MICKEY WAPNER,                         )
                                              )
7            Plaintiffs                       )
                                              )
8       v.                                    )
                                              )
9  HKALLEN, LP; HK ALLEN, INC.;               )
   HALL KEEN MANAGEMENT,                      )
10 INC.; HKN ALLEN LLC; HKN                   )
   DANVILLE HOUSE LLC; HKN                    )
11 MANAGER LLC; HALL KEEN                     )
   INVESTMENTS LLC;                           )
12 HALLKEEN LLC; JOHN L.                      )
   ALLEN; ANDREW P. BURNES;                   )
13 DAVID A. CARLEN; FRANKLIN                  )
   81 ASSOCIATES; EQUITY                      )
14 RESOURCE INVESTMENTS,                      )
   LLC; EQUITY RESOURCE                       )
15 NEWTON FUND, LP; EQUITY                    )
   RESOURCE MILTON FUND,                      )
16 LLC; EQUITY RESOURCE                       )
   CONCORD FUND, LLC; EQUITY                  )
17 RESOURCE BELMONT FUND,                     )
   LLC; and EGGERT                            )
18 DAGBJARTSSON                               )
                                              )
19           Defendants.                      )
                                     _____ )
20

                                                        COMPLAINT

## TABLE OF CONTENTS

SUMMARY OF THE CASE ..................................................................................1

PARTIES ...........................................................................................................8

JURISDICTION AND VENUE ...........................................................................18

STATEMENT OF FACTS ...................................................................................18

    FORMATION AND PURPOSE OF THE PARTNERSHIP ...............................................18

    CALIFORNIA HAS ALWAYS BEEN HOME TO MORE LIMITED PARTNERS THAN ANY

        OTHER STATE ..........................................................................................19

    THE PARTNERSHIP'S FINANCIAL PERFORMANCE HAS BEEN CONSISTENTLY

        STRONG FOR 30 YEARS ............................................................................20

    AT ALL TIMES, THE GENERAL PARTNER OF THE PARTNERSHIP WAS A FIDUCIARY

        TO THE LIMITED PARTNERS ......................................................................27

    ALLEN AND MYERSON QUIETLY USURPED AN OPPORTUNITY THAT BELONGED TO

        THE LIMITED PARTNERS .............................................................................28

    PHASE ONE BEGAN IN EARNEST: USING DECEIT AND MISCHARACTERIZATIONS,

        HKALLEN AND THE ERI PARTIES COLLABORATED TO BUY NEARLY

        HALF OF THE LP UNITS FROM LIMITED PARTNERS FOR PENNIES ON

        THE DOLLAR ...........................................................................................33

    AFFILIATE OF GENERAL PARTNER PAID MCKINNEY AND HAMILL $100 PER

        1.0 LP UNIT ...........................................................................................34

**COMPLAINT**

BURNES SENT LETTER TO LIMITED PARTNERS FALSELY REPORTING THE

PARTNERSHIP'S "BLEAK" FINANCIAL PROSPECTS – CONDITIONING THE LPS

TO ACCEPT THE ERI PARTIES' LATER OFFERS.............................................40

HKALLEN PARTICIPATED AS PURCHASER IN EQUITY RESOURCE NEWTON FUND'S

PURCHASES OF LP UNITS, BUT FAILED TO ENSURE TRANSACTIONS WERE

FAIR TO LIMITED PARTNERS ........................................................49

GENERAL PARTNER AND NEWTON FUND BOUGHT LP UNITS FROM SHERMAN,

HIROKAWA AND LEUSCHEL, IN EACH CASE FOR A SMALL FRACTION OF

THEIR FAIR MARKET VALUE ........................................................58

NEWTON FUND TRANSFERRED LP UNITS TO AFFILIATES OF GENERAL

PARTNER ................................................................................65

GENERAL PARTNER PARTICIPATED AS PURCHASER IN EQUITY RESOURCE MILTON

FUND'S PURCHASES OF LP UNITS, BUT FAILED TO ENSURE TRANSACTIONS

WERE FAIR TO LIMITED PARTNERS.................................................68

MILTON FUND SENT REMINDER OF $15,000 OFFER; GENERAL PARTNER AND

MILTON FUND BOUGHT RICHARDS FAMILY TRUST'S INTEREST FOR A SMALL

FRACTION OF ITS FAIR MARKET VALUE .........................................76

GENERAL PARTNER PARTICIPATED AS PURCHASER IN EQUITY RESOURCE

BELMONT FUND'S PURCHASE OF LP UNITS, BUT FAILED TO ENSURE

TRANSACTIONS WERE FAIR TO LIMITED PARTNERS ...................................83

**COMPLAINT**

1  GENERAL PARTNER AND BELMONT FUND BOUGHT WEIDE FAMILY TRUST'S

2       INTEREST FOR A SMALL FRACTION OF ITS FAIR MARKET VALUE.................86

3  PHASE TWO: HKALLEN AND HKM FRAUDULENTLY OBTAINED "CONSENT OF

4       THE INVESTOR LIMITED PARTNERS" TO THE SALE AND EXCHANGE

5       TRANSACTION..........................................................93

6  HKALLEN PURPOSEFULLY MISCHARACTERIZED PLAINTIFFS' CONCERNS,

7       ACCUSED PLAINTIFFS OF HARBORING IMPURE MOTIVATIONS, AND THEN

8       PROCEEDED TO COMPLETE THE SALE AND EXCHANGE, THEREBY HARMING

9       ALL PLAINTIFFS WHO REMAIN LIMITED PARTNERS ....................112

10 FIRST CAUSE OF ACTION -  BREACH OF FIDUCIARY DUTY .................120

11 SECOND CAUSE OF ACTION - CONSTRUCTIVE FRAUD .........................129

12 THIRD CAUSE OF ACTION - FRAUD..............................................132

13 FOURTH CAUSE OF ACTION - AIDING AND ABETTING BREACH OF

14      FIDUCIARY DUTY AND CONSTRUCTIVE FRAUD ...............................139

15 FIFTH CAUSE OF ACTION - BREACH OF CONTRACT ..............................147

16 SIXTH CAUSE OF ACTION - CONSTRUCTIVE TRUST...............................149

17 SEVENTH CAUSE OF ACTION - CIVIL THEFT UNDER CALIFORNIA

18      PENAL CODE § 496 .......................................................154

19 EIGHTH CAUSE OF ACTION - CIVIL THEFT UNDER NORTH CAROLINA

20      GENERAL STATUTES SECTION 1-538.2 .................................158

**COMPLAINT**

1

NINTH CAUSE OF ACTION - RESCISSION ...................................................160

2

TENTH CAUSE OF ACTION - ELDER FINANCIAL ABUSE.........................161

3

PRAYER FOR RELIEF .....................................................................................164

4

JURY TRIAL DEMAND ....................................................................................166

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

**COMPLAINT**

**SUMMARY OF THE CASE**

1. Hotel Danville Company is a Virginia limited partnership formed in 1982 (the "**Partnership**"). When the Partnership was formed, its limited partners invested over $2.5 million. The general partners invested essentially nothing: $100. For 33 years, the Partnership owned and managed Danville House, a 106-unit apartment complex in Danville, Virginia (the "**Property**"). In September 2015, an affiliate of the Partnership's general partner took title to the Property. Current and former limited partners of the Partnership bring this action against the former and current general partners of the Partnership, as well as their affiliates and co-conspirators, to obtain relief for the harm they suffered on account of the defendants' numerous breaches of fiduciary duty, aiding and abetting others' breaches of fiduciary duty, fraud, constructive fraud, theft and elder financial abuse. By deceit, materially misleading omission, and other means, defendants have knowingly and intentionally taken property rightfully belonging to each plaintiff, in some cases for grossly inadequate consideration, and in other cases for no consideration at all.

2. The misconduct occurred in two phases. Execution of Phase One involved the cooperation and coordinated action of numerous parties, including HKAllen, LP; HK Allen Inc.; Hall Keen Management, Inc.; Hall Keen Investments LLC; HKN Allen LLC; HallKeen LLC; John L. Allen; Andrew P.

**COMPLAINT**

Burnes; David A. Carlen; Franklin 81 Associates; ERI (defined below); Equity Resource Newton Fund LP; Equity Resource Milton Fund LLC; Equity Resource Concord Fund LLC; Equity Resource Belmont Fund LLC and Eggert Dagbjartsson (collectively, the "**Coordinated Parties**").  In Phase One, several of the Coordinated Parties acquired nearly half of the twenty limited partner units (each, an "**LP Unit**") in the Partnership by buying them from limited partners in manipulative self-dealing transactions for pennies on the dollar and without the requisite notice to the limited partners who did not sell.  In two cases, the purchaser was an affiliate of the Partnership's general partner, controlled by the same people who control the general partner.  In the rest, the purchasers were third parties, all of whom were subsidiaries of Equity Resource Investments, LLC ("**ERI**"), who was ostensibly unrelated to the Partnership's general partner.  However, the general partner facilitated and participated in the purchases that ERI subsidiaries made. The general partner gave ERI the limited partners' names and addresses and information about the Partnership's finances in exchange for ERI's agreement to sell a portion of the LP Units to the general partner at a later date and for the same price ERI paid to purchase the LP Units from the limited partners.  In essence, ERI acted as a middleman, insulating the general partner from the transactions with the limited partners, but granting the general partner the same benefits as if it had made the purchases directly.

**COMPLAINT**

1    Having secured this opportunity to profit at the limited partners' expense, the

2    individuals who control the general partner caused several affiliates of the

3    general partner to contribute to the joint effort.  For example, one such affiliate

4    falsely represented to the limited partners that the Partnership's prospects were

5    "bleak" and its financial position was "perilous," thus making it easier for the

6    ostensible third party to convince the limited partners to sell.  Another example:

7    although the Partnership should have been profitable in *all* years, the general

8    partner and its affiliates purposefully mismanaged the property by overpaying

9    for certain expense items, thereby reinforcing these false representations about

10   the Partnership's long-term financial prospects.  Further, ERI, through its

11   affiliates, employed a deliberate strategy to approach the limited partners when

12   they would be most likely to sell.  ERI and its affiliates mailed the limited

13   partners their first offers to purchase LP Units in the third consecutive year

14   when limited partners had to pay taxes on Partnership income but received no

15   cash at all from the Partnership. ERI and its affiliates similarly mailed later

16   offers only in years when the same tax situation occurred.  Neither ERI nor the

17   Partnership's general partners ever told the limited partners that the Partnership

18   would be extremely profitable as soon as it fully repaid its existing mortgage

19   debt in February 2014.

20

**COMPLAINT**

3.      By late 2013, the affiliates of ERI and of the Partnership's general

partner had acquired, under false pretenses, 48.75% of the LP Units in the

Partnership.  In so doing, they wrongfully took approximately $7,600,000 from

the limited partners who sold to them.  For example, in November 2013, just

three months before the Partnership fully repaid its mortgage loan, an affiliate of

ERI purchased one LP Unit, then worth more than $780,000, for the paltry sum

of $35,000.  The general partners violated their fiduciary duties by approving

these sales without ensuring their fairness to the limited partners, failing to

disclose the self-dealing nature of the transactions, and deliberately

misrepresenting and omitting material facts that they should have disclosed to

the limited partners before the transfers.

4.      Phase Two began in March 2015, when HKAllen, LP

("**HKAllen**"), a Massachusetts limited partnership and the sole general partner

of the Partnership since July 1, 2014, asked the limited partners who had not

sold their LP Units at unreasonably low prices to its affiliate Hall Keen

Investments, LLC or to an ERI affiliate to consent to a so-called "Sale and

Exchange" transaction (the "**Sale and Exchange**").  HKAllen led the limited

partners, many of whom are senior citizens, to believe that the Sale and

Exchange was in their best interest – that it paid them the full amount they

would receive in a third-party sale of the Property plus continued cash flow and

**COMPLAINT**

participation in future capital appreciation.  HKAllen failed to tell the limited partners that the Sale and Exchange reduced the value of every LP Unit by at least $480,000.00 by diverting to HKAllen and its affiliate monies that the limited partners otherwise would have received.

5.      HKAllen's description of the Sale and Exchange was littered with mischaracterizations and materially misleading omissions, all designed to prevent the 19 limited partners who owned the 51.25% of the LP Units not owned by HKAllen and its affiliates and collaborators (such limited partners owning 51.25%, the "**Independent Limited Partners**") from objecting in writing to the Sale and Exchange.  In fact, the entire process by which HKAllen obtained the limited partners' "consent" to the Sale and Exchange was a sham whose success was inextricably linked to the success of Phase One.  The accumulation of 48.75% of the LP Units by Hall Keen Investments, Newton Fund, Carlen, Franklin 81 Associates, Milton Fund, Belmont Fund and HKN Allen (collectively, the "**HKAllen Trusted Parties**") was, upon information and belief, part of one concerted and coordinated effort, led by HKAllen, to place a sufficient number of LP Units into the ownership of trusted parties on whom HKAllen could rely to consent to a transaction – such as the Sale and Exchange – by which such trusted parties would realize outsized profits from their LP Units, and by which HKAllen and its affiliates would realize even larger profits.

**COMPLAINT**

1  Coupled with HKAllen's wrongful failure to disclose this accumulation of

2  ownership, the accumulation of LP Units by the HKAllen Trusted Parties

3  transformed the limited partners' consent to the Sale and Exchange from a

4  possible, but by no means guaranteed occurrence, to a fait accompli.  This

5  transformation occurred long before HKAllen ever asked the limited partners to

6  consent to the transaction.  Under the Partnership's limited partnership

7  agreement, HKAllen would obtain consent to the Sale and Exchange as long as

8  limited partners owning more than 49% of the LP Units did not oppose the Sale

9  and Exchange in writing within 30 days after HKAllen requested consent.

10  HKAllen knew that the HKAllen Trusted Parties would not oppose the Sale and

11  Exchange. Because of that, HKAllen knew that all it had to do to clinch consent

12  was either: (a) to cause just one of the 15 Independent Limited Partners owning

13  0.5 or more LP Units either to approve the Sale and Exchange in writing or not

14  to respond at all to the request for consent; or (b) to cause any two of the four

15  Independent Limited Partners owning less than 0.5 LP Units either to approve

16  the Sale and Exchange or not to respond at all to the request for consent.  In

17  contrast, for HKAllen not to obtain consent to the Sale and Exchange, the

18  impossible had to occur: every one of the 15 Independent Limited Partners who

19  owned at least 0.5 LP Units and at least three of the four Independent Limited

20  Partners who owned less than 0.5 LP Units would have to object in writing to

**COMPLAINT**

1   the Sale and Exchange within 30 days of HKAllen's request for consent.

2   HKAllen knew that this latter scenario would never occur.  Thus, HKAllen

3   knew that, due to its success in transferring 9.75 LP Units to the HKAllen

4   Trusted Parties, it would obtain the formal consent required under the

5   Partnership Agreement to the Sale and Exchange.

6        6.     HKAllen's deception worked; the vast majority of the limited

7   partners did not oppose the Sale and Exchange – so formal "consent" to the Sale

8   and Exchange was obtained.

9        7.     To be sure, at least two limited partners expressly disapproved the

10  Sale and Exchange.  Shortly after receiving the Consent Request, two of the

11  plaintiffs (Heeney and Ball) explained to the general partner in detail the ways

12  in which the Sale and Exchange is grossly unfair to the limited partners.  But

13  even though HKAllen was – and still is – a fiduciary to the limited partners,

14  HKAllen knowingly and intentionally, in bad faith, and with malice, refused to

15  acknowledge the egregious breaches of fiduciary duty inherent in the Sale and

16  Exchange, and refused to change course.  Instead, HKAllen knowingly and

17  intentionally misrepresented to all of the limited partners the concerns that

18  Heeney and Ball expressed about the Sale and Exchange, and impugned the

19  motives of Heeney and Ball, all in an effort to complete the Sale and Exchange

20  by which HKAllen and its affiliate HKN Manager LLC would take, for no

**COMPLAINT**

1 | payment at all, more than half of the fair market value of every LP Unit in the

2 | Partnership.

3 |         8.     HKAllen completed the Sale and Exchange on September 10, 2015.

4 | In so doing, it wrongfully took more than $4,920,000 from the limited partners

5 | who had not previously sold their LP Units to defendants.  At that time, those

6 | limited partners collectively owned 10.25 LP Units.  Thus, the completion of the

7 | Sale and Exchange caused an owner of one LP Unit to suffer a loss of

8 | approximately $480,000.

9 |

10 | **PARTIES**

11 |         9.     Plaintiff DANIEL DEVOR ("**Devor**") is an individual who is now,

12 | and at all relevant times mentioned in this Complaint was, a citizen of Riverside

13 | County, California.  He purchased 1/2 of one LP Unit in 1982, when the LP

14 | Units were offered for sale in a private securities offering.  He still owns ½ of

15 | one LP Unit.

16 |       10.    Plaintiff JOHN SHERMAN ("**Sherman**") is an individual who is

17 | now, and at all relevant times mentioned in this Complaint was, a citizen of

18 | Riverside County, California.  He purchased 1/2 of one LP Unit in 1982, when

19 | the LP Units were offered for sale in a private securities offering.

20 |

**COMPLAINT**

1     11.    Plaintiffs IRVING RICHARDS AND REGINA RICHARDS, co-

2     trustees of the RICHARDS FAMILY TRUST ("**Richards Family Trust**"), are

3     a married couple who are now, and at all relevant times mentioned in this

4     Complaint were, citizens of Riverside County, California.  They purchased 1/2

5     of one LP Unit in 1982, when the LP Units were offered for sale in a private

6     securities offering.

7     12.    Plaintiffs BRIAN WEIDE AND ROBERTA WEIDE, co-trustees of

8     the WEIDE FAMILY TRUST ("**Weide Family Trust**"), are a married couple

9     who are now, and at all relevant times mentioned in this Complaint were,

10    citizens of Riverside County, California.  The Weide Family Trust has one

11    beneficiary, Beatrice Weide, whose now-deceased husband purchased one LP

12    Unit in 1982, when the LP Units were offered for sale in a private securities

13    offering.

14    13.    Plaintiff THOMAS L. HEENEY ("**Heeney**") is an individual who

15    is now, and at all relevant times mentioned in this Complaint was, a citizen of

16    Sussex County, Delaware.  He purchased 1/3 of one LP Unit in 1982, when the

17    LP Units were offered for sale in a private securities offering.  He still owns 1/3

18    of one LP Unit.

19    14.    Plaintiff JUDITH S. BALL ("**Ball**") is an individual who is now,

20    and at all relevant times mentioned in this Complaint was, a citizen of

**COMPLAINT**

9

1    Montgomery County, Maryland.  She owns 1/3 of one LP Unit, which was

2    purchased in a private securities offering in 1982.  She still owns 1/3 of one LP

3    Unit.

4         15.    Plaintiff TERUKO TAKAHASHI ("**Takahashi**") is an individual

5    who is now a resident of San Diego County, California, and at all relevant times

6    mentioned in this Complaint was a citizen of San Mateo County, California.

7    Ms. Takahashi is the sole heir to the estate of her father, Teruo Hirokawa

8    ("**Hirokawa**"), who purchased 1/2 of one LP Unit in 1982, when the LP Units

9    were offered for sale in a private securities offering.  From the time Hirokawa

10   purchased his interest in the Partnership until he died in 2013, Hirokawa was a

11   citizen of California.

12        16.    Plaintiff EARL MCKINNEY ("**McKinney**") is an individual who

13   is now, and at all relevant times mentioned in this Complaint was, a resident of

14   Fayette County, Kentucky. He purchased one full LP Unit in 1982, when the LP

15   Units were offered for sale in a private securities offering.

16        17.    Plaintiff JAMES HAMILL ("**Hamill**") is an individual who is now,

17   and at all relevant times mentioned in this Complaint was, a resident of Dallas

18   County, Texas.  He purchased one full LP Unit in 1982, when the LP Units were

19   offered for sale in a private securities offering.

20

**COMPLAINT**

10

1    18.    Plaintiff OTTO LEUSCHEL ("**Leuschel**") is an individual who is

2    now, and at all relevant times mentioned in this Complaint was, a citizen of

3    Island County, Washington.  He purchased ½ of one LP Unit in 1982, when the

4    LP Units were offered for sale in a private securities offering.

5    19.    Plaintiff RICHARD ADELMAN ("**Adelman**") is an individual

6    who is now, and at all relevant times mentioned in this Complaint was, a citizen

7    of Miami-Dade County, Florida.  He inherited 0.25 LP Units in 2004 from his

8    mother, Helen W. Adelman, who purchased 0.5 LP Units in 1982, when the LP

9    Units were offered for sale in a private securities offering.

10    20.    Plaintiff JAMES R. GUY, JR. ("**Guy**") is an individual who is now,

11    and at all relevant times mentioned in this Complaint was, a citizen of

12    Mecklenburg County, North Carolina.  He purchased 0.75 LP Units in 1982,

13    when the LP Units were offered for sale in a private securities offering.  In 2002,

14    he inherited an additional 0.75 LP Units from his father, James Guy, Sr., who

15    purchased 0.75 LP Units in 1982, when the LP Units were offered for sale in a

16    private securities offering.  Guy currently owns 1.5 LP Units.

17    21.    Plaintiff JAMES LIPPMAN, trustee of the JAMES & LINDA

18    LIPPMAN 1998 TRUST ("**Lippman Trust**"), is an individual who is now, and

19    at all relevant times mentioned in this Complaint was, a citizens of Los Angeles

20    County, California.  James Lippman purchased ½ of one LP Unit in 1982, when

**COMPLAINT**

11

1  the LP Units were offered for sale in a private securities offering, and he

2  transferred that interest to the Lippman Trust on or about January 1, 2012.

3  James Lippman, as trustee of the Lippman Trust, still owns ½ of one LP Unit.

4      22.    Plaintiffs DR. JOHN RICHARDS AND CHRIS STEIG

5  RICHARDS ("**Steig Richards Family**") are a married couple who are now, and

6  at all relevant times mentioned in this Complaint were, residents of Cowlitz

7  County, Washington.  They purchased ½ of one LP Unit in 1982, when the LP

8  Units were offered for sale in a private securities offering.  The Steig Richards

9  Family still owns ½ of one LP Unit.

10     23.    Plaintiffs THE HON. JOSEPH AND MICKEY WAPNER

11  ("**Wapners**") are a married couple who are now, and at all relevant times

12  mentioned in this Complaint were, residents of Los Angeles County, California.

13  They purchased ½ of one LP Unit in December 1982, when the LP Units were

14  offered for sale in a private securities offering, and purchased another ½ of one

15  LP Unit in January 1983 as part of the same securities offering.  The Wapners

16  still own one LP Unit.

17     24.    Plaintiff KEITH JANZEN ("**Janzen**"), trustee of the J. EMERSON

18  CHISHOLM TRUST DTD 7/18/97 ("**Chisholm Trust**"), is an individual who is

19  now, and at all relevant times mentioned in this Complaint was, a citizen of

20  McPherson County, Kansas.  The primary beneficiary of the Chisholm Trust is

**COMPLAINT**

12

1    Mildred F. Chisholm, a 96 year-old woman who is now and at all relevant times

2    mentioned in this Complaint was, a citizen of Johnson County, Kansas.  The

3    Chisholm Trust purchased one LP Unit in January 1983, when the LP Units

4    were offered for sale in a private securities offering.  The Chisholm Trust still

5    owns one LP Unit.

6        25.    Because they still own LP Units, Plaintiffs Devor, Heeney, Ball,

7    Guy, Lippman Trust, Steig Richards Family, Wapners and Chisholm Trust are

8    referred to, collectively, as the "**Holder LPs**."

9        26.    Because they have sold the LP Units that they used to own,

10   Plaintiffs Sherman, Richards Family Trust, Weide Family Trust, Takahashi,

11   McKinney, Hamill, Leuschel and Adelman are referred to, collectively, as the

12   "**Seller LPs**."

13       27.    Defendant HKALLEN, LP ("**HKAllen**"), is a Massachusetts

14   limited partnership, all of whose partners are, upon information and belief,

15   citizens of Massachusetts.  HKAllen has been a general partner of the

16   Partnership since approximately January 2001.  HKAllen has been the sole

17   general partner of the Partnership since July 1, 2014.

18       28.    Defendant HK ALLEN, INC. ("**HK Allen Inc.**"), is a

19   Massachusetts corporation with its nerve center in Massachusetts, and is now,

20   and at all relevant times mentioned in this Complaint was, a citizen of

**COMPLAINT**

1   Massachusetts.  HK Allen Inc. was the sole general partner of HKAllen from

2   HKAllen's formation in 1999 until March 15, 2015.  From March 16, 2015 to

3   the present, HK Allen Inc. has been one of two general partners of HKAllen, the

4   other being HKN Allen LLC.

5       29.    Defendant HKN ALLEN LLC ("**HKN Allen**") is a Massachusetts

6   limited liability company, all of whose members are, upon information and

7   belief, citizens of Massachusetts.  HKN Allen has been a limited partner of

8   HKAllen since July 1, 2014, and has been a general partner of HKAllen since

9   March 16, 2015.

10       30.    Defendant HKN DANVILLE HOUSE LLC is a Massachusetts

11   limited liability company, all of whose members are, upon information and

12   belief, citizens of Massachusetts.

13       31.    Defendant HKN MANAGER LLC is a Massachusetts limited

14   liability company, all of whose members are, upon information and belief,

15   citizens of Massachusetts.

16       32.    Defendant HALL KEEN MANAGEMENT, INC. ("**HKM**"), is a

17   Massachusetts corporation with its nerve center in Massachusetts, and is now,

18   and at all relevant times mentioned in this Complaint was, a citizen of

19   Massachusetts.

20

**COMPLAINT**

1    33.    Defendant HALL KEEN INVESTMENTS LLC ("**Hall Keen**

2    **Investments**") is a Massachusetts limited liability company, all of whose

3    members are, upon information and belief, citizens of Massachusetts.

4    34.    Defendant HALLKEEN LLC is a Massachusetts limited liability

5    company, all of whose members are, upon information and belief, citizens of

6    Massachusetts.

7    35.    Defendant JOHN L. ALLEN ("**Allen**"), is an individual who is

8    now, and at all relevant times mentioned in this Complaint was, a citizen of

9    Massachusetts.  Allen was a general partner of the Partnership from the

10   Partnership's inception until approximately January 2001.

11   36.    Defendant FRANKLIN 81 ASSOCIATES is, upon information and

12   belief, a Massachusetts general partnership, all of whose partners are citizens of

13   Massachusetts.

14   37.    Defendant ANDREW P. BURNES ("**Burnes**") is an individual

15   who is now, and at all relevant times mentioned in this Complaint was, a citizen

16   of Massachusetts.  Burnes is: (1) the President and a Director of HK Allen Inc.;

17   (2) Manager of HKN Allen; (3) the President, the Secretary and a Director of

18   HKM; (4) a Manager of Hall Keen Investments; and (5) the Manager of HKN

19   Manager LLC.

20

**COMPLAINT**

38.     Upon information and belief, HKAllen, HK Allen Inc., HKM, Hall Keen Investments, HKN Allen, HallKeen LLC, HKN Danville House LLC and HKN Manager LLC are all affiliates of one another and are both (i) under the common control of and (ii) beneficially owned by one or more of Burnes, John L. Hall II, Denison M. Hall and William A. Hoffman, Jr. (such individuals, collectively, the "**HK Controlling Persons**"). The HK Controlling Persons caused the above-listed entities to act in a coordinated manner to lead and to execute parts of Phase One and Phase Two of the misconduct alleged herein. Because these entities share a unity of identity and of interest, and because they acted in coordination with each other to harm Plaintiffs by fraud and other means, adherence to the fiction of the separate existence of each entity would sanction fraud and promote injustice. Indeed, and upon information and belief, the dominance of each of HKAllen, HK Allen Inc., HKM, Hall Keen Investments, HKN Allen, HallKeen LLC, HKN Danville House LLC and HKN Manager LLC by the HK Controlling Persons was so complete that any individuality or separateness of these entities does not, and at all times herein alleged did not, exist.

39.     Defendant DAVID A. CARLEN ("**Carlen**") is an individual who is now, and at all relevant times mentioned in this Complaint was, a citizen of Massachusetts.

**COMPLAINT**

40.     Defendant ERI is a Massachusetts limited liability company, all of whose members are, upon information and belief, citizens of Massachusetts or Maine.

41.     Defendant EQUITY RESOURCE NEWTON FUND, LP ("**Newton Fund**"), is a Massachusetts limited partnership, all of whose partners are, upon information and belief, citizens of Massachusetts or Maine.

42.     Defendant EQUITY RESOURCE MILTON FUND, LLC ("**Milton Fund**"), is a Massachusetts limited liability, all of whose members are, upon information and belief, citizens of Massachusetts or Maine.

43.     Defendant EQUITY RESOURCE CONCORD FUND, LLC ("**Concord Fund**"), is a Massachusetts limited liability company, all of whose members are, upon information and belief, citizens of Massachusetts or Maine.

44.     Defendant EQUITY RESOURCE BELMONT FUND, LLC ("**Belmont Fund**"), is a Massachusetts limited liability company, all of whose members are, upon information and belief, citizens of Massachusetts or Maine.

45.     Defendant EGGERT DAGBJARTSSON ("**Dagbjartsson**") is an individual who is now, and at all relevant times mentioned in this Complaint was, a citizen of Massachusetts. ERI, Newton Fund, Milton Fund, Concord Fund, Belmont Fund and Dagbjartsson, collectively, are referred to as the "**ERI Parties**."

**COMPLAINT**

1

## JURISDICTION AND VENUE

2      46.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this

3   Complaint.  No plaintiff is a citizen of a state in which a defendant is a citizen.

4   Moreover, each plaintiff's claim exceeds $75,000.

5      47.     Venue is proper in this Court under 28 U.S.C. § 1391 because a

6   substantial part of the events or omissions transpired in this District.

7

8

## STATEMENT OF FACTS

9

### *Formation and Purpose of the Partnership*

10      48.     Morton Myerson ("**Myerson**") and Allen formed the Partnership in

11   1982.  They served as the Partnership's original general partners, each holding a

12   50% general partner interest in the Partnership.

13      49.     In 1982 and 1983, the Partnership conducted a private securities

14   offering, pursuant to which it sold twenty (20) LP Units to investors it referred

15   to as Investor Limited Partners (collectively, and as the number and the names

16   of such Investor Limited Partners changed from time to time, the "**Limited**

17   **Partners**").  The Partnership sold LP Units for $126,000.00 each.  In the

18   aggregate, the Limited Partners invested $2,520,000.00 into the Partnership.  By

19   contrast, Allen and Myerson each invested only $50 into the Partnership.

20

**COMPLAINT**

1    50.    The Partnership was formed to purchase, substantially rehabilitate

2    and operate as a Section 8 subsidized housing project, a historic 106-unit

3    apartment building located in downtown Danville, Virginia.

4

5              *California Has Always Been Home to More Limited Partners*

6                          *Than Any Other State*

7    51.    On January 1, 1983, Amendment One to Amended and Restated

8    Limited Partnership Agreement and Certificate of the Partnership

9    ("**Amendment One**,") was executed.  The Limited Partnership Agreement, as

10   amended from time to time, is herein referred to as the "**Partnership**

11   **Agreement**."  Attached to Amendment One is a Schedule A labeled "Final

12   Closing" that lists all of the partners in the Partnership.  That Schedule A lists

13   thirty Limited Partners who collectively owned all twenty of the LP Units in the

14   Partnership.  At that time, ten of the thirty Limited Partners were citizens of

15   California.  No other state had more Limited Partners than California.  Second to

16   California were Florida and Maryland, each of which had four Limited Partners

17   among its citizens.  Beyond California, Florida and Maryland, no single state

18   could claim more than one or two Limited Partners among its citizens.

19   52.    As of January 1, 2001, the Partnership had 35 Limited Partners, and

20   more of them were citizens of California than of any other state.

**COMPLAINT**

53.     As of July 1, 2014, the Partnership had 28 Limited Partners.  Nine of these Limited Partners were (i) current or former general partners of the Partnership, (ii) affiliates of those general partners, or (iii) one or more of the ERI Parties (such Limited Partners in (i), (ii) and (iii), collectively, the "**GP Limited Partners**").  Of the 19 Limited Partners who were <u>not</u> GP Limited Partners (the "**Independent Limited Partners**"), seven were citizens of California.  No other state was home to more of these 19 Independent Limited Partners than California.  Second to California were Maryland and North Carolina, each of which had three Independent Limited Partners among its citizens.

*The Partnership's Financial Performance Has Been*

*Consistently Strong for 30 Years*

54.     From the Partnership's formation until May 31, 1997, the Boston Financial Technology Group, Inc. ("**BFTG**") or one of its affiliates served as the Partnership's Investor Service Agent.  During its tenure as Investor Service Agent, BFTG and/or its affiliates sent each year's audited financial results to the Limited Partners.  In addition, each year, BFTG and/or its affiliates also sent the Limited Partners one or more memoranda containing descriptions and analyses of recent operations at the Property, historical analyses of the Partnership's investment performance, discussion and analysis of Partnership tax issues, and a

**COMPLAINT**

comparison of actual operating performance to original projections.  These memoranda consistently reported strong performance at the Property and for the Partnership. The following memoranda are not exhaustive, but are exemplary:

55.     On March 27, 1984, BFTG sent a memorandum to the Limited Partners stating that 76% of the apartments at the Property were leased by January 31, 1984, and that BFTG expected all the apartments to be leased in April 1984.  By August of the following year, BFTG reported that, due to the excellent occupancy rate, the property had a waiting list of prospective tenants.

56.     On September 9, 1986, Boston Financial Investor Services ("**BFIS**"), a division of BFTG, sent a memorandum to the Limited Partners stating that the property was fully occupied, rents had increased 3%, and management continued to maintain a waiting list of prospective tenants.

57.     In 1986, major changes to the Internal Revenue Code were enacted that phased-out over five years the ability of the Limited Partners to deduct from their active income their losses from the Partnership.  This change in the law eliminated the Limited Partners' ability to realize some of the income tax savings that the Partnership formerly produced for them.  On December 22, 1986, BFIS sent a three-page memorandum to the Limited Partners explaining its analysis of the effect of this legal change on the Partnership (the "**1986 Tax Memo**").

**COMPLAINT**

58.    The Summary of the 1986 Tax Memo stated:

> **Your investment was structured to generate cash flow, residual value**, and substantial early tax savings to reduce the net cost of acquiring the property. **Although the new tax bill limits the value of the tax benefits, we believe tax reform may increase Danville Hotel's residual value**.  (Emphasis added.)

59.    The 1986 Tax Memo explained that most experts agreed the new law would sharply curtail new construction of potentially competing properties, while demand was expected to grow, thereby enhancing the value of existing properties.  The memo predicted that this dynamic would increase the value of the Property, to the benefit of the Partnership.  Overall, the memo predicted that the Partnership would remain "an attractive investment" for the Limited Partners despite the recently enacted tax reform, noting both the likely increase in value and the continued availability of tax deductions through 1990.

60.    On March 26, 1987, BFIS sent a memorandum to the Limited Partners stating that, "Hotel Danville continues to operate smoothly with a 98% occupancy level. This should continue throughout 1987 and allow the property to operate at breakeven."  Two and a half months later, BFIS reported that the property remained fully occupied, despite another rent increase, and was operating at breakeven with a 10-person waiting list.

**COMPLAINT**

61.    On October 10, 1988, BFIS sent a memorandum to the Limited Partners stating that the Property was 100% occupied with a waiting list.

62.    On November 1, 1990, BFTG, now operating as The Boston Financial Group Incorporated ("**BFG**"), sent a memorandum to the Limited Partners analyzing the residual value of one LP Unit.  In its analysis, BFG concluded that the current value of the Property was $7,817,340 and an owner of one full LP Unit would receive $124,334.00 if the Property were sold at that time, which payment would be subject to a tax of $46,133.00.  This analysis took account of the fact that the Partnership had an outstanding mortgage debt of approximately $5.3 million.  The following month, a division of BFG sent another memorandum reporting the property was 99% occupied.

63.    On November 5, 1991, BFIS sent a memorandum to the Limited Partners stating that the Property was 100% occupied in the first nine months of 1991 and that it operated "ahead of budget" during that time.

64.    In November 1993, a division of BFG reported on recent operations, noting that the Property had a 100% occupancy rate and had generated $51,676 in unaudited cash flow, and that the balance in the replacement reserve account as of September 30, 1993 was $285,365.

65.    On August 22, 1994, BFG sent a memorandum to the Limited Partners describing recent operations and stating that the Property was 100%

**COMPLAINT**

1    occupied, total income was on budget, expenses were 5% under budget, net

2    operating income was 3% over budget, and the property was expected to

3    "operate at breakeven."

4         66.    On November 16, 1995, BFG sent a memorandum to the Limited

5    Partners stating that an owner of one full LP Unit had, from 1982 through 1994,

6    received "$15,504.00 in benefits in excess of [its] original contribution." The

7    memo also described recent operations, stating the Property was 100% occupied,

8    that total income was 1.8% over budget, expenses were 50.1% under budget, net

9    operating income was 34.3% over budget, and the property was expected to

10   "operate at breakeven."

11        67.    On October 3, 1996, BFG sent a memorandum to the Limited

12   Partners describing recent operations, stating as of year-end 1995, "property

13   operations were above break-even" and had a net operating income of $868,389.

14   Furthermore, as of the end of June 1996, the Property was 98.7% occupied,

15   unaudited results indicated net operating income was $510,913, and BFG

16   expected "the property to operate above break-even."

17        68.    On December 3, 1996, BFG sent a memorandum to the Limited

18   Partners announcing its resignation as Investor Service Agent for the Company.

19   BFG wrote, "It is our belief that it may be more efficient and beneficial for the

20   Limited Partners to deal with the General Partner directly."

**COMPLAINT**

69.     On October 20, 1997, Allen Management Company ("**AMC**"), which, upon information and belief, was owned and controlled by Allen, sent a memorandum to the Limited Partners describing recent operations, stating the property maintained 99.9% occupancy at the end of 1996, had a net operating income before debt service of $836,694 at the end of 1996, and was expected to "continue to operate above break-even."

70.     AMC assumed the role of the Partnership's Investor Service Agent on or about January 1, 1998.  On September 9, 1998, AMC sent a memorandum to the Limited Partners describing recent operations, stating the property maintained 99.9% occupancy at the end of 1997, had a net operating income before debt service of $846,506 at the end of 1997, and was expected to "continue to operate above break-even."

71.     On or about May 1, 1999, HKM assumed the role of Management Agent of the Property, meaning it was the property manager of the Property.  On October 26, 1999, HKM sent a memorandum to the Limited Partners.  That memorandum (i) announced that HKM was assuming the role of Investor Service Agent because AMC sold its property management business to HKM; and (ii) described recent operations, noting the Property maintained 99.9% occupancy at the end of 1998, was 96% occupied as of the end of September

**COMPLAINT**

1    1999, had a net operating income before debt service and depreciation of

2    $831,369 in 1998, and was expected to "continue to operate above break-even."

3          72.    On November 8, 2000, HKM sent a memorandum to the Limited

4    Partners stating the Property maintained 99.9% occupancy at the end of 1999,

5    was 98% occupied as of the end of September 2000, had a net operating income

6    before debt service and depreciation of $822,092 in 1999, and was expected to

7    "continue to operate above break-even."

8          73.    Allen assigned his general partner interest in the Partnership to

9    HKAllen, effective on or about January 1, 2001.  After that assignment,

10   HKAllen and Myerson were the Partnership's two general partners.

11         74.    In December 2001, HKM sent a memorandum to the Limited

12   Partners describing recent operations, stating the property maintained 99.9%

13   occupancy at the end of 2000 and through October 2001, and net operating

14   income before debt service and depreciation was $822,092 in 2000.  Based on

15   2001 year-to-date performance, HKM expected the property to "continue to

16   operate above break-even."

17         75.    On March 29, 2002, HKM sent a memorandum to the Limited

18   Partners stating operations were going smoothly and, while distributions would

19   be somewhat lower due to settlement of a dispute, HKM anticipated being able

20   to distribute the full amount of the distribution the following year.

**COMPLAINT**

76.    Upon information and belief, the March 29, 2002 memo is the last such memo HKM, HKAllen or any affiliate of HKAllen ever sent to all of the Limited Partners.

77.    Upon information and belief, after March 29, 2002 and through 2014, none of HKM, HKAllen or HKAllen's affiliates sent the Limited Partners reports or analyses of the Partnership's operations and performance; HKM sent only one set of documents to the Limited Partners each year – the Partnership's audited financial statements, which were prepared by a third-party accounting firm.

78.    Occupancy at the Property has remained high, and vacancy has remained very low, from 2004 through the present.  The Property's economic vacancy has also been very low in the same period; the highest economic vacancy between 2004 and 2014 was in 2012 – at 4.4%. It was only 1.5% in 2014, and the average from 2004 through 2014 was 2.2%.

## *At All Times, the General Partner of the Partnership*

## *Was a Fiduciary to the Limited Partners*

79.    At all times, each general partner of the Partnership was a fiduciary to the Limited Partners and to the Partnership.   This is because every general

**COMPLAINT**

1  partner of a limited partnership is a fiduciary to the limited partnership itself and

2  to its limited partners.

3       *80.*    In a limited partnership, general partners are legally bound to act in

4  the highest good faith to their limited partners, and general partners may not

5  obtain any advantage over limited partners in the partnership affairs by even the

6  slightest misrepresentation, concealment, threat or adverse pressure of any kind.

7  A general partner who desires to engage in a business transaction with a limited

8  partner where the general partner's interest is adverse to the limited partner's

9  interest bears the burden of showing complete good faith and fairness to the

10  limited partner and of ensuring that the transaction is fair to the limited partner.

11  Fairness means both fairness in procedures and fairness in financial outcome.

12  Fairness in outcome means that the general partner must ensure that financial

13  outcome is fair to the limited partner.

14

15                  *Allen and Myerson Quietly Usurped an Opportunity*

16                     *That Belonged to the Limited Partners*

17       81.    By letter dated March 20, 1989, acting on behalf of Allen and

18  Myerson in their capacities as general partners, BFG formally notified one of the

19  Limited Partners, Art Pfeiffer ("**Pfeiffer**"), that he was in default under the

20

**COMPLAINT**

28

1  Partnership Agreement because he failed to pay the seventh installment of his

2  capital contribution to the Partnership.

3       82.    At the time of his default, Pfeiffer owned 0.5 LP Units.

4       83.    When a Limited Partner defaults as Pfeiffer did, Section 5.2 of the

5  Partnership Agreement gives the general partner the option to purchase from the

6  defaulting Limited Partner the entirety of that Limited Partner's interest in the

7  Partnership.  However, if the general partner does not exercise this option and

8  complete its purchase within thirty (30) days after the default, then Section 5.2

9  requires the general partner to notify all the other Limited Partners that the

10  Limited Partners have the option to purchase the interest of the defaulting

11  Limited Partner.  All of the Limited Partners, with the exception of Pfeiffer,

12  were in compliance with their obligations under the Partnership Agreement at

13  the time of Pfeiffer's default and thus were entitled to rely on the general

14  partners' upholding their obligations to comply with Section 5.2.

15       84.    Neither Allen nor Myerson exercised his option to purchase

16  Pfeiffer's 0.5 LP Units within thirty (30) days after the date of Pfeiffer's default.

17  Rather, more than 21 months after BFG sent its March 20, 1989, letter to

18  Pfeiffer notifying Pfeiffer that he was formally in default under the Partnership

19  Agreement, Allen and Myerson caused Pfeiffer's 0.5 LP Units to be assigned to

20  themselves: 0.25 LP Units to Allen and 0.25 LP Units to Myerson.  This action

**COMPLAINT**

1    was in direct breach of Allen's and Myerson's contractual duties under Section

2    5.2.

3        85.    Allen and Myerson notified Pfeiffer of their election to take

4    ownership of his interest by a letter dated January 5, 1991, signed by Allen.

5    That letter stated the General Partners were exercising their option to purchase

6    Pfeiffer's entire interest in the Property, effective December 30, 1990.  Included

7    with the letter was $100.00 as payment in full for the interest.

8        86.    In breach of the Partnership Agreement and their fiduciary duties to

9    the Limited Partners, neither Allen nor Myerson ever notified or caused anyone

10   else to notify the other Limited Partners that: (i) Pfeiffer had failed to pay the

11   final installment of his capital contribution to the Partnership; (ii) the general

12   partners formally declared Pfeiffer to be in default under the Partnership

13   Agreement; (iii) the general partners neglected to timely exercise their 30-day

14   option to purchase the interest; or (iv) the other Limited Partners had a right to

15   purchase Pfeiffer's 0.5 LP Unit at a price established by a formula in the

16   Partnership Agreement.  Without such notice, the other Limited Partners could

17   not and did not know, and had no reason to suspect, that any of these facts was

18   true.

19       87.    Allen and Myerson waited nearly ten years to notify the Limited

20   Partners that Pfeiffer's interest had been assigned to Allen and Myerson.  Even

**COMPLAINT**

then, they buried this fact to prevent the Limited Partners from noticing the transfer, and they never revealed facts that would alert the Limited Partners to the transfer's impropriety. The fact was not communicated in a memo or a letter. Instead, the fact of the transfer was contained in an endnote to the Schedule A that was attached to Amendment Two to Amended and Restated Limited Partnership Agreement and Certificate ("**Amendment Two**"), which was dated January 1, 2001. The notation in Schedule A to Amendment Two read simply, "Arthur M. Pfeiffer -1/2 Unit. Arthur M. Pfeiffer's interest has been transferred as follows:" and then listed each of Allen's and Myerson's name, Social Security number and address, and indicated that each received 0.25 LP Units. Without more, the Limited Partners could not have been expected to suspect that the transfer was the result of default or, even if it was, that the general partners had not timely exercised their rights upon such default.

88.     The bare fact that Pfeiffer's interest had been transferred to Allen and Myerson in equal parts was the only information about the transfer that has to this day been communicated by or on behalf of any general partner of the Partnership to the Limited Partners other than Pfeiffer. Allen and Myerson did not tell the Limited Partners that Allen and Myerson purchased Pfeiffer's interest because Pfeiffer defaulted, nor did they disclose that they made the purchase long after their 30-day option had expired. Allen and Myerson

**COMPLAINT**

1    usurped the Limited Partners' right to purchase Pfeiffer's 0.5 LP Unit, and they

2    failed to disclose to the Limited Partners any information that could reasonably

3    alert any Limited Partner to Allen's and Myerson's secret self-dealing.

4        89.    Had Allen fulfilled his obligation to notify the Limited Partners

5    other than Pfeiffer that they had the right to purchase 0.5 LP Units in 1989 for

6    $100.00, some or all of those Limited Partners (other than Pfeiffer) would have

7    exercised that right.

8        90.    Any of the Limited Partners other than Pfeiffer who had bought

9    some or all of Pfeiffer's 0.5 LP Units at the price of $100 per 0.5 LP Unit would

10   have realized a substantial gain in the value of that interest, because 0.5 LP Unit,

11   as of June, 2015, had a fair market value of at least $390,000.00.

12       91.    Plaintiffs discovered only very recently – in 2015 – that Allen

13   wrongfully usurped an opportunity from each of them. They discovered this fact

14   as a result of one Limited Partner's investigation of a March 2015 Consent

15   Request document that HKM sent to the Limited Partners on behalf of HKAllen.

16

17

18

19

20

**COMPLAINT**

*Phase One Began in Earnest: Using Deceit and Mischaracterizations, HKAllen and the ERI Parties Collaborated to Buy Nearly Half of the LP Units from Limited Partners for Pennies on the Dollar*

92.     Led by HKAllen, the Coordinated Parties embarked on a deliberate and successful campaign to gobble up nearly half of the LP Units from Limited Partners at prices far below fair market value. HKAllen falsely represented to the Limited Partners that their interests in the Partnership were unsound investments whose future performance was likely to be poor. HKAllen made these false representations, knowing that they were false, in order to convince the Limited Partners to sell their LP Units for pennies on the dollar so that HKAllen and its affiliates and collaborators could profit at the expense of the Limited Partners. At some time before May 2006, and without notice to the Limited Partners, HKAllen provided the names and addresses of all the Limited Partners to one or more of the ERI Parties to enable the ERI Parties to send the Limited Partners offers to purchase LP Units. HKAllen entered into an agreement with one or more of the ERI Parties by which HKAllen obtained an option to purchase from one or more of the ERI Parties a portion of the LP Units that the ERI Parties purchased from the Limited Partners, at the same price that the ERI Parties paid to the Limited Partners. But HKAllen never disclosed this clear conflict of interest to the Limited Partners.

**COMPLAINT**

93.    The scheme worked.  As discussed below, the Coordinated Parties hoodwinked thirteen of the Limited Partners to sell their LP Units for pennies on the dollar, against their financial interests and for the enormous benefit of HKAllen, affiliates of HKAllen, and the ERI Parties.  Collectively, Hall Keen Investments, HKN Allen, Carlen, Franklin 81 Associates, Allen, Myerson and the ERI Parties obtained 9.75 of the 20 LP Units, representing 48.75% of the equity in the Partnership. They intended to profit – and did in fact profit – from their below-market purchases of LP Units. They paid a total of $89,050 to buy those 9.75 LP Units. In early 2014, when the Partnership owned the Property free of any debt and before the Sale and Exchange was completed, those 9.75 LP Units were worth at least $7,600,000.  That is *more than 85 times* the amount HKAllen, its affiliates and the ERI Parties paid for them.

*Affiliate of General Partner Paid McKinney and Hamill $100 per 1.0 LP Unit*

94.    In or about April 2002, a representative of HKAllen called McKinney to ask whether McKinney was interested in selling his interest in the Partnership, which was 1.0 LP Unit.  The HKAllen representative told McKinney that the LP Unit he owned was not worth much, but that he would pay McKinney $100 for it.  McKinney asked whether HKAllen was buying all the LP Units in the Partnership.  The HKAllen representative said he was

**COMPLAINT**

1    making the same offer to all of the Limited Partners.  McKinney asked how

2    many Limited Partners had sold to the representative, and the representative

3    falsely stated that a large number of Limited Partners had sold their LP Units.

4    (In fact, no other Limited Partner had sold its LP Units at that time.)  Based in

5    part on his reliance on the fiduciary duty owed to him by HKAllen, McKinney

6    decided to accept the $100 offer for his LP Unit.  McKinney had no knowledge,

7    nor any reason to suspect, that HKAllen would act in a manner contrary to his

8    best interest or make misrepresentations regarding the value of his LP Unit.

9          95.    At about the same time, McKinney called Hamill to tell Hamill

10   about the call he had received from HKAllen and his decision to sell his LP

11   Unit.  Like McKinney, Hamill also owned 1.0 LP Unit.  McKinney and Hamill

12   trusted one another, having worked together for more than 10 years and having

13   known each other for more than 25 years.  McKinney explained to Hamill that

14   HKAllen viewed the LP Units as worthless but would, nonetheless, buy them for

15   $100 per LP Unit.  Shortly after having this conversation with McKinney,

16   Hamill spoke with a representative of HKAllen by telephone about selling his

17   LP Unit to HKAllen.  During this conversation, the representative confirmed

18   Hamill's understanding that his LP Unit was then worthless, that holding onto it

19   would cost him money, that it was in his best interest to dump it, and that the

20

**COMPLAINT**

35

1  $100 payment he would receive from HKAllen was essentially a token or

2  nominal payment because the LP Unit's true value was essentially zero.

3      96.    Based upon his conversations with McKinney and HKAllen, and

4  his reliance on HKAllen's fiduciary duties, Hamill decided to sell his LP Unit to

5  HKAllen for $100.  Hamill had no knowledge, nor any reason to suspect, that

6  HKAllen would act in a manner contrary to his best interest or make

7  misrepresentations regarding the value of his LP Unit.

8      97.    In May 2002, HKAllen sent a document entitled Assignment of

9  Limited Partner Interest to each of Hamill and McKinney.  Burnes had signed

10  each document twice.  First, Burnes signed in his capacity as Manager of the

11  assignee, Hall Keen Investments.  Second, Burnes signed in his capacity as

12  President of HK Allen Inc., which was then the sole general partner of HKAllen,

13  to evidence HKAllen's express approval of the transfer from Hamill to Hall

14  Keen Investments and of the transfer from McKinney to Hall Keen Investments.

15      98.    At that time, HKAllen was one of two general partners of the

16  Partnership (the other being Myerson).  Upon information and belief, Hall Keen

17  Investments was then and is now an affiliate of HKAllen, because it was then

18  and is now controlled by the same individual(s) who controlled and control

19  HKAllen.

20

**COMPLAINT**

99.    Later in May 2002, McKinney signed and returned to Burnes one copy of the Assignment of Limited Partner Interest he had received (the "**McKinney Assignment**") by which McKinney sold his 1.0 LP Unit to Hall Keen Investments.  Contemporaneously, Hamill signed and returned to Burnes one copy of the Assignment of Limited Partner Interest he had received (the "**Hamill Assignment**"), by which Hamill sold his 1.0 LP Unit to Hall Keen Investments.  Although the McKinney Assignment and the Hamill Assignment were signed in May 2002, each document was dated to be effective on December 31, 2001.  Hall Keen Investments paid $100 to each of McKinney and Hamill.

100.    Upon information and belief, the Hamill Assignment and the McKinney Assignment, and the participation in each by Hall Keen Investments, HKAllen, HK Allen Inc. and Burnes, were all part of the larger concerted and coordinated effort, led by HKAllen and involving each of the Coordinated Parties, to place a sufficient number of LP Units into the ownership of trusted parties who agreed to ratify – and on whom HKAllen could rely to ratify – a transaction, such as the Sale and Exchange, by which such trusted parties would realize outsized profits from their LP Units, and by which HKAllen and its affiliates would realize even larger profits.

**COMPLAINT**

1    101.   At the time each of McKinney and Hamill sold his LP Unit to Hall

2    Keen Investments, $100.00 represented just a small fraction of the fair market

3    value of McKinney's LP Unit or Hamill's LP Unit, a fact that was known to

4    Burnes, Myerson, HKAllen, HK Allen Inc., and Hall Keen Investments.

5    102.   It is true that, for several years beginning in about 1999 or 2000,

6    some owners of LP Units had to pay taxes on Partnership income in years in

7    which they received no cash distributions from the Partnership – or distributions

8    that were lower than their tax liability.  However, Defendants Burnes, HKAllen,

9    HK Allen Inc., and Hall Keen Investments knew that this situation was not

10   permanent.  They knew that the situation would end by early 2014 at the latest,

11   at which time the Partnership would have no debt and would be able to make

12   substantial annual cash distributions to the Limited Partners indefinitely. This

13   fact was material to the valuation of an LP Unit in 2002, but none of Defendants

14   HKAllen, Burnes, HK Allen Inc. or Hall Keen Investments disclosed it to

15   McKinney, Hamill or to any of the other Limited Partners who invested in the

16   Partnership in the early 1980s.

17   103.   In connection with the McKinney Assignment and Hamill

18   Assignment, Defendant HKAllen knowingly, intentionally, and with malice,

19   failed to fulfill its obligation as fiduciary to McKinney and to Hamill to show

20   complete good faith and fairness to McKinney or to Hamill.  HKAllen did this

**COMPLAINT**

1    so that it would profit at McKinney's and at Hamill's expense.  With the same

2    knowledge, Defendants Burnes, HK Allen Inc., and Hall Keen Investments

3    aided and abetted HKAllen in breaching its fiduciary duties to each of

4    McKinney and Hamill.

5        104.   Defendants HKAllen, Burnes, Hall Keen Investments and HK

6    Allen Inc. knowingly, intentionally, and with malice, failed to ensure that: (i) the

7    purchase by Hall Keen Investments of McKinney's 1.0 LP Unit produced a fair

8    financial outcome for McKinney; and (ii) the purchase by Hall Keen

9    Investments of Hamill's 1.0 LP Unit produced a fair financial outcome for

10   Hamill.  They did this so they would profit at McKinney's and Hamill's

11   expense.

12       105.   Had HKAllen actually fulfilled its obligations as McKinney's

13   fiduciary to show complete good faith and fairness to McKinney, McKinney

14   would not have agreed to sell his 1.0 LP Unit for only $100.00.

15       106.   Had HKAllen actually fulfilled its obligations as Hamill's fiduciary

16   to show complete good faith and fairness to Hamill, Hamill would not have

17   agreed to sell his 1.0 LP Unit for only $100.00.

18       107.   Each of McKinney and Hamill discovered only very recently – in

19   2015 – the failure of HKAllen to fulfill its obligation as fiduciary to each of

20   McKinney and Hamill to show complete good faith and fairness to McKinney

**COMPLAINT**

1  and to Hamill in connection with the negotiation and execution of the McKinney

2  Assignment and the Hamill Assignment.  Neither McKinney nor Hamill had any

3  knowledge or any reason to suspect that HKAllen would take advantage of them

4  and violate their fiduciary duties of loyalty, fairness and disclosure. Each of

5  Hamill and McKinney discovered these facts as a result of one Limited Partner's

6  investigation of a March 2015 Consent Request document that HKM sent to the

7  Limited Partners on behalf of HKAllen.

8

9  *Burnes Sent Letter To Limited Partners Falsely Reporting the Partnership's*

10  *"Bleak" Financial Prospects – Conditioning the LPs to Accept the ERI Parties'*

11  *Later Offers*

12      108.   On or about February 15, 2005, Burnes, in his capacity as Principal

13  of HallKeen LLC, sent a two-page letter (the "**2005 Burnes Letter**") on

14  HallKeen LLC letterhead to some or all of the Limited Partners who then owned

15  LP Units.  HallKeen LLC's letterhead described HallKeen LLC as "A Joint

16  Enterprise of Hall Properties, Inc. and Keen Development Corporation," and the

17  letter described HallKeen LLC as an affiliate of HKAllen.

18      109.   The 2005 Burnes Letter described the Partnership's financial

19  prospects as "perilous" and "bleak."  The crux of the negative assessment was in

20

**COMPLAINT**

1    the second paragraph of the letter, under the heading "Background," whose

2    entire text appears below:

3        **Background:**  As you well know, the Danville House partnership

4        was formed in 1982 to renovate the Danville Hotel for low-income

5        elderly residents using the federal Section 8 program to subsidize

6        the rents and the Virginia Housing Development Authority

7        (VHDA) to finance the project. The renovated Hotel Danville was,

8        and still is, a prominent and well-maintained affordable housing

9        property. Unfortunately, a combination of rule changes by the

10       federal government to the Section 8 program and VHDA's

11       unwillingness to refinance the underlying first mortgage debt of

12       the **Hotel Danville** has created a **discouraging and perilous**

13       **financial position for the property**. Essentially, the federal rule

14       changes to the Section 8 program are severely limiting the

15       partnership's ability to seek rent increases to Section 8 rents. This

16       means that our overall income growth in the partnership is flat or

17       very, very minimal. Unfortunately, there is no such cap on

18       expenses; while the property's per unit expenses are very

19       reasonable for comparable properties, expenses do increase

20       regularly, most notably taxes, insurance, payroll benefits, and cost

**COMPLAINT**

of maintenance materials. **The result of flat income and rising expenses is, first of all, that the partnership will not be able to pay dividends to the investors. Secondly, and most importantly, if this trend continues, the longer term ability for the partnership to pay the mortgage and operating expenses is bleak**.  (Emphasis added.)

110.   In its third paragraph, under a heading of "Solutions," the 2005 Burnes Letter described HallKeen LLC's unsuccessful efforts to solve the problem it described – and attributed its failure to factors beyond its own control: that HUD issued new rules for the Section 8 housing subsidy program, and that the Virginia Housing Development Authority "flatly rejected" several alternatives Burnes personally proposed to modify the Partnership's outstanding loan. This third paragraph appears below in its entirety:

**Solutions:**  In 2004, HallKeen spent considerable time and energy trying to attack the basic problems, with limited success. HallKeen Management was able to secure a modest Section 8 "special" rent increase from HUD late in 2004 that will stabilize operations at least through 2005. While one never knows what will happen with HUD, **the current federal administration's drastic proposed cuts to the HUD budget do not bode well for further increases**

**to the Section 8 rents at Hotel Danville**. In early 2004, I met with several senior officials at VHDA to discuss Hotel Danville's perilous financial position, with the specific proposal that VHDA allow us to refinance the existing first mortgage. With a simple refinancing of the first mortgage at today's rates, we could stabilize the property for years to come. The current interest rate on the VHDA first mortgage is 12.54% and the current market rate for a similar mortgage would be approximately 6**%. VHDA, while sympathetic to our collective plight, would not agree to a prepayment of their mortgage or a refinancing. I explored several alternatives that were flatly rejected.** VHDA's only suggestion was for the partnership to sell the property to a non-profit organization. While HallKeen has considerable concern about the impacts of such a sale to all the partners, HallKeen will be exploring this option over the next several months.  (Emphasis added.)

111.   Upon information and belief, none of Burnes, HKAllen, HKM, HallKeen LLC or Myerson ever sent any correspondence to the Limited Partners updating them on the continued search for solutions to the Partnership's purportedly "perilous" financial situation.

**COMPLAINT**

43

112.   Despite these statements of doom, the Partnership's financial situation was <u>not</u> perilous.  Its long-term ability to pay its mortgage and operating expenses was <u>not</u> bleak.  To the contrary, the Partnership's finances were healthy.

113.   Burnes, HKAllen, HallKeen LLC and their affiliates all knew at the time Burnes sent his 2005 Burnes Letter that its dramatically negative assessment of the Partnership's prospects was not and could not be true.  In February 2005, the Partnership owned an apartment building whose vacancy losses had averaged just 0.84% for 19 consecutive years (1986 through 2004), with the highest single-year vacancy loss being just 3.27%.  The building had a fair market value of at least $7.5 million using conservative assumptions, and the Partnership's outstanding debt secured by the building was only about $3.6 million.

114.   HKAllen was and is a sophisticated and experienced real estate owner and investor.  As such, it knew the Partnership had at least $4 million of equity and would become highly profitable as soon as its primary mortgage loan was repaid in February 2014, at which point it would be able to pay substantial cash distributions to the Limited Partners.  For these reasons, HKAllen knew that it would be able, if necessary, to find a way to obtain money for the Partnership to ensure that the Partnership could and would make its loan

**COMPLAINT**

1  payments and pay its costs and expenses until it began to produce large profits in

2  early 2014.  In fact, from 2005 through 2014, the Partnership made its mortgage

3  payments and paid all its expenses without any extra infusion of cash.  If

4  HKAllen had not completed the Sale and Exchange transaction in September

5  2015, the Partnership should and would be able to pay cash dividends to the

6  Limited Partners at an annual rate of more than $33,000 per LP Unit.

7      115.   An appraisal of the Property that was prepared in late 2014 in

8  conjunction with the Sale and Exchange proves that the doom-saying in the

9  2005 Burnes Letter could not have been true and, moreover, was based in part

10 on the Defendants' own deliberate (and readily fixable) mismanagement.  The

11 appraisal shows that any financial stress that the Partnership experienced

12 between the writing of the 2005 Burnes Letter and January/February 2014, when

13 the Partnership fully repaid its mortgage loan on-schedule and owned the

14 Property free of debt, was caused by deliberate mismanagement on the part of

15 HKAllen and/or its affiliate HKM.

16     116.   The lender who, as part of the Sale and Exchange transaction,

17 issued a HUD-guaranteed loan in September 2015 that is secured by the

18 Property, hired the national accounting firm of Novogradac & Company LLP

19 ("**Novogradac**") to produce an appraisal of the Property as part of the HUD-

20 required underwriting process for loans of this type.  Novogradac issued its

**COMPLAINT**

1  'HUD MAP 223(F) Firm Commitment Appraisal Report' (the "**Novogradac**

2  **Appraisal**") on October 14, 2014, with an effective date of September 11, 2014.

3      117.   In evaluating the Property, the Novogradac Appraisal compared the

4  Property to comparable properties.  In so doing, it found that the Partnership

5  paid approximately $60,000 more per year for payroll, taxes and benefits for on-

6  site building staff than is typical for a property of its type, size and location.  The

7  Partnership's audited annual financial statements show that this overpayment

8  dates back at least as far as 2001-2002.

9      118.   Had the Partnership not overpaid by approximately $60,000 per

10 year for payroll, taxes and benefits, the Partnership's average annual operating

11 expenses from 2005 through 2013 would have been lower than its operating

12 expenses in 2004.

13      119.   According to the audited financial statements sent to the Limited

14 Partners, from 2005 through 2013, the Partnership's average annual total

15 operating expenses net of acquisitions of fixed assets were $486,949.  That is

16 $50,583 more than the Partnership's total operating expenses net of acquisitions

17 of fixed assets in 2004, which were $436,366.[1]  Upon information and belief,

18

19      [1] Expense line items included in "total operating expenses net of acquisitions of fixed assets" are the following line items from the Partnership's annual, audited Statements of Cash Flows: Administrative, Management Fees, Utilities, Salaries and Wages, Operating and Maintenance, Real Estate Taxes, Property and Liability

20

**COMPLAINT**

1   other expenses charged to the Partnership from 2005 through 2013 were either

2   unnecessary or unnecessarily high, and the Partnership's finances would have

3   been still healthier had HKAllen and its affiliate, HKM, not paid more than they

4   should have paid for those expense items.

5       120.   HKAllen hired its own affiliate, HKM, to provide property

6   management services to the Property.  HKM manages over 80 low-income

7   housing properties all along the East Coast.  Based on HKM's and HKAllen's

8   individual and combined experience in the ownership and operation of

9   properties similar to the Property, HKAllen and HKM both knew or should have

10  known that the Partnership could have saved approximately $60,000 in annual

11  expenses by not over-paying for payroll, taxes and benefits.  As a result, both

12  HKAllen and HKM knew or should have known that the Partnership's total

13  operating expenses net of acquisitions of fixed assets in 2004 should have been

14  approximately $376,366 ($436,366 less $60,000).  At that level, based on

---

Insurance, Misc. Taxes and Insurance, and Grant Expenses.  Monies paid for acquisitions of fixed assets are <u>excluded</u> because, during the years 2005 through 2013, the Partnership's aggregate withdrawals from its replacement reserve account ($580,532.00) exceeded the aggregate amount spent to acquire fixed assets ($558,778.00).  Similarly, 2014 figures are excluded from these totals because the general partner had to know that 2014 would be a highly profitable year.  This is because the Partnership's primary mortgage loan was scheduled to be fully repaid in January or February 2014, meaning that the Partnership would have to make mortgage payments in 2014 that total no more than one-sixth of the amount of its total mortgage payments in each year from 2005-2013 – and the other five-sixths would be profit.

**COMPLAINT**

figures from the Partnership's annual audited financial statements, the Partnership's total operating expenses net of acquisitions of fixed assets could have increased by $77,541.00, or more than 20%, before the Partnership experienced a net decrease in cash-on-hand in 2005.

121.   None of HKAllen, Myerson, Burnes, HKM or any of their respective affiliates could have reasonably predicted in February 2005 that the Partnership would likely encounter difficulty making its mortgage and operating expense payments through 2014.  Despite this, Burnes deliberately and maliciously misrepresented the Partnership's financial condition in his 2005 Burnes Letter.  Upon information and belief, Burnes, HKAllen, Myerson, HKM, HK Allen Inc., and the ERI Parties all knew, at the time Burnes sent his 2005 Burnes Letter to the Limited Partners, that Burnes' characterization of the Partnership's financial prospects as "bleak," "discouraging," and "perilous" was both inaccurate and dishonest.

122.   Upon information and belief, Burnes, acting knowingly, intentionally, and with malice, grossly mischaracterized the Partnership's financial condition as part of a larger, concerted effort involving HKAllen, HKM, HK Allen Inc., and the ERI Parties to convince the Limited Partners to sell LP Units at abusively low prices to the ERI Parties and to HKAllen, with whom the ERI Parties were collaborating and sharing their profits.  Per this

**COMPLAINT**

1    scheme, the 2005 Burnes Letter convinced the Limited Partners that their LP

2    Units had little or no value.  Then, as described below, ERI, through its

3    affiliates, sent strategically timed offers to the Limited Partners to purchase their

4    LP Units – strategic because they were sent only in years when Limited Partners

5    had to pay income tax on Partnership income but received no cash distributions

6    whatsoever from the Partnership.  This scheme succeeded.

7

8    *HKAllen Participated as Purchaser in Equity Resource Newton Fund's Purchases*

9    *of LP Units, But Failed to Ensure Transactions Were Fair to Limited Partners*

10        123.   On or about May 11, 2006, Newton Fund mailed to several of the

11   Limited Partners of the Partnership an envelope containing: (i) a three-page

12   letter dated May 11, 2006 (the "**2006 ERI Letter**") stating that Newton Fund

13   was offering to purchase the LP Units owned by the Limited Partners; (ii) an

14   Agreement of Sale and Assignment and a Power of Attorney for each Limited

15   Partner to execute if he/she decided to sell his/her LP Units; and (iii) a 12-page

16   Offer To Purchase For Cash 9 Units of Hotel Danville Company for $5,000.00

17   per LP Unit (the "**2006 ERI Offer**").

18        124.   ERI was then and remains today in control of Newton Fund, as the

19   manager of the general partner of Newton Fund.

20

**COMPLAINT**

49

1    125.   At the time Newton Fund sent the 2006 ERI Letter, $5,000.00

2    represented a small fraction of the fair market value of one LP Unit.

3    126.   At the time Newton Fund sent the 2006 ERI Letter, Defendants

4    HKAllen, ERI, Newton Fund and Burnes knew that $5,000.00 represented a

5    small fraction of the fair market value of one LP Unit.  Defendants HKAllen,

6    ERI, Newton Fund and Burnes also knew that, in the two immediately preceding

7    years, 2004 and 2005, the Limited Partners had to pay tax on Partnership income

8    but received no cash distributions from the Partnership, and thus would be

9    unfairly susceptible to offers to purchase their interests unless full and complete

10   facts regarding the LP Units' financial prospects were disclosed to correct the

11   misconceptions created by the 2005 Burnes Letter.

12   127.   The 2006 ERI Letter contained several misleading statements

13   designed to convince the Limited Partners to sell rather than to hold their LP

14   Units, such as: (i) stating, in underlined text, that the federal tax due on

15   Partnership income allocated to an owner of one LP Unit from 2006 until 2014

16   "could be over $61,250 per unit" without mentioning that this tax expense

17   would be lower than that amount in real terms because it would be paid over

18   time or that the Partnership would produce substantial profits from 2014

19   onward, which profits would dwarf any interim tax liability; and (ii) stating that

20   "Purchaser believes that the typical limited partner should have after-tax

**COMPLAINT**

1   proceeds on a Federal basis from the sale of units under this Offer" when, upon

2   information and belief, Newton Fund was in a position to know that this

3   statement was likely, if not certain, to be false.

4       128.   The first paragraph of the 2006 ERI Offer stated that, "neither

5   Newton Fund nor Equity Resource Investments, LLC, the manager of Newton

6   Fund's general partner, is an affiliate of the Partnership or the general partner of

7   the Partnership."

8       129.   The last page of the 2006 ERI Offer contained a paragraph whose

9   heading is "Past Contact with the General Partner." That paragraph appears

10   below in its entirety:

11           Various affiliates of the Purchaser have engaged in ongoing

12           conversations and exchanges of correspondence with various

13           affiliates of the Partnership and affiliates of the general partner of

14           the Partnership with regard to these affiliates' ownership of units

15           and other partnership interests in which the general partner of the

16           Partnership is affiliated. These conversations have principally

17           involved requests to obtain the list of limited partners and other

18           information concerning the Partnership and other partnerships. As

19           a result of these conversations, **an affiliate of the Purchaser**

20           **entered into an agreement with the general partner of the**

**COMPLAINT**

51

**Partnership. One Part of this agreement gives the general partner the option to acquire up to 50% of all units acquired by the Purchaser in certain partnerships, including this Partnership, on the same terms as the Purchaser**. The Purchaser does not know if the general partner will exercise its option with regard to this particular offer. Further, affiliates of the Purchaser are limited partners in numerous partnerships that are controlled and managed by the affiliates of the general partner of the Partnership. (Emphasis added.)

130. On page three of the 2006 ERI Letter, Newton Fund told each Limited Partner that, "there is a conflict between the [Newton Fund's] desire to acquire [each Limited Partner's] units at a low price and [each Limited Partner's] desire to sell [his/her] units at a high price."

131. As soon as the general partner of the Partnership obtained the option to purchase from Newton Fund up to 50% of the LP Units that Newton Fund purchased, HKAllen became a knowing and intentional participant with Newton Fund in every purchase Newton Fund made of LP Units. By entering into the agreement with an affiliate of Newton Fund, HKAllen knowingly and intentionally put itself in a position where its interest conflicted directly with those whose interests it was obligated to protect: the Limited Partners. At the

**COMPLAINT**

1  same time, by entering into that same agreement, the affiliate of Newton Fund

2  became a knowing and willing aider and abettor of HKAllen's breach of its

3  fiduciary duties to the Limited Partners <u>and</u> a collaborator with HKAllen in its

4  plans to take property from the Limited Partners by means of deception and

5  fraudulent representation.

6       132.   Because HKAllen was the Limited Partners' fiduciary, HKAllen

7  was obligated to show complete good faith and fairness to every Limited Partner

8  when dealing with them on matters related to the Partnership.  Where, as here,

9  HKAllen knowingly and intentionally put itself in a position where its interests

10  conflicted directly with those of the Limited Partners, HKAllen had an

11  obligation to disclose to the Limited Partners the existence of the conflict and all

12  information in its possession or control that might reasonably be material to a

13  Limited Partner who is considering the offer from Newton Fund.  HKAllen also

14  had an obligation to ensure that every purchase of LP Units from a Limited

15  Partner in which HKAllen participated actually produced a fair financial

16  outcome for each Limited Partner who sold.  HKAllen failed to fulfill these

17  obligations.

18       133.   HKAllen failed to fulfill its fiduciary obligation to show complete

19  good faith and fairness to every Limited Partner who sold to Newton Fund.

20  HKAllen failed to disclose to the Limited Partners the existence of the conflict

**COMPLAINT**

1    between its interest and that of each Limited Partner who sold to Newton Fund.

2    HKAllen failed to disclose to the Limited Partners the fact that any purchase by

3    Newton Fund of LP Units would necessarily be a conflicted, self-dealing

4    transaction in which it, one of the Partnership's general partners, stood to profit

5    at the expense of the Limited Partners.  Upon information and belief, HKAllen

6    never disclosed any information to the Limited Partners about Newton Fund's

7    offer to buy LP Units; HKAllen did not even acknowledge to the Limited

8    Partners that it was aware that Newton Fund had sent the 2006 ERI Offer to the

9    Limited Partners.  HKAllen failed to disclose all information in HKAllen's

10   possession that might reasonably have been material to a Limited Partner who

11   was considering the 2006 ERI Offer, including but not limited to the fact that the

12   representations made in the 2005 Burnes Letter were materially false and

13   misrepresented the likely financial value of the Limited Partners' investments in

14   the Property.  HKAllen failed to ensure that the purchases of LP Units made by

15   Newton Fund produced a fair financial outcome for each Limited Partner who

16   sold.

17        134.   HKAllen had actual knowledge of the purchases made by Newton

18   Fund and other ERI affiliates.  HKAllen expressly and in writing made the

19   wholly discretionary decision to approve every single purchase of LP Units

20   made by any of the ERI Parties.  But none of HKAllen, Burnes, HKM or any of

**COMPLAINT**

1   their respective affiliates ever told the Limited Partners who sold to any ERI

2   affiliates that the price they received was too low.  Nor did any of HKAllen,

3   Burnes, HKM or any of their respective affiliates warn those Limited Partners

4   who did not sell to an ERI affiliate that one or more of the ERI Parties had been

5   offering to purchase LP Units at prices far below fair value.

6       135.   At least once, however, in February 2013, Burnes did send a letter

7   to at least some of the Limited Partners warning generally about solicitations

8   sent to Limited Partners to purchase LP Units.  Even though the ERI Parties had

9   by that time acquired 6.25 LP Units, and even though the ERI Parties were at

10   that time the only third parties who had purchased LP Units from Limited

11   Partners, the letter did not mention any of the ERI Parties by name. The entire

12   text of Burnes letter of February 13, 2013 is below:

13

14          Dear Limited Partner:

15          It has come to our attention that limited partners in the Hotel

16          Danville Company may be receiving solicitations to purchase their

17          individual limited partnership shares.

18

19          As the managing general partner, HallKeen generally does not

20          believe it is in the best interest of the limited partners to sell. We

**COMPLAINT**

55

strongly recommend that you contact the general partner before

considering a sale of your interest. Third party buyers rarely pay

full value and must obtain the approval of the general partner

before a sale can occur. The general partner is in no way obligated

to approve a sale of your interest.


If you are contacted by a third party in regards to purchasing your

limited partner shares please contact Chris Pavoni at

[redacted]@[redacted].com or [phone number redacted].


Sincerely,

Andrew Burnes

Managing Member

136.    Upon information and belief, this letter was not intended to

dissuade the Limited Partners from selling to the ERI Parties, which sales

HKAllen had and continued to expressly approve, but rather to diminish any

possibility that the Limited Partners might sell to a *different* third party, i.e., one

without a pre-existing agreement with HKAllen.  In other words, HKAllen

wanted to make sure that the Limited Partners made sales only if those sales

would create profits for HKAllen and the ERI Parties.

**COMPLAINT**

137.   Newton Fund knew that HKAllen was a fiduciary to the Limited Partners, and Newton Fund substantially assisted HKAllen's breach of its duty to the Limited Partners by soliciting the offer to purchase LP Units and by agreeing to share the profits with HKAllen.  Upon information and belief, the agreement and understanding between HKAllen and an affiliate of Newton Fund set forth how HKAllen and the ERI Parties would share the profits produced from their unfair dealings with the Limited Partners.

138.   The fact that the 2006 ERI Offer contained numerous cautionary statements made it appear to the Limited Partners to be a legitimate offer from a sophisticated buyer who knew and understood the legal implications of making such a purchase.  Most of the Limited Partners who received the 2006 ERI Offer probably did not see the disclosure of the agreement between HKAllen and an affiliate of Newton Fund, because it was buried at the end of a long list of protective disclosures written in 'legalese.'  Regardless, to those Limited Partners who did read and understand it, that disclosure could most reasonably be interpreted as an endorsement by HKAllen of Newton Fund and its affiliates.  As such, it would and did tend to convince the Limited Partners of the legitimacy and propriety of the 2006 ERI Offer.  The disclosure did not contain any express acknowledgement that the understanding and agreement between

**COMPLAINT**

1   HKAllen and ERI or its affiliates made the solicited sales self-dealing

2   transactions.

3        139.   As a result, the numerous cautionary statements in the 2006 ERI

4   Offer and its disclosure of an agreement between HKAllen and an affiliate of

5   Newton Fund misled the Limited Partners into believing that the Newton Fund's

6   offer to the Limited Partners and any eventual sale to Newton Fund were

7   legitimate and fair, when in fact they were not.  Thus, both factors contributed to

8   the joint and deliberate plan, orchestrated by the ERI Parties, HKAllen, HKM,

9   HK Allen Inc., and Burnes, to defraud the Limited Partners by convincing the

10  Limited Partners that their LP Units had little value and then purchasing their LP

11  Units from them at prices that were far below market value.

12

13  *General Partner and Newton Fund Bought LP Units from Sherman, Hirokawa and*

14     *Leuschel, In Each Case for a Small Fraction of Their Fair Market Value*

15       140.   On or about May 21, 2006, after receiving the 2006 ERI Letter and

16  the 2006 ERI Offer, Sherman signed an Agreement of Sale and Assignment (the

17  "**Sherman Assignment**") by which Sherman sold his 0.5 LP Unit to Newton

18  Fund.  HKAllen was, at that time, one of two general partners of the Partnership

19  (the other being Myerson).

20

**COMPLAINT**

58

1  141.   On or about May 24, 2006, after receiving the 2006 ERI Letter and

2  the 2006 ERI Offer, Hirokawa signed an Agreement of Sale and Assignment

3  (the "**Hirokawa Assignment**") by which Hirokawa sold his 0.5 LP Unit to

4  Newton Fund.

5  142.   Hirokawa was 84 years of age when he received the 2006 ERI

6  Letter and the 2006 ERI Offer, and when he signed the Hirokawa Assignment.

7  Defendants knew or should have known that Hirokawa was over 65 years of age

8  when he received the 2006 ERI Letter and the 2006 ERI Offer, and when he

9  signed the Hirokawa Assignment.

10  143.   On or about June 12, 2006, after receiving the 2006 ERI Letter and

11  the 2006 ERI Offer, Leuschel signed an Agreement of Sale and Assignment (the

12  "**Leuschel Assignment**") by which Leuschel sold his 0.5 LP Unit to Newton

13  Fund.

14  144.   Leuschel was over 65 years of age when he received the 2006 ERI

15  Letter and the 2006 ERI Offer, and when he signed the Leuschel Assignment.

16  Defendants knew or should have known that Leuschel was over 65 years of age

17  when he received the 2006 ERI Letter and the 2006 ERI Offer, and when he

18  signed the Leuschel Assignment.

19

20

**COMPLAINT**

145.   On a date after May 21, 2006, but no later than July 14, 2006, Dagbjartsson, in his capacity as Authorized Representative of Newton Fund, signed the Sherman Assignment on behalf of Newton Fund, as assignee.

146.   On a date after May 24, 2006, but no later than July 14, 2006, Dagbjartsson, in his capacity as Authorized Representative of Newton Fund, signed the Hirokawa Assignment on behalf of Newton Fund, as assignee.

147.   On a date after June 12, 2006, but no later than July 14, 2006, Dagbjartsson, in his capacity as Authorized Representative of Newton Fund, signed the Leuschel Assignment on behalf of Newton Fund, as assignee.

148.   Upon information and belief, Dagbjartsson has had primary responsibility for ERI's investment decisions since 1990.

149.   On July 14, 2006, Burnes signed the General Partner Consent by which HKAllen, with knowledge of the terms and price of the sales from Sherman, Hirokawa and Leuschel to Newton Fund, made the wholly discretionary decision expressly to approve each of the sales from Sherman, Hirokawa and Leuschel to Newton Fund, and admitted Newton Fund to the Partnership as a Substitute Limited Partner.

150.   Upon information and belief, the Sherman Assignment, Hirokawa Assignment and Leuschel Assignment, and the participation in each by Newton Fund, Dagbjartsson, HKAllen and Burnes, were all part of the larger concerted

**COMPLAINT**

1  and coordinated effort, led by HKAllen and involving each of the Coordinated

2  Parties, to place a sufficient number of LP Units into the ownership of trusted

3  parties who agreed to ratify – and on whom HKAllen could rely to ratify – a

4  transaction, such as the Sale and Exchange, by which such trusted parties would

5  realize outsized profits from their LP Units, and by which HKAllen and its

6  affiliates would realize even larger profits.

7      151.   Newton Fund paid Sherman $2,500.00 in exchange for Sherman's

8  0.5 LP Unit.

9      152.   Newton Fund paid Hirokawa $2,500.00 in exchange for

10 Hirokawa's 0.5 LP Unit.

11     153.   Newton Fund paid Leuschel $2,500.00 in exchange for Leuschel's

12 0.5 LP Unit.

13     154.   At the time each of Sherman, Hirokawa and Leuschel transferred

14 his 0.5 LP Unit to Newton Fund, $2,500.00 represented just a very small

15 fraction of the fair market value of 0.5 LP Unit.

16     155.   At the time each of Sherman, Hirokawa and Leuschel transferred

17 his 0.5 LP Unit to Newton Fund, Defendants knew that $2,500.00 represented

18 just a very small fraction of the fair market value of Sherman's 0.5 LP Unit.

19     156.   HKAllen knowingly, intentionally, and with malice: (i) failed to

20 fulfill its obligation as a fiduciary to Sherman, Hirokawa and Leuschel to show

**COMPLAINT**

complete good faith and fairness to each of Sherman, Hirokawa and Leuschel, (ii) failed to disclose to each of Sherman, Hirokawa and Leuschel the fact that any purchase by Newton Fund of their LP Units would be a conflicted, self-dealing transaction in which HKAllen, one of the Partnership's general partners, stood to profit at the expense of the Sherman, Hirokawa and Leuschel, (iii) failed to disclose all information in its possession or control that might reasonably have been material to each of Sherman's, Hirokawa's and Leuschel's consideration of Newton Fund's offer, including but not limited to the fact that the representations made in the 2005 Burnes Letter were materially false and misrepresented the likely financial value of the Limited Partners' investments in the Property; and (iv) failed to ensure that the purchase of each of Sherman's, Hirokawa's and Leuschel's 0.5 LP Unit produced a fair financial outcome for each of Sherman, Hirokawa and Leuschel.

157.    HKAllen profited from the Sherman, Hirokawa, and Leuschel sales by virtue of its agreement with ERI. HKAllen failed to fulfill its fiduciary obligations to each of Sherman, Hirokawa and Leuschel because it took advantage of its position to profit unduly from the fact that Newton Fund purchased each of Sherman's, Hirokawa's and Leuschel's 0.5 LP Unit for a small fraction of its fair market value.

**COMPLAINT**

158.   Had HKAllen fulfilled its obligation as fiduciary to Sherman, Hirokawa and Leuschel to show complete good faith and fairness to Sherman, Hirokawa and Leuschel, then none of Sherman, Hirokawa or Leuschel would have agreed to sell his 0.5 LP Unit for only $2,500.00.

159.   Burnes, HKM, HK Allen Inc., Newton Fund, Dagbjartsson and at least one affiliate of Newton Fund aided and abetted HKAllen's breach of the fiduciary duty it owed to each of Sherman, Hirokawa and Leuschel.

160.   Sherman, Hirokawa and Leuschel had no knowledge, nor any reason to suspect, that HKAllen, Burnes, or Myerson would act in a manner contrary to the Limited Partners' best interests or would make misrepresentations regarding the value of the LP Units.  Nor did they have any reason to suspect that their understandings regarding the fairness of the transaction, which they had reached in reliance on the fiduciaries' misrepresentations, were inaccurate.  As a consequence, Sherman, Hirokawa and Leuschel had no reason to suspect that the terms of their transactions with the ERI Parties were substantially unfair and not in their financial interests.

161.   Sherman discovered only very recently – in 2015 – the following: (i) the failure of HKAllen to fulfill its obligation as Sherman's fiduciary to show complete good faith and fairness to Sherman in connection with the presentation, execution and approval of the Sherman Assignment, and (ii) that

**COMPLAINT**

1   Burnes, HKM, HK Allen Inc., Newton Fund, Dagbjartsson and at least one

2   affiliate of Newton Fund materially assisted HKAllen's scheme to defraud

3   Sherman and the other Limited Partners.  Sherman discovered these facts as a

4   result of one Limited Partner's investigation of a March 2015 Consent Request

5   document that HKM sent to the Limited Partners on behalf of HKAllen.

6       162.   Hirokawa did not discover the failure of HKAllen to fulfill its

7   obligation as Hirokawa's fiduciary to show complete good faith and fairness to

8   Hirokawa in connection with the presentation and execution of the Hirokawa

9   Assignment.  Hirokawa died in 2013 without knowledge of Defendant's

10  wrongdoing.  Takahashi, who is Hirokawa's only child and only heir, discovered

11  only very recently – in 2015 – the following: (i) the failure of HKAllen to fulfill

12  its obligation as Hirokawa's fiduciary to show complete good faith and fairness

13  to Hirokawa in connection with the presentation, execution and approval of the

14  Hirokawa Assignment, and (ii) that Burnes, HKM, HK Allen Inc., Newton

15  Fund, Dagbjartsson and at least one affiliate of Newton Fund materially assisted

16  HKAllen's scheme to defraud Hirokawa and the other Limited Partners.

17  Takahashi discovered these facts as a result of one Limited Partner's

18  investigation of a March 2015 Consent Request document that HKM sent to the

19  Limited Partners on behalf of HKAllen.

20

**COMPLAINT**

163.    Leuschel discovered only very recently – in 2015 – the following: (i) the failure of HKAllen to fulfill its obligation as Leuschel's fiduciary to show complete good faith and fairness to Leuschel in connection with the presentation, execution and approval of the Leuschel Assignment, and (ii) that Burnes, HKM, HK Allen Inc., Newton Fund, Dagbjartsson and at least one affiliate of Newton Fund materially assisted HKAllen's scheme to defraud Leuschel and the other Limited Partners.  Leuschel discovered these facts as a result of one Limited Partner's investigation of a March 2015 Consent Request document that HKM sent to the Limited Partners on behalf of HKAllen.

### *Newton Fund Transferred LP Units to Affiliates of General Partner*

164.    Upon information and belief, Newton Fund assigned some of its LP Units to Franklin 81 Associates and to David Carlen as partial compensation to HKAllen for: (i) HKAllen having given Newton Fund and its affiliates the names and addresses of the Limited Partners; and (ii) HKAllen having approved all purchases of LP Units that Newton Fund had by that time made, including the Sherman Assignment, the Hirokawa Assignment and the Leuschel Assignment.

165.    David Carlen is a certified public accountant who was formerly a vice president at BFG and is currently Treasurer of BFG.  Upon information and

**COMPLAINT**

1    belief, he has been an advisor to HKAllen and/or certain of its affiliates since at

2    least 2007, and he was involved in the structuring and execution of the Sale and

3    Exchange.  (The Consent Request, Update Number One, Update Number Two

4    and Update Number Three (defined below) all provided Carlen's name, phone

5    number and email address, and invited Limited Partners to contact Carlen with

6    questions about the Sale and Exchange.)  Also upon information and belief, both

7    Carlen and Franklin 81 Associates had actual or constructive knowledge that

8    Newton Fund had wrongfully obtained the LP Units that Newton Fund

9    transferred to Carlen and to Franklin 81 Associates.

10        166.   On February 13, 2007, Newton Fund assigned 0.54 LP Units to

11   Franklin 81 Associates.  David Carlen signed the Assignment of Partnership

12   Interests (the "**Franklin 81 Assignment**") on behalf of Franklin 81 Associates,

13   and the notice address provided for Franklin 81 Associates in the Franklin 81

14   Assignment is the same address that is provided for David Carlen personally on

15   the Schedule A attached to Amendment Three to Amended and Restated

16   Limited Partnership Agreement and Certificate ("**Amendment Three**"), dated

17   July 14, 2001.

18        167.   Dagbjartsson, in his capacity as Manager of ERI, which was

19   Managing Member of ERI N LLC, which was General Partner of Newton Fund,

20   signed the Franklin 81 Assignment on behalf of Newton Fund, as assignor.

**COMPLAINT**

168.   On February 13, 2007, Newton Fund assigned 0.14 LP Units to David Carlen personally.  David Carlen signed the Assignment of Partnership Interests (the "**Carlen Assignment**") on his own behalf, and the notice address provided for David Carlen in the Carlen Assignment is the same as (i) the address that is provided for Franklin 81 Associates in the Franklin 81 Assignment, and (ii) the address that is provided for David Carlen personally on the Schedule A attached to Amendment Three.

169.   Dagbjartsson, in his capacity as Manager of ERI, which was Managing Member of ERI N LLC, which was General Partner of Newton Fund, signed the Franklin 81 Assignment on behalf of Newton Fund, as assignor.

170.   On June 26, 2007, Burnes, acting on behalf of HKAllen, made the wholly discretionary decision to sign the General Partner Approval for the Franklin 81 Assignment and for the Carlen Assignment.

171.   Upon information and belief, the Carlen Assignment and the Franklin 81 Assignment, and the participation in each by ERI, Newton Fund, Dagbjartsson, Carlen, Franklin 81, HKAllen and Burnes, were all part of the larger concerted and coordinated effort, led by HKAllen and involving each of the Coordinated Parties, to place a sufficient number of LP Units into the ownership of trusted parties who agreed to ratify – and on whom HKAllen could rely to ratify – a transaction, such as the Sale and Exchange, by which such

**COMPLAINT**

1  trusted parties would realize outsized profits from their LP Units, and by which

2  HKAllen and its affiliates would realize even larger profits.

3

4  *General Partner Participated as Purchaser in Equity Resource Milton Fund's*

5  *Purchases of LP Units, But Failed to Ensure Transactions*

6  *Were Fair to Limited Partners*

7      172.   On or about March 27, 2007. Equity Resource Milton Fund LLC

8  ("**Milton Fund**") mailed to several of the Limited Partners an envelope

9  containing: (i) a three-page letter dated March 27, 2007 (the "**March 2007 ERI**

10 **Letter**") stating that Milton Fund was offering to purchase the LP Units owned

11 by the Limited Partners; (ii) an Agreement of Sale and Assignment for each

12 Limited Partner to execute if he/she decided to sell his/her LP Units; and (iii) a

13 12-page Offer To Purchase For Cash 9 Units of Hotel Danville Company for

14 $5,000.00 per LP Unit (the "**March 2007 ERI Offer**").

15      173.   ERI was on March 27, 2007, and remains today, the manager of the

16 LLC that is the manager of Milton Fund.

17      174.   At the time Milton Fund sent the March 2007 ERI Letter, $5,000.00

18 represented just a small fraction of the fair market value of one LP Unit.

19      175.   At the time Milton Fund sent the March 2007 ERI Letter,

20 Defendants HKAllen, ERI, Milton Fund and Burnes knew that $5,000.00

**COMPLAINT**

68

1   represented just a small fraction of the fair market value of one LP Unit.

2   Defendants HKAllen, ERI, Milton Fund and Burnes also knew that, in the three

3   immediately preceding years, the Limited Partners had to pay tax on Partnership

4   income but received no cash distributions from the Partnership.  These

5   Defendants therefore knew the Limited Partners would thus be unfairly

6   susceptible to offers to purchase their interests unless full and complete facts

7   regarding the LP Units' financial prospects were disclosed to correct the

8   misconceptions created by the 2005 Burnes Letter.

9        176.   Like the 2006 ERI Letter, the 2007 ERI Letter contained several

10  misleading statements designed to convince the Limited Partners to sell rather

11  than to hold their LP Units, such as: (i) stating, in underlined text, that the

12  federal tax due on Partnership income allocated to an owner of one LP Unit

13  from 2006 until 2014 "could be over $56,625 per unit" without mentioning that

14  this tax expense would be lower than that amount in real terms because it would

15  be paid over time, and (ii) stating in its conclusion that, "it is likely that the

16  Partnership will continue to operate as it is currently operating for the

17  foreseeable future" while failing to acknowledge a crucial fact known to Milton

18  Fund: that the Partnership was expected to be highly profitable from early 2014

19  onward, and that those profits would easily dwarf any interim tax liability

20  associated with owning the LP Units.

**COMPLAINT**

177.    The first paragraph of the March 2007 ERI Offer states that, "Neither Milton Fund nor Equity Resource Investments, LLC, the manager of Newton Fund's manager, is an affiliate of the Partnership or the general partner of the Partnership."

178.    The last page of the March 2007 ERI Offer contained a paragraph whose heading was "Past Contact with the General Partner."  That paragraph was identical in content to the paragraph with the same heading in the 2006 ERI Offer, except that HKAllen had an option to acquire up to 33% of the LP Units acquired by Milton Fund, as opposed to 50% in the 2006 ERI Offer.

179.    Also like the 2006 ERI Offer, page three of the March 2007 ERI Letter disclosed: "there is a conflict between the [Milton Fund's] desire to acquire [each Limited Partner's] units at a low price and [each Limited Partner's] desire to sell [his/her] units at a high price."

180.    As soon as the general partner of the Partnership obtained the option to purchase from Milton Fund up to 33% of the LP Units that Milton Fund purchased, HKAllen became a knowing and intentional participant with Milton Fund in every purchase Milton Fund made of LP Units. By entering into the agreement with an affiliate of Milton Fund, HKAllen knowingly and intentionally put itself in a position where its interests conflicted directly with those whose interests it was obligated to protect: the Limited Partners.  At the

**COMPLAINT**

1   same time, by entering into that same agreement, the affiliate of Milton Fund

2   became a knowing and willing aider and abettor of HKAllen's breach of its

3   fiduciary duties to the Limited Partners and a collaborator with HKAllen in its

4   plans to take property from the Limited Partners by means of deception and

5   fraudulent representation.

6        181.   The March 2007 ERI Letter and March 2007 ERI Offer

7   manipulated the Limited Partners in the same ways that the 2006 ERI Letter and

8   2006 ERI Offer did.  As such, and in the interest of brevity, the allegations of

9   Paragraphs 132 through 139 are incorporated here and applied to the March

10  2007 ERI Letter, the March 2007 ERI Offer and to the Milton Fund.  Those

11  Paragraphs support the allegations that: (i) the March 2007 ERI Offer contained

12  HKAllen's implicit endorsement; and (ii) the March 2007 Letter and Offer were

13  part of the same joint and deliberate plan, orchestrated by the ERI Parties,

14  HKAllen, HKM, HK Allen Inc., and Burnes, to defraud the Limited Partners by

15  convincing the Limited Partners that their LP Units had little value and then

16  purchasing their LP Units from them at prices that were far below market value.

17       182.   On or about September 7, 2007, Milton Fund mailed to several of

18  the Limited Partners of the Partnership a new offer – this time offering to pay

19  $15,000.00 for each LP Unit. The mailing contained a three-page letter dated

20  September 7, 2007 (the "**September 2007 ERI Letter**"), an Agreement of Sale

**COMPLAINT**

1   and Assignment for each Limited Partner to execute if he/she decided to sell

2   his/her LP Units, and a 12-page Offer To Purchase For Cash 5 Units of Hotel

3   Danville for $15,000.00 per LP Unit (the "**September 2007 ERI Offer**").

4       183.   The last page of the September 2007 ERI Offer contained a

5   paragraph whose heading was "Past Contact and Negotiations with the General

6   Partner."  That paragraph was similar in content to the paragraphs with the

7   similar headings in the 2006 ERI Offer and the March 2007 ERI Offer, except

8   that the language in the September 2007 ERI Offer refers to a "broader

9   agreement [between HKAllen and one or more of the ERI Parties] covering

10  multiple partnerships" pursuant to which HKAllen has "the option to acquire up

11  to 50% of all units that [Milton Fund] acquires under the offer on the same terms

12  as [Milton Fund]."  Also new in the September 2007 ERI Offer is the following

13  language that suggests that HKAllen and the ERI Parties have not discussed

14  with each other the true value of the LP Units: "The general partner has had no

15  input in determining the offer price, has not expressed any opinion on the offer

16  price and has not indicated whether it will acquire the units offered to it as a

17  result of the offer."

18      184.   The September 2007 ERI Letter and September 2007 ERI Offer

19  manipulated the Limited Partners in the same ways that the previous ERI Letters

20  and Offers did.  As such, and in the interest of brevity, the allegations of

**COMPLAINT**

Paragraphs 132-139 and 181 are incorporated here and applied to the September

2007 ERI Letter and the September 2007 ERI Offer.  Those Paragraphs support

the allegations that: (i) the September 2007 ERI Offer contained HKAllen's

implicit endorsement; and (ii) the September 2007 Letter and Offer were part of

the same joint and deliberate plan, orchestrated by the ERI Parties, HKAllen,

HKM, HK Allen Inc., and Burnes, to defraud the Limited Partners by

convincing the Limited Partners that their LP Units had little value and then

purchasing their LP Units from them at prices that were far below market value.

185.   On or about September 9, 2007, after receiving the September 2007

ERI Letter and the September 2007 ERI Offer, Adelman signed an Agreement

of Sale and Assignment (the "**Adelman Assignment**"), by which Adelman sold

his 0.25 LP Unit to Milton Fund.

186.   On a date after September 9, 2007, but no later than November 26,

2007, Dagbjartsson signed the Adelman Assignment on behalf of Milton Fund,

the assignee.  Dagbjartsson signed in his capacity as Manager of ERI, which was

the sole member of ERF Manager LLC, which was Manager of Milton Fund.

187.   On November 26, 2007, Burnes signed the General Partner Consent

by which HKAllen, with knowledge of the terms and price of the sales from

Adelman to Milton Fund, made the wholly discretionary decision expressly to

**COMPLAINT**

1    approve the sale from Adelman to Milton Fund, and admitted Milton Fund to the

2    Partnership as a Substitute Limited Partner.

3        188.   Upon information and belief, the Adelman Assignment, and the

4    participation in it by ERI, Milton Fund, Dagbjartsson, HKAllen and Burnes,

5    were all part of the larger concerted and coordinated effort, led by HKAllen and

6    involving each of the Coordinated Parties, to place a sufficient number of LP

7    Units into the ownership of trusted parties who agreed to ratify – and on whom

8    HKAllen could rely to ratify – a transaction, such as the Sale and Exchange, by

9    which such trusted parties would realize outsized profits from their LP Units,

10   and by which HKAllen and its affiliates would realize even larger profits.

11       189.   Milton Fund paid Adelman $3,750.00 in exchange for Adelman's

12   0.25 LP Unit.

13       190.   At the time Adelman transferred his 0.25 LP Unit to Milton Fund,

14   $3,750.00 represented just a very small fraction of the fair market value of 0.25

15   LP Unit.

16       191.   At the time Adelman transferred his 0.25 LP Unit to Milton Fund,

17   Defendants knew that $3,750.00 represented just a very small fraction of the fair

18   market value of Adelman's 0.25 LP Unit.

19       192.   HKAllen knowingly, intentionally, and with malice: (i) failed to

20   fulfill its obligation as Adelman's fiduciary to show complete good faith and

**COMPLAINT**

fairness to Adelman; (ii) failed to disclose to Adelman the fact that any purchase by Milton Fund of Adelman's LP Units would be a conflicted, self-dealing transaction in which it, the Partnership's general partner, stood to profit at the expense of Adelman; (iii) failed to disclose all information in HKAllen's possession that might reasonably have been material to Adelman's consideration of Milton Fund's offer; and (iv) failed to ensure that the purchase of Adelman's 0.25 LP Unit produced a fair financial outcome for Adelman.

193.   HKAllen failed to fulfill its fiduciary obligations to Adelman because it took advantage of its position to profit unduly from the fact that Milton Fund purchased Adelman's 0.25 LP Unit for a small fraction of its fair market value.

194.   Had HKAllen actually fulfilled its obligation as Adelman's fiduciary to show complete good faith and fairness to each of Adelman, then Adelman would not have agreed to sell his 0.25 LP Unit for only $3,750.00.

195.   Adelman had no knowledge, nor any reason to suspect, that HKAllen or Burnes would act in a manner contrary to the Limited Partners' best interests or would make misrepresentations regarding the value of the LP Units. Nor did he have any reason to suspect that his understanding regarding the fairness of the transaction, which he had reached in reliance on the fiduciaries' misrepresentations, was inaccurate.  As a consequence, Adelman had no reason

**COMPLAINT**

1    to suspect that the terms of the Adelman Assignment were substantially unfair

2    and not in his financial interests. Burnes, HKM, HK Allen Inc., Milton Fund,

3    Dagbjartsson and at least one affiliate of Milton Fund aided and abetted

4    HKAllen's breach of the fiduciary duty it owed to Adelman.  Adelman

5    discovered only very recently – in 2015 – the following: (i) the failure of

6    HKAllen to fulfill its obligation as Adelman's fiduciary to show complete good

7    faith and fairness to Adelman in connection with the presentation, execution and

8    approval of the Adelman Assignment, and (ii) that Burnes, HKM, HK Allen

9    Inc., Milton Fund, Dagbjartsson and at least one affiliate of Milton Fund

10   materially assisted HKAllen's scheme to defraud Adelman.  Adelman

11   discovered these facts as a result of one Limited Partner's investigation of a

12   March 2015 Consent Request document that HKM sent to the Limited Partners

13   on behalf of HKAllen.

14

15   *Milton Fund Sent Reminder of $15,000 Offer; General Partner and Milton Fund*

16   *Bought Richards Family Trust's Interest for a Small Fraction*

17   *of its Fair Market Value*

18        196.   On or about July 15, 2008, Milton Fund mailed to several of the

19   Limited Partners of the Partnership a new offer – again offering to pay

20   $15,000.00 for each LP Unit. The mailing contained a three-page letter dated

**COMPLAINT**

1   July 15, 2008 (the "**2008 ERI Letter**"), an Agreement of Sale and Assignment

2   for each Limited Partner to execute if he/she decided to sell his/her LP Units,

3   and a 12-page Offer To Purchase For Cash 5 Units of Hotel Danville for

4   $15,000.00 per LP Unit (the "**2008 ERI Offer**").

5        197.   On July 15, 2008, ERI was the manager of the LLC that is the

6   manager of Milton Fund.

7        198.   At the time Milton Fund sent the 2008 ERI Letter, $15,000.00

8   represented just a small fraction of the fair market value of one LP Unit.

9        199.   At the time Milton Fund sent the 2008 ERI Letter, Defendants

10  HKAllen, ERI, Milton Fund and Burnes knew that $15,000.00 represented just a

11  small fraction of the fair market value of one LP Unit.  Defendants HKAllen,

12  ERI, Milton Fund and Burnes also knew that, in the four immediately preceding

13  years – 2004, 2005, 2006 and 2007 – the Limited Partners had to pay tax on

14  Partnership income but received no cash distributions from the Partnership.

15  Defendants therefore knew the Limited Partners would thus be unfairly

16  susceptible to offers to purchase their interests unless full and complete facts

17  regarding the LP Units' financial prospects were disclosed to correct the

18  misconceptions created by the 2005 Burnes Letter.

19       200.   Like the previous ERI Letters, the 2008 ERI Letter misled the

20  Limited Partners to convince them to sell rather than to hold their LP Units.  For

**COMPLAINT**

1   example, the 2008 ERI Letter stated that, "it is likely that limited partners'

2   annual net tax liability will increase in the future," and that, "by selling your

3   units at this time, you will avoid the ongoing tax liability associated with the

4   taxable income being generated by the Partnership."  However, just like the

5   previous ERI Letters, the 2008 ERI Letter failed to acknowledge a crucial fact

6   known to Milton Fund: that the Partnership was expected to be highly profitable

7   from early 2014 onward, and that those profits would easily dwarf any interim

8   tax liability associated with owning the LP Units.

9       201.   Like the previous Offers, the last page of the 2008 ERI Offer

10   contained a paragraph whose heading was "Past Contact and Negotiations with

11   the General Partner."  That paragraph was similar to the analogous paragraphs in

12   previous Offers, except that this paragraph in the 2008 ERI Offer says nothing

13   about HKAllen's option to purchase LP Units.  The paragraph stated only that

14   Milton Fund has been in contact with affiliates of the Partnership and of

15   HKAllen, and that affiliates of Milton Fund are limited partners in "numerous"

16   partnerships that are controlled by affiliates of HKAllen.

17       202.   The 2008 ERI Letter and 2008 ERI Offer manipulated the Limited

18   Partners in the same ways that the all the previous ERI Letters and Offers did.

19   As such, and in the interest of brevity, the allegations of Paragraphs 132-139,

20   181 and 184 are incorporated here and applied to the 2008 ERI Letter and to the

**COMPLAINT**

2008 ERI Offer.  Those Paragraphs support the allegation that the 2008 Letter and Offer were part of the same joint and deliberate plan, orchestrated by the ERI Parties, HKAllen, HKM, HK Allen Inc., and Burnes, to defraud the Limited Partners by convincing the Limited Partners that their LP Units had little value and then purchasing their LP Units from them at prices that were far below market value.

203.   On or about July 29, 2008, Milton Fund mailed to several of the Limited Partners of the Partnership a reminder of its 2008 ERI Offer to purchase LP Units in the Partnership for $15,000.00 per LP Unit (the "**2008 ERI Reminder**"), along with an Agreement of Sale and Assignment for each Limited Partner to execute if he/she decided to sell his/her LP Units; and a formal Offer To Purchase For Cash 5 Units of Hotel Danville Company for $15,000.00 per LP Unit.

204.   On or about August 12, 2008, after receiving the 2008 ERI Letter, the 2008 ERI Offer and the 2008 ERI Reminder, Irving and Regina Richards, as co-trustees of the Richards Family Trust, signed an Agreement of Sale and Assignment (the "**Richards Assignment**") by which the Richards Family Trust sold its 0.5 LP Unit to Milton Fund. HKAllen was, at that time, one of two general partners of the Partnership (the other being Myerson).

**COMPLAINT**

205.   Irving Richards was 65 years old when he received the 2008 ERI Reminder, and when he signed the Richards Assignment. Defendants knew or should have known that Irving Richards was at least 65 years of age when he received the 2008 ERI Reminder, and when he signed the Richards Assignment.

206.   On or about August 12, 2008, Dagbjartsson, in his capacity as Manager of ERI, which was the sole member of ERF Manager LLC, which was Manager of Milton Fund, signed the Richards Assignment on behalf of Milton Fund, as assignee.

207.   On August 12, 2008, Burnes signed the General Partner Consent by which HKAllen, with knowledge of the terms and price of the sale from the Richards Family Trust to Milton Fund, made the wholly discretionary decision expressly to approve the sale from the Richards Family Trust to Milton Fund and admitted Milton Fund to the Partnership as a Substitute Limited Partner.

208.   Upon information and belief, the Richards Assignment, and the participation in it by ERI, Milton Fund, Dagbjartsson, HKAllen and Burnes, were all part of the larger concerted and coordinated effort, led by HKAllen and involving each of the Coordinated Parties, to place a sufficient number of LP Units into the ownership of trusted parties who agreed to ratify – and on whom HKAllen could rely to ratify – a transaction, such as the Sale and Exchange, by

**COMPLAINT**

1  which such trusted parties would realize outsized profits from their LP Units,

2  and by which HKAllen and its affiliates would realize even larger profits.

3      209.   Milton Fund paid the Richards Family Trust $7,500.00 in exchange

4  for the Trust's 0.5 LP Unit.

5      210.   At the time the Richards Family Trust transferred its 0.5 LP Unit to

6  Milton Fund, $7,500.00 represented just a small fraction of the fair market value

7  of the Trust's 0.5 LP Unit.

8      211.   At the time the Richards Family Trust transferred its 0.5 LP Unit to

9  Milton Fund, Defendants HKAllen, ERI, Milton Fund and Burnes knew that

10  $7,500.00 represented just a small fraction of the fair market value of the Trust's

11  0.5 LP Unit.

12      212.   HKAllen knowingly, intentionally, and with malice: (i) failed to

13  fulfill its obligations as the Richards Family Trust's fiduciaries to show

14  complete good faith and fairness to the Richards Family Trust; (ii) failed to

15  disclose to the Richards Family Trust the fact that any purchase by Milton Fund

16  of the Trust's LP Units would be a conflicted, self-dealing transaction in which

17  they, the Partnership's general partners, stood to profit at the expense of the

18  Richards Family Trust; (iii) failed to disclose all information in HKAllen's

19  possession that might reasonably have been material to the Richards Family

20  Trust's consideration of Milton Fund's offer; and (iv) failed to ensure that the

**COMPLAINT**

1  purchase of the Richards Family Trust's 0.5 LP Unit produced a fair financial

2  outcome for the Richards Family Trust.

3      213.   HKAllen failed to fulfill its fiduciary obligations to Richards

4  Family Trust because it was in a position to profit from the fact that Milton Fund

5  purchased the Richards Family Trust's 0.5 LP Unit from the Richards Family

6  Trust for a small fraction of its fair market value.

7      214.   Had HKAllen actually fulfilled its obligation as the Richards

8  Family Trust's fiduciary to show complete good faith and fairness to the

9  Richards Family Trust, the Richards Family Trust would not have agreed to sell

10  its 0.5 LP Unit for only $7,500.00.

11      215.   Irving and Regina Richards, and the Richards Family Trust, had no

12  knowledge, nor any reason to suspect, that HKAllen, Burnes, or Myerson would

13  act in a manner contrary to the Limited Partners' best interests or would make

14  misrepresentations regarding the value of the LP Units.  Nor did they have any

15  reason to suspect that their understanding regarding the fairness of the

16  transaction, which they had reached in reliance on the fiduciaries'

17  misrepresentations, was inaccurate.  As a consequence, Irving and Regina

18  Richards, and the Richards Family Trust, had no reason to suspect that the terms

19  of the Richards Assignment were substantially unfair and not in their financial

20  interests.

**COMPLAINT**

216.   Burnes, HKM, HK Allen Inc., Milton Fund, Dagbjartsson and at least one affiliate of Milton Fund aided and abetted HKAllen's breach of the fiduciary duty it owed to the Richards Family Trust.

217.   The Richards Family Trust discovered only very recently – in 2015 – the following: (i) the failure of HKAllen to fulfill its obligation as the Richards Family Trust's fiduciary to show complete good faith and fairness to the Richards Family Trust in connection with the presentation, execution and approval of the Richards Assignment; and (ii) that Burnes, HKM, HK Allen Inc., Milton Fund, Dagbjartsson and at least one affiliate of Milton Fund materially assisted HKAllen's scheme to defraud the Richards Family Trust and the other Limited Partners.  The Richards Family Trust discovered these facts as a result of one Limited Partner's investigation of a March 2015 Consent Request document that HKM sent to the Limited Partners on behalf of HKAllen.

*General Partner Participated as Purchaser in Equity Resource Belmont Fund's Purchase of LP Units, But Failed to Ensure Transactions Were Fair to Limited Partners*

218.   On or about April 19, 2012, Equity Resource Concord Fund LLC ("**Concord Fund**") mailed to several of the Limited Partners an offer to pay $35,000.00 for each LP Unit.  The mailing contained a two-page letter (the

**COMPLAINT**

1    "**2012 ERI Letter**"), an Agreement of Sale and Assignment for each Limited

2    Partner to execute if he/she decided to sell his/her LP Units, and a 12-page Offer

3    To Purchase For Cash 5 Units of Hotel Danville for $35,000.00 per LP Unit (the

4    "**2012 ERI Offer**").

5         219.   On April 19, 2012, ERI was the manager of the LLC that is the

6    manager of Concord Fund.

7         220.   At the time Concord Fund sent the 2012 ERI Letter, $35,000.00

8    represented just a small fraction of the fair market value of one LP Unit.

9         221.   At the time Concord Fund sent the 2012 ERI Letter, Defendants

10   HKAllen, ERI, Concord Fund, Belmont Fund and Burnes knew that $35,000.00

11   represented just a small fraction of the fair market value of one LP Unit.

12   Defendants HKAllen, ERI, Concord Fund, Belmont Fund and Burnes knew this

13   because they knew that, beginning in early 2014, the Partnership would be

14   highly profitable and that it could and should distribute over $33,000 each year

15   to an owner of one LP Unit. Defendants HKAllen, ERI, Concord Fund, Belmont

16   Fund and Burnes also knew that, in the three immediately preceding years –

17   2009, 2010 and 2011 – the Limited Partners had to pay tax on more than

18   $15,000 of Partnership income per LP Unit, but received cash distributions from

19   the Partnership of less than $1000 in each of those years.  Defendants therefore

20   knew the Limited Partners would thus be unfairly susceptible to offers to

**COMPLAINT**

1   purchase their interests unless full and complete disclosure was made regarding

2   the expected profitability that was to begin in less than two years' time.

3       222.   The first paragraph of the 2012 ERI Offer states that, "Neither

4   [Concord Fund] nor Equity Resource Investments, LLC, the manager of

5   [Concord Fund's] manager, is an affiliate of the Partnership or the general

6   partner of the Partnership."

7       223.   The last page of the 2012 ERI Offer contained a paragraph whose

8   heading is "Past Contact and Negotiations with the General Partner."  That

9   paragraph was almost identical in content to the paragraphs with the same

10  headings in the 2006 and 2007 ERI Offers, the only difference being that the

11  2012 ERI Offer described HKAllen's option to purchase LP Units from ERI as

12  somewhat less definite. It said, "If requested, we may give the general partner

13  the option to acquire up to 50% of all units acquired by the Purchaser in certain

14  partnerships, including this Partnership, on the same terms as the Purchaser."

15      224.   Like the previous ERI Letters, the 2012 ERI Letter misled the

16  Limited Partners to convince them to sell rather than to hold their LP Units. It

17  stated that, in 2011, an owner of one LP Unit had a federal tax liability of more

18  than $6,500 but received no cash distributions from the Partnership. But, just

19  like the previous ERI Letters, the 2012 ERI Letter failed to acknowledge a

20  crucial fact known to Concord Fund: that the Partnership was expected to be

**COMPLAINT**

1   highly profitable in less than two years, and that those profits would enable the

2   Partnership to pay more than $33,000 in annual cash dividends to each owner of

3   one LP Unit for as long as the Partnership chose to continue owning the

4   Property.

5       225.   The 2012 ERI Letter and 2012 ERI Offer manipulated the Limited

6   Partners in the same ways that the previous ERI Letters and Offers did, as

7   alleged above.  As such, and in the interest of brevity, the allegations of

8   Paragraphs 132-139, 181, 184 and 202 are incorporated here and applied to the

9   2012 ERI Letter, the 2012 ERI Offer and to the Concord Fund and Belmont

10  Fund, in support of the allegations that the 2012 ERI Offer contained HKAllen's

11  implicit endorsement and that the 2012 ERI Letter and 2012 ERI Offer were part

12  of the same joint and deliberate plan, orchestrated by the ERI Parties, HKAllen,

13  HKM, HK Allen Inc., and Burnes, to defraud the Limited Partners by

14  convincing the Limited Partners that their LP Units had little value and then

15  purchasing their LP Units from them at prices that were far below market value.

16

17  *General Partner and Belmont Fund Bought Weide Family Trust's Interest for a*

18  *Small Fraction of its Fair Market Value*

19      226.   Brian and Roberta Weide received the 2012 ERI Letter and the

20  2012 ERI Offer in or around late April 2012.

**COMPLAINT**

227.   On or about March 25, 2013, Mr. Phil Darby of ERI ("**Darby**") sent to Roberta Weide, as co-trustee of the Weide Family Trust, an email with an attachment containing an unexecuted Agreement of Sale and Assignment dated March 25, 2013 (the "**March 2013 Assignment Form**").  In July 2013, Darby confirmed to Ms. Weide the continued validity of the offer to purchase LP Units implicit in the March 2013 Assignment Form.

228.   On September 27, 2013, Brian and Roberta Weide, as co-trustees of the Weide Family Trust, signed the March 2013 Assignment Form (as signed, the "**Weide Assignment**") by which the Weide Family Trust agreed to sell its 1.0 LP Unit to Concord Fund.  HKAllen was, at that time, one of two general partners of the Partnership (the other being Myerson).  At that time and now, the Weide Family Trust had only one beneficiary: the mother of Brian Weide, a widow in her 90s.  Defendants knew or should have known that the beneficiary of the Weide Family Trust was at least 65 years of age when the Trust's trustees received the 2012 ERI Letter and 2012 ERI Offer, and when they signed the Weide Assignment.

229.   On or about October 7, 2013, Dagbjartsson, in his capacity as Managing Member of ERF Fund 2011 GP LLC, which was the Manager of Concord Fund, signed the Weide Assignment on behalf of Concord Fund, as assignee.

**COMPLAINT**

230.    Also on or about October 7, 2013, and immediately after signing the Weide Assignment on behalf of Concord Fund, Dagbjartsson, in his capacity as the Managing Member of ERF Fund 2013 GP LLC, which was the Manager of Equity Resource Belmont Fund LLC ("**Belmont Fund**"): (i) caused a notation to be added to the Weide Assignment by which Concord Fund assigned to Belmont Fund the right to purchase the LP Unit under the Weide Assignment; and (ii) signed the Weide Assignment on behalf of Belmont Fund, as assignee.

231.    On October 28, 2013, Burnes signed the General Partner Consent by which the Partnership's "General Partner(s)," with knowledge of the terms and price of the sale from the Weide Family Trust to Belmont Fund, made the wholly discretionary decision expressly to approve the sale from the Weide Family Trust to Belmont Fund and admitted Belmont Fund to the Partnership as a Substitute Limited Partner.

232.    Upon information and belief, the Weide Assignment, and the participation in each by Concord Fund, Belmont Fund, ERF Fund 2011 GP LLC, ERF Fund 2013 GP LLC, Dagbjartsson, HKAllen and Burnes, were all part of the larger concerted and coordinated effort, led by HKAllen and involving each of the Coordinated Parties, to place a sufficient number of LP Units into the ownership of trusted parties who agreed to ratify – and on whom HKAllen could rely to ratify – a transaction, such as the Sale and Exchange, by

**COMPLAINT**

1  which such trusted parties would realize outsized profits from their LP Units,

2  and by which HKAllen and its affiliates would realize even larger profits.

3      233.   By check dated November 11, 2013, Belmont Fund paid the Weide

4  Family Trust $35,000 in exchange for the Weide Family Trust's 1.0 LP Unit.

5      234.   When Burnes signed the General Partner Consent to approve the

6  transfer from the Weide Family Trust to Belmont Fund and to admit Belmont

7  Fund to the Partnership as a Substitute Limited Partner, the Partnership was <u>just</u>

8  <u>three months</u> away from fully repaying its primary mortgage loan, after which

9  repayment the Partnership would own the Property with no debt, and the

10  Property should have produced net operating income of approximately $675,000

11  per year. The Weide Family Trust, if it had not sold its LP Unit, would have

12  been entitled to receive <u>annual</u> dividends of more than $33,000 from the

13  Partnership.

14      235.   HKAllen had actual knowledge of the facts alleged in the

15  immediately preceding Paragraph, but did not disclose this information to the

16  Weide Family Trust.

17      236.   At the time the Weide Family Trust transferred its 1.0 LP Unit to

18  Belmont Fund, $35,000 represented just a small fraction of the fair market value

19  of the Weide Family Trust's 1.0 LP Unit.

20

**COMPLAINT**

237.   At the time the Weide Family Trust transferred its 1.0 LP Unit to Belmont Fund, Defendants HKAllen, ERI, Concord Fund, Belmont Fund and Burnes knew that $35,000 represented just a small fraction of the fair market value of the Weide Family Trust's 1.0 LP Unit.

238.   At the time Burnes signed the General Partner Consent by which the Partnership's "General Partner(s)" consented to the Weide Assignment and admitted Belmont Fund to the Partnership as a Substitute Limited Partner, Defendants HKAllen, ERI, Concord Fund, Belmont Fund and Burnes knew that $35,000 represented just a small fraction of the fair market value of the Weide Family Trust's 1.0 LP Unit.

239.   HKAllen knowingly, intentionally, and with malice: (i) failed to fulfill its obligation as the Weide Family Trust's fiduciary to show complete good faith and fairness to the Weide Family Trust; (ii) failed to disclose to the Weide Family Trust the fact that any purchase by Concord Fund or Belmont Fund of the Weide Family Trust's LP Unit would be a conflicted, self-dealing transaction in which they, the Partnership's general partners, stood to profit at the expense of the Weide Family Trust; (iii) failed to disclose all information in HKAllen's possession that might reasonably have been material to the Weide Family Trust's consideration of Concord Fund's offer; and (iv) failed to ensure

**COMPLAINT**

1  that the purchase of the Weide Family Trust's 1.0 LP Unit produced a fair

2  financial outcome for the Weide Family Trust.

3      240.   HKAllen failed to fulfill its fiduciary obligations to the Weide

4  Family Trust because it was in a position to profit from the fact that Belmont

5  Fund purchased the Weide Family Trust's 1.0 LP Unit from the Weide Family

6  Trust for a small fraction of its fair market value.

7      241.   Had HKAllen fulfilled its obligation as the Weide Family Trust's

8  fiduciary to show complete good faith and fairness to the Weide Family Trust,

9  the Weide Family Trust would not have agreed to sell its 1.0 LP Unit for merely

10  $35,000.

11      242.   Brian and Roberta Weide, and the Weide Family Trust, had no

12  knowledge, nor any reason to suspect, that HKAllen or Burnes would act in a

13  manner contrary to the Limited Partners' best interests or would make

14  misrepresentations the value of the LP Units.  Nor did they have any reason to

15  suspect that their understanding regarding the fairness of the transaction, which

16  they had reached in reliance on the fiduciaries' misrepresentations, was

17  inaccurate.  As a consequence, Brian and Roberta Weide, and the Weide Family

18  Trust, had no reason to suspect that the terms of the Weide Assignment were

19  substantially unfair and not in their financial interests.

20

**COMPLAINT**

243.    Burnes, HKM, HK Allen Inc., Concord Fund, Belmont Fund, Dagbjartsson and at least one affiliate of Concord Fund aided and abetted HKAllen's breach of the fiduciary duty it owed to the Weide Family Trust.

244.    On July 1, 2014, each of Allen and a trust of which Myerson and his wife were both trustees ("**Myerson Trust**") assigned to HKN Allen 99% of his/its LP Units. The assignments by Allen to HKN Allen and by the Myerson Trust to HKN Allen were both documented in a single document (the "**Allen & Myerson Assignment**"). Allen signed the Allen & Myerson Assignment on his own behalf. Joseph Myerson signed the Allen & Myerson Assignment on behalf of the Myerson Trust. Burnes signed the Allen & Myerson Assignment twice. First, Burnes signed in his capacity as Manager of the assignee, HKN Allen. Second, Burnes signed in his capacity as President of HK Allen Inc., which was then the sole general partner of HKAllen, to evidence HKAllen's express approval of the transfer from Allen to HKN Allen and from he Myerson Trust to HKN Allen. HKN Allen was and is an affiliate of HKAllen. Upon information and belief, the Allen & Myerson Assignment was part of the larger concerted and coordinated effort, led by HKAllen and involving each of the Coordinated Parties, to place a sufficient number of LP Units into the ownership of trusted parties on whom HKAllen could rely to consent to a transaction – such as the Sale and Exchange – by which such trusted parties would realize outsized profits

**COMPLAINT**

1 | from their LP Units, and by which HKAllen and its affiliates would realize even

2 | larger profits.

3 |

4 | *Phase Two: HKAllen and HKM Fraudulently Obtained "Consent of the Investor*

5 | *Limited Partners" to the Sale and Exchange Transaction*

6 | 245.   On or about March 26, 2015, HKM, acting on behalf of HKAllen,

7 | sent to all the Limited Partners a document dated March 26, 2015 and entitled,

8 | "Consent Request for Hotel Danville Company: Solicitation by General Partner

9 | of Limited Partner Consent" (the "**Consent Request**").  The Consent Request

10 | was printed on HKM letterhead and asked the Limited Partners to consent to the

11 | so-called Sale and Exchange. It asked the Limited Partners to return a Limited

12 | Partner Consent to Chris Pavoni, at HKM.

13 | 246.   The Consent Request falsely described the Sale and Exchange as a

14 | transaction that was beneficial to and in the best interest of the Limited Partners.

15 | 247.   The steps of the Sale and Exchange, which was completed on

16 | September 10, 2015, are as follows:

17 | a.      The Partnership, which owned the Property free of

18 | any debt, contributed the Property to a newly formed Massachusetts limited

19 | liability company called HKN Danville House LLC ("**New Owner**") in

20 | exchange for a 99.99% membership interest in New Owner.  The Consent

**COMPLAINT**

1   Request described New Owner as "an affiliate of HKAllen."  The managing

2   member of the New Owner, HKN Manager LLC ("**Managing Member**"), is an

3   affiliate of HKAllen and received a 0.01% membership interest in New Owner

4   for free; it contributed no money, and it promised to provide no services that

5   HKAllen was not already required and paid to provide.  The same individuals

6   who currently control HKAllen also have full control over New Owner and

7   Managing Member.  Transferring the Property to New Owner reduced the

8   degree to which the Limited Partners can influence the Property's management,

9   operations and disposition.

10          b.      New Owner borrowed approximately $6.1 million at

11  an interest rate of approximately 3.57% that is fixed for the entire 35-year term

12  of the loan, and the loan ("**New Loan**") is secured by the Property and

13  guaranteed by the U.S. Department of Housing and Urban Development

14  ("**HUD**").

15          c.      Since there was no outstanding debt on the Property

16  before the Sale and Exchange, most of the loan proceeds were available for

17  immediate distribution. Approximately $5.5 million of the loan proceeds were

18  distributed.

19          d.      New Owner promised to pay the Partnership $7.46

20  million, which amount the Consent Request called the "Sale Price Equivalent."

**COMPLAINT**

1   The "Sale Price Equivalent" is, according to the Consent Request, "equal to (a)

2   $7.70 million appraised value [of the Property], less (b) approximately $243,000

3   to otherwise pay standard broker costs, closing and transaction costs (after

4   applying $65k of available reserves) in connection with sale of the Property to

5   the New Owner."  Upon information and belief, there were no actual brokerage

6   costs in the Sale and Exchange.  Further, the Consent Release did not specify the

7   actual closing or transaction costs associated with the Sale and Exchange.

8           e.      New Owner promised to pay this "Sale Price

9   Equivalent" to the Partnership in two components: (i) approximately $5.5

10  million of the loan proceeds was paid to the Partnership upon closing of the New

11  Loan – from the proceeds of the New Loan; and (ii) the balance is supposed to

12  be paid to the Partnership from New Owner's cash flow as a so-called "Priority

13  Return" until the full amount of the "Sale Price Equivalent" is paid to the

14  Partnership.  That is, now that New Owner has paid $5.5 million to the

15  Partnership when the New Loan closed, the New Owner will pay 100% of its

16  cash flow to the Partnership until New Owner pays the Partnership, in the

17  aggregate, $7.46 million.  The expectation is that New Owner will pay the full

18  $7.46 million to the Partnership within 6-7 years after the closing of the New

19  Loan. According to the Consent Request, an owner of one LP Unit was expected

20

**COMPLAINT**

1    to receive a total of $224,000 from the Sale and Exchange: $184,000 at closing

2    and $40,000 over the next six to seven years.

3            f.      HKAllen received approximately $1.8 million of the

4    $5.5 million paid to the Partnership at the time the New Loan closed.

5            g.      HKAllen will receive Fifty Percent (50%) of the

6    Priority Return that New Owner pays to the Partnership.

7            h.      The Consent Request described payments to the

8    Partnership after the Priority Return is fully paid as follows: "In addition, after

9    the Sale Price Equivalent has been paid in full, the Partnership will continue to

10   have a 50% interest in all cash flow and capital proceeds generated by the

11   Property, thus allowing the Partnership to receive the continued benefit of the

12   Property's strong cash flow and long term appreciation."

13           i.      After the New Owner pays a total of $7.46 million to

14   the Partnership, Managing Member, which is an affiliate of HKAllen, will take

15   Fifty Percent (50%) of all cash flows from operations and all capital proceeds

16   from the Property. New Owner will pay the other Fifty Percent (50%) to the

17   Partnership.  Pursuant to the Partnership Agreement, the Partnership will pay

18   HKAllen One Percent (1%) of the operational cash flows that the Partnership

19   receives and Fifty Percent (50%) of the capital proceeds that the Partnership

20   receives.

**COMPLAINT**

248.   The Consent Request contained numerous material omissions and material misrepresentations about the Sale and Exchange:

a.    The Consent Request did not openly acknowledge that the Sale and Exchange was a self-dealing transaction with a glaring conflict of interest between HKAllen and the Limited Partners.  Neither the phrase "conflict of interest" nor even the term "conflict" appeared even once in the Consent Request.

b.    The Consent Request contained no independent analysis to address the fairness of the Sale and Exchange – and HKAllen has never provided such an analysis to the Limited Partners.

c.    By calling the payment to the Partnership the "Sale Price Equivalent," and by naming the transaction the "Sale and Exchange," HKAllen misled the Limited Partners to believe that there would be a true sale of the Property, or at least its economic equivalent.  In fact, there was not.  There was a financing (not a refinancing because there was no outstanding loan to repay with the proceeds of the New Loan), which was the New Loan.  After that, there was a complicated reshuffling of the distributions of cash flows and capital proceeds that was designed to convince the Limited Partners that there was a real sale.  Yet, the only party in the Sale and Exchange who could possibly have been a legitimate buyer was putting nothing of value into the deal and was

**COMPLAINT**

1    taking no risk, but inexplicably emerged as the recipient of half of all cash flows

2    produced by the Property.  Further, all the money that constituted the "Sale Price

3    Equivalent" would come from either: (i) proceeds from financing the Property,

4    which the Partnership owned free of any debt; or (ii) the Property's rental

5    income.  Calling the transaction a "Sale and Exchange" lulled the Limited

6    Partners into believing that, if they received the amount they would receive in a

7    true sale to a third party, then anything they received above that amount would

8    be a bonus.  The truth is that there was no bona fide sale in the Sale and

9    Exchange – and that continuing to operate the Property with no debt would have

10   been, by a <u>substantial</u> margin, the obvious way to maximize the net present

11   value of each LP Unit.  HKAllen knew or should have known this, but chose

12   deliberately not to mention to the Limited Partners the obvious option of

13   continuing to operate the Property without any transaction at all.  HKAllen made

14   this choice because HKAllen knew: (i) that it would profit substantially from the

15   Sale and Exchange, and (ii) that every dollar HKAllen and its affiliates gained in

16   the Sale and Exchange was a dollar that the Limited Partners would otherwise

17   have retained for themselves.

18              d.    The Consent Request did not disclose to the Limited

19   Partners that, if the Sale and Exchange were to be completed, then (i) neither the

20   New Owner nor the Managing Member would owe fiduciary duties to the

**COMPLAINT**

1    Limited Partners or to the Partnership, and (ii) the limited, but meaningful

2    ability of the Limited Partners to influence the operations and disposition of the

3    Property by participating in governance of the Partnership would be eliminated.

4    By contrast, if the Sale and Exchange were not approved, then (i) HKAllen

5    would continue to owe fiduciary duties to each Limited Partner and to the

6    Partnership, and (ii) the Limited Partners would continue to enjoy limited, but

7    meaningful rights to influence the Partnership's governance and operations.

8                    e.      By defining the $7.46 million payment from New

9    Owner to the Partnership as the "Sale Price Equivalent," and by comparing the

10   Sale and Exchange to only one alternative scenario – a "fee simple sale of the

11   Property to a third party purchaser" – HKAllen materially misled the Limited

12   Partners to believe that Sale Price Equivalent is the net amount that the

13   Partnership would receive if it sold the Property to a third party buyer for fair

14   market value.  In fact, the fair market value of the Property was and is

15   substantially greater than $7.70 million.  HKAllen achieved this deception by

16   implying that the opinion of the Property's value provided in the Novogradac

17   Appraisal is the same as the fair market value of the Property at the time the

18   Consent Request was distributed to the Limited Partners.  In fact, the

19   Novogradac Appraisal did not purport to provide the fair market value of the

20   Property in its current condition as a Section 8 property whose Section 8 rental

**COMPLAINT**

subsidy contract was renewed in 2014 and expires in 2034.  Instead, as required by applicable HUD regulations, the Novogradac Appraisal provided an opinion of value that assumes several facts that do not accurately describe the Property, including, notably, the assumption that <u>no</u> Section 8 rent restrictions are in place.  The counterfactual assumption that no Section 8 rent restrictions are in place materially reduced the Novogradac Appraisal's determination of value.  Without Section 8 rent restrictions, the Novogradac Appraisal concluded that the Property's value is $7.7 million.  If the Novogradac Appraisal had assumed that Section 8 rent restrictions were in place, the Novogradac Appraisal would have concluded that the Property's fair market value was at least $10 million.  Moreover, the Consent Request provided no discussion or even any mention of at least two obvious alternatives to the Sale and Exchange: holding the Property as-is and operating it profitably without debt; or executing an honest financing <u>without</u> giving half of the Property's future cash flows to an affiliate of HKAllen for literally nothing in return.

f.    In the Consent Request, HKAllen falsely implied that payment by the New Owner to the Partnership of 50% of all cash flows and capital proceeds (after payment of the Priority Return) is either a bonus to the Limited Partners or a continuation of the same cash flows that the Limited

**COMPLAINT**

1  Partners already receive.  This excerpt from the "Summary' section of the

2  Consent Request illustrates the point:

3        As a practical matter, the HUD Refinancing Closing Distribution

4        to a Limited Partner is projected to be approximately the same as

5        the after-tax results of a sale at the $7.70 million appraised value to

6        that Limited Partner, assuming the Limited Partner was admitted to

7        the Partnership in the original syndication and has used all of

8        his/her losses. **Future cash flow**, while subject to annual taxation,

9        **would add to these benefits**, deferring exit taxes for potentially

10       many years. (Emphasis added.)

11 HKAllen's false implication helped HKAllen to mislead the Limited Partners

12 into believing that the economic terms of the Sale and Exchange were either

13 generous to the Limited Partners, or at least completely fair to the Limited

14 Partners.  In fact, however, the Sale and Exchange was demonstrably unfair to

15 the Limited Partners because it improperly and without consideration diverted to

16 an HKAllen affiliate 50% of the cash flows and capital proceeds that the

17 Partnership was otherwise entitled to receive after the "Sale Price Equivalent" is

18 paid, and also improperly paid 50% of the so-called Priority Return to HKAllen

19 (as discussed in Paragraphs 248(m) and (n) below). The net result for the

20 Limited Partners is that, since the proceeds of the New Loan were distributed

**COMPLAINT**

1  when the New Loan closed, HKAllen and its affiliate have been taking and will

2  continue to take from the Limited Partners half of the money that the Limited

3  Partners were and are entitled to receive.  The Limited Partners are, under the

4  Partnership Agreement, entitled to receive 98% of cash flows from the

5  Property's operations, but they will receive only 49% of those cash flows now

6  that the Sale and Exchange is completed.  Under the Partnership Agreement, the

7  Limited Partners are entitled to receive 50% of capital proceeds after certain

8  thresholds are met, and the general partner receives the other 50%.  Now that the

9  Sale and Exchange is completed, the Limited Partners will receive only 25% of

10  the proceeds from future capital transactions, while HKAllen and its affiliate

11  will receive 75%.

12          g.      The HKAllen affiliate who takes 50% of the cash

13  flows that should be paid to the Partnership is the Managing Member, who has

14  only a 0.01% membership interest in New Owner.  HKAllen and Managing

15  Member invested no money in the Sale and Exchange, and HKAllen and

16  Managing Member committed to provide no services that HKAllen was not

17  already obligated and compensated under the Partnership Agreement to provide.

18  All said, the Sale and Exchange was nothing more than a complicated ruse

19  designed to hide an outright theft by HKAllen and its affiliate of half of the cash

20  flows that rightfully belong to the Limited Partners.

**COMPLAINT**

h.      The Consent Request contained no clear acknowledgement of the fact that Managing Member, who is an affiliate of HKAllen, has paid and will pay no consideration whatsoever in exchange for obtaining a right to receive 50% of the Property's future cash flows and capital proceeds.

i.      The Consent Request contained no disclosure, discussion or analysis of the value of one LP Unit in the absence of a new transaction, where the Partnership simply continues to operate the Property with no debt and produces substantial profits every year.

j.      The Consent Request did not explain that HKAllen would and did receive a distribution of approximately $1.8 million shortly after the closing of the Sale and Exchange, but would receive no such distribution if the Partnership continued to operate the Property without any debt.

k.      The Consent Request did not explain that the $1.8 million distribution to HKAllen reduces the value of the LP Units.  Operating the Property with no debt is substantially more valuable to an owner of one LP Unit than operating pursuant to the Sale and Exchange, in part because there would be no $1.8 million distribution to HKAllen if HKAllen continued to operate the Property with no debt.

**COMPLAINT**

1    l.    If the Property were operated under the Partnership

2  Agreement with no debt, it would have been able to distribute at least $675,000

3  to the partners in 2015.  If the Partnership distributed $675,000 of operating

4  revenues to its partners, the Limited Partners as a group would have received

5  98% of that (or $661,500), and an owner of one LP Unit would have received

6  $33,075.  Therefore, simply operating the Property without any debt would have

7  provided over $33,000 of <u>annual</u> income to every owner of one LP Unit, and the

8  net present value of the cash flows payable to an owner of one LP Unit is at least

9  $780,000.

10    m.    The Consent Request contained no discussion or

11  analysis of the amount of money that HKAllen and its affiliates would and did

12  receive from the Sale and Exchange. The Consent Request contained no clear

13  statement that HKAllen will receive half of the Priority Return payments made

14  by New Owner to the Partnership.  However, this is precisely what is happening

15  now that the Sale and Exchange is complete, because the Consent Request stated

16  that, "the Closing Distribution and the Priority Return will be distributed by the

17  Partnership as capital proceeds in accordance with the priorities defined in

18  10.2(C) of the Partnership Agreement."

19    n.    The above-referenced statement that the Priority

20  Return will be treated as capital proceeds constitutes a violation of the

**COMPLAINT**

Partnership Agreement.  Section 10.2(C) of the Partnership Agreement provides that 50% of capital proceeds are paid to the Limited Partners after certain thresholds are met.  But the Priority Return monies do not come from any capital transaction; they come from the rental income from the Property's *operations*, and section 10.2(A) of the Partnership Agreement requires that 98% of cash flows from *operational* income be paid to the Limited Partners.  Presumably, HKAllen would contend that the "Sale Price Equivalent" constitutes proceeds of a capital transaction, but that would be improper because there is no legitimate sale or exchange in the Sale and Exchange.

o.    The Consent Request stated that HKAllen and its affiliates will waive certain 'Incentive Management Fees,' and implied that this waiver is of real value to the Limited Partners.  In fact, the waiver of the Incentive Management Fee has no value at all to the Limited Partners.  Now that the Sale and Exchange is complete, the formula in section XI(B) of the Partnership Agreement that determines the amount of the Incentive Management Fee can never produce a positive value.

p.    When the Sale and Exchange was complete, each of Hall Keen Investments, the ERI Parties and their respective affiliates, (such parties collectively, and together with HKAllen, Carlen and Franklin 81 Associates, the "**GP Parties**") realized extraordinarily high returns on the LP

**COMPLAINT**

1    Units it purchased.  The ERI Parties paid a total of $88,750 to purchase 7.25 LP

2    Units.  Even after the Sale and Exchange reduced the value of each of those LP

3    Units by at least $480,000.00, each LP Unit was still worth approximately

4    $300,000.  That means that the ERI Parties investment of $88,750 grew to more

5    than $2,175,000.  That is *more than 24 times* the ERI Parties' original

6    investment in fewer than ten years.  Hall Keen Investments and its affiliate,

7    HKAllen, did even better than that with the two LP Units that Hall Keen

8    Investments bought from Hamill and McKinney.  HKAllen and its affiliates kept

9    for themselves 100% of the value of each LP Unit even after the Sale and

10    Exchange, so the two LP Units for which Hall Keen Investments paid only $200

11    produced at least $1,560,000 for HKAllen and its affiliates.  *That is 7,800 times*

12    *the original investment of $200.*  HKAllen and the ERI Parties knew that the GP

13    Parties would realize such enormous profits upon the completion of the Sale and

14    Exchange.

15                    q.    HKAllen knew when it sent the Consent Request to

16    the Limited Partners that none of the GP Parties would disapprove the Sale and

17    Exchange – because the GP Parties would reap such enormous returns from the

18    Sale and Exchange.  As a result, HKAllen knew that, under the terms of the

19    Partnership Agreement, all 15 Independent Limited Partners who owned at least

20    0.5 LP Units <u>and</u> three of the four Independent Limited Partners who owned less

**COMPLAINT**

than 0.5 LP Units would have to *affirmatively oppose* the Sale and Exchange for HKAllen not to obtain the "Consent of the Limited Partners" that is technically required under the Partnership Agreement for approval of the Sale and Exchange.

r.   HKAllen knew when it sent the Consent Request to the Limited Partners that there was no chance that those 18 of 19 Independent Limited Partners would <u>affirmatively oppose</u> the Sale and Exchange, especially since, as described below, the Limited Partner Consent form it sent to the Limited Partners had no place on it for a Limited Partner to record a "no" vote. Therefore, HKAllen was certain when it sent the Consent Request to the Limited Partners that it would obtain the "Consent of the Investor Limited Partners" (as defined in the Partnership Agreement) necessary to approve the Sale and Exchange – even though HKAllen also knew that the Sale and Exchange was fundamentally unfair to the Independent Limited Partners.

s.   The Consent Request did not disclose the fact that, since January 1, 2001, the GP Parties have acquired 9.75 of the 20 LP Units in the Partnership, or fully 48.75% of the Partnership.

t.   HKAllen's failure expressly to disclose to the Limited Partners the current ownership of the LP Units <u>before</u> seeking the Limited Partners' approval of the Sale and Exchange misled the Limited Partners to

**COMPLAINT**

107

1   conclude that the ownership of LP Units was as described in the last disclosure

2   of such information by HKAllen – and, in so doing, misled the Limited Partners

3   to believe that the election process initiated by the Consent Request was as fair

4   as such a process could be under the Partnership Agreement.

5          u.      The last time before the Consent Request that

6   HKAllen disclosed Partnership ownership information to the Limited Partners

7   was on or around January 1, 2001, the date on which Amendment Two was

8   executed.  The Schedule A attached to Amendment Two indicated that the

9   general partner owned 0.5 LP Units (Allen and Myerson each owned 0.25 LP

10  Units, which they wrongfully acquired from Pfeiffer), and it did not list any of

11  the GP Parties as Limited Partners.

12         v.      HKAllen knowingly and intentionally failed to

13  disclose to the Limited Partners in clear, comprehensible terms the current

14  ownership of LP Units to help ensure that HKAllen would obtain "Consent of

15  the Limited Partners" (as defined in the Partnership Agreement) to the Sale and

16  Exchange despite the fact that HKAllen knew that the Sale and Exchange was

17  and is fundamentally unfair to all of the Limited Partners other than Allen,

18  Myerson and the GP Parties.

19         w.      The Consent Request did not ask each Limited Partner

20  to consider the Sale and Exchange and then to send by writing their approval or

**COMPLAINT**

disapproval.  Instead, the Consent Request asked the Limited Partners to approve the Sale and Exchange.  The Limited Partner Consent form that appeared on page 8 of the Consent Request was designed for a Limited Partner to sign it to express only his or her consent to the Sale and Exchange.  The form did not contemplate the possibility that a Limited Partner might not consent to the Sale and Exchange, and there was no place on the form for a Limited Partner to express his or her opposition to the Sale and Exchange.  Particularly when coupled with HKAllen's failure to disclose the current ownership of the Partnership (as described above) and HKAllen's failure to disclose that it had collaborated with the ERI Parties to acquire LP Units and to share the profits from those acquisitions, HKAllen's deliberate design of the Limited Partner Consent form constituted a knowing, intentional and malicious attempt to mislead the Limited Partners to help ensure that the Sale and Exchange was approved so that HKAllen and the ERI Parties could profit at the expense of the Limited Partners.

            x.    HKAllen has never disclosed to the Limited Partners its dealings and agreement(s) with ERI or with any affiliates of ERI – not in the Consent Request or in any other document.

      249.   One day after the deadline for replies to the Consent Request, on April 28, 2015, HKM, on behalf of HKAllen, sent to all the Limited Partners a

**COMPLAINT**

1  document dated April 28, 2015 and entitled, "Sale and Exchange Update for

2  Hotel Danville Company" ("**Update Number One**").  Update Number One was

3  printed on HKM letterhead.

4      250.   Update Number One announced that the Sale and Exchange was

5  formally approved.  It did not disclose how many Limited Partners affirmatively

6  consented to the Sale and Exchange.  Update Number One also did not disclose

7  that the GP Parties collectively own 9.75 of the Partnership's 20 LP Units.

8      251.   Update Number One acknowledged that "several Limited Partners"

9  communicated questions and comments to HKAllen about the Sale and

10  Exchange, and that one of the two Limited Partners who dissented was among

11  those who sent such questions and comments.  "As a result of these discussions"

12  with several Limited Partners, HKAllen announced a modification to the terms

13  of the Sale and Exchange:  "Specifically, a 7.0% annual priority rate will be

14  added with regard to the unpaid portion of the Priority Return. To the extent

15  unpaid, the Priority Return will accrue interest at a rate of 7.0%, compounded

16  annually."

17      252.   This modification did not cure any of the serious inequities and

18  other flaws in the Sale and Exchange.  Instead, it constituted a knowing,

19  intentional and malicious attempt to mislead the Independent Limited Partners

20  who had not dissented to the Sale Exchange to believe that HKAllen was acting

**COMPLAINT**

in good faith and in the best interest of the Independent Limited Partners by listening to feedback from Independent Limited Partners and by implementing a remedy that benefits the Independent Limited Partners.

253.   The 'Summary' section of Update Number One echoed the Consent Request's grossly misleading description of the Sale and Exchange – but this time shifted its characterization of future cash flows from a sort of bonus to simply a continuation of the same cash flows the Partnership is entitled to receive before the Sale and Exchange.  The relevant language appears below:

> After payment of the Priority Return (the installment note equivalent) and all accrued 7% priority, the Partnership will continue to be entitled to receive 50% of cash flow from Property operations, and 50% of proceeds from a future sale or refinancing, and those funds will be distributed among the Partners of the Partnership in accordance with the applicable provisions of the Partnership Agreement, with the exception that the Incentive Management Fee will no longer be charged by or paid to the General Partner after the closing.

254.   In fact, the Sale and Exchange reduces by 50% the Limited Partners' right to receive cash flow and proceeds from capital transactions, and it does this without compensating the Limited Partners in any way.

**COMPLAINT**

*HKAllen Purposefully Mischaracterized Plaintiffs' Concerns, Accused Plaintiffs of Harboring Impure Motivations, and Then Proceeded to Complete the Sale and Exchange, Thereby Harming all Plaintiffs Who Remain Limited Partners*

255.   On or about May 11, 2015, HKM, on behalf of HKAllen, sent to all the Limited Partners a document dated May 11, 2015 and entitled, "Sale and Exchange 2nd Update for Hotel Danville Company" ("**Update Number Two**").

256.   Update Number Two dealt with one topic: the objections to the Sale and Exchange communicated to HKAllen by two of the Plaintiffs. In Update Number Two, HKAllen notified the Limited Partners that, "In addition to opposing the transaction proposed in the Limited Partner Consent, the Dissenters, through counsel, have now made serious allegations against HKAllen and have threatened litigation."

257.   However, HKAllen grossly mischaracterized the substance of the Dissenters' concerns, and then attempted to bolster the rationale for the Sale and Exchange by employing still more mischaracterizations, as follows:

In pertinent part, the Dissenters appear to believe that the Partnership's property should not be conveyed and/or that HKAllen should not be entitled to pull the remainder of its equity out of the Partnership on the same terms as the Limited Partners. However, this Partnership was contemplated in the original

**COMPLAINT**

1   Confidential Offering Memorandum as a 15-year investment, with

2   a sale of the property at the end of that period that would have

3   resulted in significant tax liabilities to the Partners. For many

4   reasons, it made sense to continue to manage the investment for

5   another 17 years. With no debt, low interest rates and a strong sale

6   market, a sale of the property now would be very logical. Instead,

7   HKAllen proposed a transaction that worked like a sale, but

8   deferred taxes, which HKAllen thought would appeal to the

9   Limited Partners. The proposed transaction also reflected the idea

10  that after 33 years, it was appropriate to carry out the original

11  premise of the Confidential Offering Memorandum - a sale of the

12  property that allowed all partners to cash out their equity.

13      258.   HKAllen's assertion that the Dissenters believe that HKAllen

14  "should not be able to pull its equity out of the Partnership on the same terms as

15  the Limited Partners" was a false and misleading attempt to portray the

16  Dissenters as unreasonable and punitive.  First, HKAllen could not reasonably

17  have concluded from the concerns expressed to HKAllen on behalf of the

18  Dissenters that the Dissenters held that belief.  Second, HKAllen's implication

19  that it should be able to pull its equity out of the Partnership falsely suggests that

20  it had in fact invested substantial equity into the Partnership.  It had not.  The

**COMPLAINT**

general partners invested only $100 into the Partnership in 1982, and they have received substantial fees and other payments for their services every year since then.  By contrast, the Limited Partners invested more than $2.5 million in 1982. Notably, HKAllen fails again in Update Number Two to evaluate the economics of no transaction at all, even when it purports to respond to the Dissenters' apparent position that, "the Partnership's property should not be conveyed."

259.    Still worse, in Update Number Two, HKAllen misleadingly characterized the Dissenters as spoilers, and stated that it will cancel the Sale and Exchange and, instead, proceed with a third party sale if the Dissenters "continue to cause delay by resisting the proposal outlined in the Limited Partner Consent."  Even though continuing to operate the Property with no debt would be significantly more lucrative for each Limited Partner than either the Sale and Exchange or a third party sale, HKAllen did not even acknowledge the existence of this obvious alternative.  One reason for HKAllen's failure to consider this 'no transaction' alternative is that it would not provide an immediate seven-figure payment to HKAllen ($1.8 million), while the Sale and Exchange or a third party sale would – and did.

260.    On or about May 18, 2015, HKM, on behalf of HKAllen, sent to all the Limited Partners a document dated May 18, 2015, and entitled, "Sale and Exchange 3rd Update for Hotel Danville Company" ("**Update Number Three**").

**COMPLAINT**

261.   Update Number Three announced that HKAllen had received "no new information from the dissenting parties," and that it was proceeding to lock interest rates "as quickly as possible" on the loan that was part of the Sale and Exchange, "while attempting to address the concerns of the Dissenters or, if not possible, finding a path forward that minimizes the delay and expense associated with their objections."

262.   Attached to Update Number Three was a near-final draft of the limited liability company operating agreement of New Owner ("**New Owner LLC Agreement**").  Attached as Exhibit B to the New Owner LLC Agreement was a complete copy of the Partnership Agreement, with all amendments through May 11, 2015.

263.   HKAllen disclosed to the Limited Partners for the first time in Update Number Three the fact that HKAllen, its affiliates, and ERI and its affiliates, collectively own 48.75% of the Partnership's LP Units.  They acquired a total of 9.75 of the Partnership's 20 LP Units in 14 separate transactions.  Update Number Three contained a two-page memo followed by 167 pages of exhibits and attachments, and the Schedule A from which one can extract current ownership information appeared only on the last four pages of the 167 pages of exhibits and attachments.  Because this ownership information was buried at the end of 167 pages of exhibits and attachments, and because no

**COMPLAINT**

1    mention whatsoever of it was made in the two-page memo that constitutes the

2    primary document of Update Number Three, HKAllen knew that there was very

3    little likelihood that most, or even any, of the Independent Limited Partners

4    would see it, much less appreciate its import.

5         264.   HKAllen's failure to disclose each of these transactions to all of the

6    Limited Partners was not only material and misleading, but was also a violation

7    of the Partnership Agreement.  Section 8.3 of the Partnership Agreement

8    requires HKAllen, as general partner, to amend Schedule A to the Partnership

9    Agreement and to file with the Commonwealth of Virginia an amendment to the

10   Partnership's Certificate of Limited Partnership each time a Substitute Limited

11   Partner is admitted to the Partnership.  Myerson and Allen waited nearly ten

12   years before disclosing their ownership of the 0.5 LP Units that Pfeiffer used to

13   own.  In 2001, 2006, 2007, 2008 and 2013, HKAllen approved thirteen transfers

14   of LP Units and admitted six Substitute Limited Partners to the Partnership.  But

15   HKAllen failed to disclose any of these transfers or Substitute Limited Partners

16   to the Independent Limited Partners until weeks after the deadline for response

17   to the Consent Request had passed.  And even then, it did not disclose the facts

18   directly, but rather buried the facts on the last four pages of 167 pages of

19   attachments to its two-page memorandum.

20

**COMPLAINT**

265.   On or about May 22, 2015, HKM, on behalf of HKAllen, sent to all the Limited Partners a letter on HKM letterhead, dated May 22, 2015 and with the subject line, "Hotel Danville Company – Confirmation of Consent for Sale and Exchange" (the "**Confirmation of Consent**").

266.   The Confirmation of Consent announced a highly atypical mechanism - a "straw poll" through which HKAllen sought to reconfirm the original approval of the Sale and Exchange.  HKAllen never reported the results of this straw poll to the Limited Partners.

267.   Once again, the Confirmation of Consent contained numerous material omissions and misrepresentations, some of which are described below.

268.   In the Confirmation of Consent, HKAllen falsely stated, "To our disappointment, the Dissenters … have not engaged us substantively on their specific concerns within the proposed Sale and Exchange." In fact, the Dissenters shared with HKAllen detailed explanations of their concerns about the Sale and Exchange.  HKAllen knowingly, intentionally and with malice made this false statement to the Limited Partners in its attempt to bolster the Sale and Exchange by discrediting the opponents of the Sale and Exchange.

269.   In the Confirmation of Consent, HKAllen made what may be its strongest express endorsement of the Sale and Exchange, which HKAllen knew was fundamentally unfair to the Independent Limited Partners: "Toward that

**COMPLAINT**

1   end, the general partner strongly believes that the Sale and Exchange proposal

2   submitted to you on March 26, 2015 and approved by 95% of the limited

3   partners is still the best way to proceed." In its attempt to portray the Sale and

4   Exchange as having strong support and to portray the dissenters as a marginal

5   and unreasonable minority, HKAllen overstated the degree to which the Limited

6   Partners actually supported the Sale and Exchange. In truth, 95% of the owners

7   of LP Units did not sign and return the Consent Request to indicate their consent

8   to the deal. At least a few Limited Partners did not respond at all to the Consent

9   Request. HKAllen, in its zeal to shore-up support for the deal it sold through

10  deception and material omission, took the liberty of interpreting a non-response

11  to the Consent Request as an "approval" of the Sale and Exchange. The actual

12  percentage of Limited Partners who approved the Sale and Exchange is

13  substantially lower than 95%, and that number would be even lower had

14  HKAllen described the transaction honestly.

15       270.  On or about September 10, 2015, HKAllen completed the Sale and

16  Exchange. HKAllen did not send any updates or other written communications

17  to the Limited Partners after it sent the Confirmation of Consent and before it

18  completed the Sale and Exchange.

19       271.  On or about September 15, 2015, HKM, on behalf of HKAllen, sent

20  a "Distribution Transmittal for Hotel Danville Company" to each of the Holder

**COMPLAINT**

LPs (the "**Closing Memo**").  Included with the Closing Memo was a check for each Limited Partner in the amount of  $186,978.37 per LP Unit. The Closing Memo explained that $164,870.83 of the amount paid by check was the "Closing Distribution" from the Sale and Exchange. The other $22,207.54 was a partial distribution of 2014 cash flow. The Closing Memo also stated that the unpaid Priority Return is "about $51,414" per LP Unit. The Closing Memo did not state explicitly the unavoidable conclusion to be drawn from the figures set forth above: that the total amount each owner of one LP Unit would receive from the Sale and Exchange was $8,000 lower than the $224,000 amount stated in the Consent Request. The Closing Memo also did not provide any explanation for the reduced amount each Limited Partner would receive from the Sale and Exchange.  Further, HKAllen has not sent the Limited Partners an accounting of the Sale and Exchange transaction or any of the fully executed loan documents, land transfer documents or even organizational documents of HKN Danville LLC or HKN Manager LLC.  HKAllen also has not disclosed to the Limited Partners whether it exercised its option(s) to purchase LP Units from the ERI Parties.

272.   Because HKAllen completed the Sale and Exchange, the net present value of one LP Unit fell from at least $780,000 to approximately $300,000.00, causing every Holder LP to lose $480,000 for each LP Unit

1    owned.  But the result was different for the ERI Parties who purchased LP Units

2    for as little as $5000 per LP Unit: to them, a net present value of $300,000

3    represents a return of 5900% on their original investment.

4

5    **FIRST CAUSE OF ACTION**

6    **Breach of Fiduciary Duty**

7    (All Plaintiffs Against Defendants Allen and HKAllen)

8    273.   Plaintiffs reallege here and incorporate by reference into this Cause

9    of Action all preceding Paragraphs of this Complaint.

10    274.   During the periods of time alleged herein, there existed between

11    Plaintiffs and Defendants Allen and HKAllen, a fiduciary and/or confidential

12    relationship upon which Plaintiffs justifiably relied to their detriment.

13        a.    Allen owed a fiduciary duty from the creation of the

14    Partnership to approximately January 1, 2001 to all Plaintiffs, because Allen was

15    then a General Partner of the Partnership.

16        b.    HKAllen has owed a fiduciary duty from

17    approximately January 1, 2001 to the present, and still owes a fiduciary duty to

18    all Plaintiffs while they held some Limited Partner interest, because HKAllen

19    has been a General Partner of the Partnership since approximately January 1,

20    2001.

**COMPLAINT**

275.    Pursuant to said fiduciary duties, Defendants Allen and HKAllen owed the utmost good faith and fairness to Plaintiffs in all matters pertaining to such Defendants' conduct with respect to Plaintiffs' property and investment in the Partnership.  Such Defendants furthermore had a duty to disclose all material facts pertaining to such investments and such Defendants' personal interests and benefits accruing from any action or potential action involving said investments, including transfers of interests and sales of same.  Moreover, these fiduciary duties included a duty to disclose all material information, including information relevant to operation and ownership of the Partnership, information relevant to each Limited Partner's rights under the Partnership Agreement, and other information as designated by the Partnership Agreement.  For example, per the Partnership Agreement, Defendant Allen had an express obligation to disclose to the Limited Partners his option to purchase the interest of a defaulting limited partner, where the general partners had not exercised their option to purchase the defaulting partner's interest within thirty days after the default.

276.    Defendants Allen and HKAllen accepted the reliance of Plaintiffs on their fiduciary and confidential relationships.

277.    Defendants Allen and HKAllen breached their aforesaid duties as alleged herein, and in so doing gained an advantage over Plaintiffs in matters relating to the management and control of their Partnership-related assets.

**COMPLAINT**

278.   In particular and without limiting the generality of the foregoing, Defendants breached their fiduciary duties by each of the following:

a.   Defendant Allen violated and breached his fiduciary duties to all of the Plaintiffs by failing to disclose that Pfeiffer had defaulted on his obligations under the Partnership Agreement and that the general partners had not exercised their option to purchase his interest within thirty days of such default.  By purchasing half of Pfeiffer's interest for himself and by permitting Myerson to purchase the other half, Defendant Allen violated the fiduciary duty he owed to all Plaintiffs, because the Partnership Agreement required him to present that opportunity to all of the Plaintiffs and the rest of the Limited Partners.  Allen wrongfully usurped an opportunity that rightfully belonged to the Limited Partners, and Plaintiffs have suffered harm equal to the investment gains they would have realized had the opportunity been presented to them.

b.   Defendant HKAllen breached its fiduciary duty to each of Plaintiffs Hamill and McKinney by participating with Burnes, HK Allen Inc., and Hall Keen Investments to induce each of Plaintiffs Hamill and McKinney by means of fraudulent misrepresentation and material omission to sell one LP Unit to Hall Keen Investments for the token sum of $100.00, which amount was a mere fraction of one LP Unit's true value at the time, and by which sales HKAllen and/or one or more of its affiliates would profit at

**COMPLAINT**

1    Hamill's expense and at McKinney's expense.  The magnitude of this profit was

2    truly extraordinary.  Each LP Unit improperly acquired from Hamill and

3    McKinney for $100 is now worth *at least 7,800 times* the price that Hall Keen

4    Investments paid.

5              c.    Defendant HKAllen, breached its fiduciary duty to all

6    Plaintiffs owning LP Units at any time during the period 2001 to 2014 by

7    allowing and/or directing its affiliate, HKM, to mismanage the Partnership such

8    that salaries and wages were overpaid to the extent that the Partnership paid

9    higher operating expenses than it should have paid, which overpayment (i) was

10   never disclosed to the Limited Partners, (ii) devolved directly or indirectly to the

11   benefit of HKAllen and/or its affiliates, and (iii) contributed to the plan

12   orchestrated by HKAllen, and aided by its affiliates and by the ERI Parties, to

13   purchase nearly half of the LP Units from Limited Partners at abusively low

14   prices, and then to use their substantial ownership to ensure approval of the Sale

15   and Exchange, which substantially harmed the Holder LPs.

16             d.    Defendant HKAllen breached its fiduciary duty to

17   each of the Seller LPs other than Hamill and McKinney by orchestrating,

18   participating in, and failing honestly to disclose to such Seller LPs, the scheme it

19   carried out, together with HK Allen Inc., HKM, Burnes, and the ERI Parties, to

20   cause such Seller LPs to sell their LP Units to one of the ERI Parties at

**COMPLAINT**

1   abusively low prices.  HKAllen failed to disclose to the Seller LPs: (i) the fact of

2   its collaboration with the ERI Parties; (ii) the fact that the sales which appeared

3   to be made to a third-party were in fact self-dealing transactions where HKAllen

4   stood to profit at the expense of the Seller LPs when the Seller LPs sold to one

5   of the ERI Parties; (iii) the fact that, upon information and belief, HKAllen

6   and/or one or more of its affiliates directed, approved or acquiesced to the

7   mailing of the 2005 Burnes Letter to several of the Limited Partners, which

8   materially misrepresented the Partnership's financial prospects in a way

9   intended to induce the Seller LPs to sell their LP Units in response to the offers

10  distributed by the ERI Parties; (iv)  the fact that prices offered by the ERI Parties

11  in the 2006 ERI Offer, the March 2007 Offer, the September 2007 Offer, the

12  2008 ERI Offer, the 2008 ERI Reminder and the 2012 ERI Offer were, in each

13  case, abusively low; (v) the fact that the purchases were part of a scheme with

14  the express purpose of inducing the Limited Partners to divest their interests and

15  transfer them to the ERI Parties and their affiliates and collaborators for far less

16  than market value so that HKAllen, the ERI Parties and their respective affiliates

17  and collaborators would reap returns of a magnitude that are typically

18  unavailable to those who deal honestly in the marketplace; (vi) material facts

19  known to HKAllen regarding the true financial prospects for the Partnership

20  investments; (vii) the fact that many material misrepresentations and material

**COMPLAINT**

1  omissions, as alleged in detail herein, had been made (or, in the case of

2  omissions, not made) to the Seller LPs for the purpose of undermining their

3  confidence in the future financial value of the LP Units they owned; (viii) the

4  fact that the prices paid to each of the Seller LPs for their respective LP Units

5  were, in each case, abusively low; and (ix) other material facts as set forth in this

6  Complaint.

7           e.        Defendant HKAllen breached its fiduciary duty to all

8  Holder LPs by orchestrating, participating in, and failing honestly to disclose to

9  the Holder LPs, the scheme it carried out, together with HKM, Burnes, HKN

10  Danville House LLC and HKN Manager LLC to obtain consent of the Limited

11  Partners and then to execute the Sale and Exchange, all as described in this

12  Complaint, and including, without limitation, the following acts: (i) failing to

13  disclose before seeking consent of the Limited Partners to the Sale and

14  Exchange the fact that HKAllen, its affiliates, and the ERI Parties owned

15  48.75% of the LP Units; (ii) materially misrepresenting numerous aspects of the

16  Sale and Exchange so that the Holder LPs would understand the Sale and

17  Exchange as a transaction that is beneficial to them when, in fact, it substantially

18  harmed the Holder LPs and benefited HKAllen and its affiliates and

19  collaborators; (iii) failing to disclose the true facts regarding the financial

20  prospects of the Partnership; (iv) failing to disclose the true financial

**COMPLAINT**

1    implications of the Sale and Exchange to the Holder LPs, to HKAllen and its

2    affiliates, and to the ERI Parties; (v) failing to disclose that the Sale and

3    Exchange would reduce the degree to which the Limited Partners could

4    influence the Property's management, operations, and disposition; (vi)

5    misleading the Holder LPs into believing that the modification announced in

6    Update Number One cured the serious inequities and other flaws in the Sale and

7    Exchange that the dissenting Limited Partners communicated to HKAllen, and

8    failing to disclose this misrepresentation; (vii) grossly misrepresenting in Update

9    Number Two the concerns and issues raised by the dissenting Limited Partners;

10   (viii) erroneously implying that 95% of the limited partners had affirmatively

11   approved the Sale and Exchange; (ix) failing to ensure that the Sale and

12   Exchange was in the Holder LPs' best interests; and (x) consummating the Sale

13   and Exchange, by which HKAllen and its affiliates took millions of dollars from

14   the Holder LPs for no consideration whatsoever, and by which the ERI Parties

15   realized returns in excess of 2500% on their purchases of LP Units from the

16   Seller LPs.

17         279.   In breaching said duties as alleged herein, Defendants Allen and

18   HKAllen proximately caused the Plaintiffs to suffer damages as follows:

19                a.      As to the breaches related to usurpation of the right to

20   purchase Pfeiffer's interest, Defendants proximately caused Plaintiffs damages

**COMPLAINT**

1    because, if not for Defendants' breach, Plaintiffs would have had the option to

2    purchase some or all of Pfeiffer's valuable 0.5 LP Unit for a price of $100 per

3    0.5 LP Unit and thereafter would have realized substantial gains, because that

4    0.5 LP Unit was then and is now worth substantially more than $100. Some or

5    all of the Plaintiffs would have taken advantage of this opportunity.

6            b.    As to the breaches of duties owed to the Seller LPs,

7    Defendants proximately caused all of the Seller LPs' damages by wrongfully

8    inducing them to sell their LP Units for far less than market value, thereby

9    losing the difference between the actual fair market value of the LP Units and

10   the price they received, and foregoing future profits accruing to those LP Units

11   in the form of income distributions and capital gains.

12           c.    As to the breaches of duties owed to the Holder LPs,

13   Defendants proximately caused the Holder LPs' damages by wrongfully

14   inducing enough of them either to approve the Sale and Exchange affirmatively

15   or not to respond at all to the Consent Request, so that Defendants obtained

16   "Consent of the Investor Limited Partners" as defined in the Partnership

17   Agreement, and were then able to complete the Sale and Exchange, which

18   substantially devalued the Holder LPs' LP Units and eroded the Holder LPs'

19   rights as Limited Partners.

20

**COMPLAINT**

280.   As a proximate cause of Plaintiffs' justified reliance on Defendants' misrepresentations and omissions of material fact, Plaintiffs suffered economic losses in an amount to be proven at trial.

281.   In breaching said duties as alleged herein, Defendants Allen and HKAllen are required to disgorge their profits, and Plaintiffs are entitled to an award in the amount of these profits, and interest on all such sums from the respective dates of each injury.

282.   As to each of the breaches of duty alleged herein prior to 2013, Plaintiffs did not have actual or constructive knowledge of the facts constituting the constructive fraud, nor were they aware of facts giving rise to a duty of inquiry to uncover said facts.  Moreover, Defendants had an affirmative duty of full and fair disclosure of said facts, thus Defendants' failure to disclose the facts constitutes fraudulent concealment of same such that Plaintiffs' delayed discovery of the facts is excusable.

283.   In performing the acts herein alleged, Defendants acted fraudulently, maliciously, and oppressively, and with behavior reflecting a callous disregard for Plaintiffs' rights where the conduct was substantially certain to vex, annoy or injure, thereby justifying an award of punitive damages in an amount according to proof.

**COMPLAINT**

284.   Under California Civil Code section 3345, Defendants are liable to the California-resident Seller LPs and Holder LPs for punitive damages in an amount up to three times greater than the amount the trier of fact would otherwise impose because Defendants' conduct was directed to each of these Plaintiffs, and Defendants knew or should have known that one or more of these Plaintiffs was, at all relevant times, a senior citizen.

## SECOND CAUSE OF ACTION

### Constructive Fraud

(All Plaintiffs Against Defendants Allen and HKAllen)

285.   Plaintiffs reallege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

286.   During the periods of time alleged herein, there existed between Plaintiffs and Defendants Allen and HKAllen, a fiduciary and/or confidential relationship upon which Plaintiffs justifiably relied to their detriment.  The details of such fiduciary relationships and the dates during which these relationships existed are detailed in the First Cause of Action. By virtue of the relationship between Plaintiffs and each of Defendants Allen and HKAllen, a fiduciary duty existed.

**COMPLAINT**

287.    Pursuant to said fiduciary duties, Defendants Allen and HKAllen owed the utmost good faith and fairness to Plaintiffs in all matters pertaining to their conduct with respect to Plaintiffs' property and investment in the Partnership. Defendants Allen and HKAllen furthermore had a duty to disclose all material facts pertaining to such investments and their personal interests and benefits accruing from any action or potential action involving said investments, including transfers of interest and sales of same.

288.    Defendants Allen and HKAllen accepted the reliance of Plaintiffs on the fiduciary and/or confidential relationship.

289.    Defendants Allen and HKAllen breached their aforesaid fiduciary duties as alleged herein, and in so doing gained an advantage over Plaintiffs in matters relating to the management, control and disposition of their Partnership-related assets.

290.    In particular and without limiting the generality of the foregoing, Defendants breached their duties as described in the First Cause of Action.

291.    In breaching said duties as alleged herein, Defendants Allen and HKAllen proximately caused the Plaintiffs to suffer damages as described in the First Cause of Action.  As a proximate cause of Plaintiffs' justified reliance on Allen's and HKAllen's misrepresentations and omissions of material fact, Plaintiffs suffered economic losses in an amount to be proven at trial.

**COMPLAINT**

292.   In breaching said duties and committing said constructive fraud as alleged herein, Defendants Allen and HKAllen are required to disgorge their profits and Plaintiffs are entitled to an award in the amount of these profits, and interest on all such sums from the respective dates of each injury.

293.   As to each of the breaches of duty and commissions of constructive fraud alleged herein prior to 2013, Plaintiffs did not have actual or constructive knowledge of the facts constituting the constructive fraud, nor were they aware of facts giving rise to a duty of inquiry to uncover said facts. Moreover, Allen and HKAllen had an affirmative duty of full and fair disclosure of said facts, thus Allen's and HKAllen's failure to disclose the facts constitutes fraudulent concealment of same such that Plaintiffs' delayed discovery of the facts is excusable.

294.   In performing the acts herein alleged, Defendants Allen and HKAllen acted fraudulently, maliciously, and oppressively, and with behavior reflecting a callous disregard for Plaintiffs' rights where the conduct was substantially certain to vex, annoy or injure, thereby justifying an award of punitive damages in an amount according to proof.

295.   Under California Civil Code section 3345, Defendants Allen and HKAllen are liable to the California-resident Seller LPs and Holder LPs for punitive damages in an amount up to three times greater than the amount the

**COMPLAINT**

1  trier of fact would otherwise impose because Allen's and HKAllen's conduct

2  was directed to each of these Plaintiffs, and Defendants Allen and HKAllen

3  knew or should have known that one or more of these Plaintiffs was, at all

4  relevant times, a senior citizen.

5

6                    **THIRD CAUSE OF ACTION**

7                              **Fraud**

8  (All Plaintiffs Against Defendants Allen, HKAllen, HallKeen LLC, Hall Keen

9  Investments, Burnes, HKN Danville House LLC, HKN Manager LLC, HKM and

10                         ERI Parties)

11      296.   Plaintiffs reallege here and incorporate by reference into this Cause

12  of Action all preceding Paragraphs of this Complaint.

13      297.   As alleged herein, Defendants falsely, fraudulently, and with the

14  intent to deceive and defraud Plaintiffs, made multiple material

15  misrepresentations of fact and fraudulent omissions of facts, including but not

16  limited to the following:

17            a.      Defendant Allen fraudulently omitted to disclose to all

18  Plaintiffs that Pfeiffer had defaulted on his obligations under the Partnership

19  Agreement and that the general partners had not exercised their option to

20  purchase his interest within thirty days of such default, which facts Defendant

**COMPLAINT**

1  Allen was under a fiduciary duty to disclose.  Defendant Allen furthermore

2  fraudulently omitted to disclose that he and Myerson usurped Plaintiffs' rights

3  by purchasing Pfeiffer's interest for themselves, by delaying for nearly ten years

4  disclosure to Plaintiffs of such purchase, and even after such delay, by failing to

5  disclose to Plaintiffs any of the circumstances surrounding Defendants'

6  acquisition of Pfeiffer's LP Units that might alert Plaintiffs to Defendants'

7  misconduct.

8          b.      Defendants Burnes, HKAllen, and Hall Keen

9  Investments, acting together, defrauded each of Plaintiffs Hamill and McKinney

10  by: (i) intentionally misrepresenting that each of Hamill's and McKinney's

11  investment in the Partnership was worthless and not likely to perform well in the

12  future, (ii) making such misrepresentations for the purpose of inducing each of

13  Hamill and McKinney to rely on those misrepresentations and to enter into an

14  unfair and oppressive transaction so that Defendant Hall Keen Investments

15  could purchase each of Hamill's and McKinney's LP Units at an abusively low

16  price and, thereby, realize an extraordinarily high profit at the expense of each

17  of Hamill and McKinney, (iii) failing, in violation of HKAllen's fiduciary duties

18  to Hamill and McKinney, to disclose to Hamill and McKinney the true value of

19  their LP Units and to ensure that the economic outcome of a transaction between

20  its affiliate, Hall Keen Investments, and each of Hamill and McKinney was fair

**COMPLAINT**

1   to each of Hamill and McKinney, and (iv) causing each of Hamill and

2   McKinney to agree to sell his LP Unit for only $100.00, which amount was only

3   a small fraction of such LP Unit's true value.

4                    c.      Defendants HKAllen, HallKeen LLC, Burnes and the

5   ERI Parties, acting together, defrauded the Seller LPs by misrepresenting to the

6   Seller LPs the condition and prospects of the Partnership and the Property, and

7   by convincing the Seller LPs that their LP Units were worth far less than they

8   were in fact worth and that it was in the Seller LPs' best interest to sell to one of

9   the ERI Parties, which resulted in each of the Seller LPs: (i) reasonably relying

10  on the apparent legitimacy of each of the ERI Parties' offers to purchase LP

11  Units and the implicit endorsement of those offers by HKAllen; and (ii) selling

12  its LP Units to one of the ERI Parties at a price that was far below fair market

13  value. Defendants HKAllen, Burnes and the ERI Parties achieved this fraud by,

14  among other actions: (i) sending the 2005 Burnes Letter to the Seller LPs; (ii)

15  timing the distribution of the ERI Parties' offers to purchase LP Units to begin

16  after years in which Limited Partners had to pay income tax associated with

17  their LP Units but received no cash distributions from the Partnership and to be

18  sent only in years when the same tax situation obtained; (iii) failing to explain to

19  the Seller LPs that the financial condition of the Partnership would improve

20  dramatically in early 2014, which improvement would enable the Partnership to

**COMPLAINT**

distribute more than $33,000 annually to each owner of one LP Unit; (iv) failing explicitly to disclose that, by virtue of the agreement between the ERI Parties and HKAllen, every sale by a Seller LP to one of the ERI Parties was a self-dealing transaction from which HKAllen profited at the expense of each Seller LP; (v) HKAllen, in its capacity as general partner of the Partnership, formally approving every single purchase of LP Units made by any of the ERI Parties and, upon information and belief, not once disclosing to any of the Seller LPs that HKAllen and/or its affiliates expected to profit from each of those purchases; and (vi) failing to disclose that the purchases of LP Units by the ERI Parties were, upon information and belief, part of a deliberate plan, known to each of Defendants HKAllen, Burnes and the ERI Parties, to acquire a sufficient number of LP Units so that HKAllen could propose the Sale and Exchange to the Limited Partners with essentially no doubt that HKAllen would obtain the consent required under the Partnership Agreement.

           d.     Defendants HKAllen, HKN Danville House LLC, HKN Manager LLC, HKM and Burnes defrauded the Holder LPs by: (i) intentionally misrepresenting, by means of both affirmative misrepresentation and by material omission in the Consent Request and otherwise, the Sale and Exchange transaction as one that is beneficial to and in the best interest of the Limited Partners, with the intent to cause enough of the Holder LPs reasonably

**COMPLAINT**

1    to rely on such misrepresentations and either to approve the Sale and Exchange

2    affirmatively or not to respond at all to the Consent Request, so that the Sale and

3    Exchange would be approved under the applicable provisions of the Partnership

4    Agreement; (ii) actually causing enough of the Holder LPs reasonably to rely on

5    such misrepresentations so that formal approval of the Sale and Exchange

6    technically consistent with the Partnership Agreement's requirements was in

7    fact obtained; (iii) misrepresenting to the Holder LPs that the modification to the

8    Sale and Exchange announced in Update Number One cured the concerns

9    voiced by two of the Holder LPs; (iv) grossly misrepresenting in the

10   Confirmation of Consent the concerns and issues raised by two of the Holder

11   LPs and portraying those Holder LPs as acting in a way contrary to the interests

12   of the other Holder LPs; (v) erroneously implying in the same document that

13   95% of the limited partners had affirmatively approved the Sale and Exchange

14   proposal when in fact, several Limited Partners had simply not responded at all

15   to the Consent Request; and (vi) completing the Sale and Exchange and,

16   thereby, taking for themselves, and without any compensation to the Holder

17   LPs, millions of dollars that rightfully belong to the Holder LPs.

18        298.   Plaintiffs are informed and believe and thereon allege that in truth

19   and in fact, as the Defendants named in Paragraph 297 well knew, their

20   representations were false and were intended to induce Plaintiffs' reasonable

**COMPLAINT**

1  reliance, and thus were also fraudulent and that all of these fraudulent

2  misrepresentations and omissions were made for the express purpose of

3  defrauding Plaintiffs out of their rights, money, and property interests and

4  converting same to such Defendants' and such Defendants' affiliates' own use.

5          299.   Plaintiffs are informed and believe and thereon allege that the true

6  facts were known to the Defendants named in Paragraph 297 at the time of the

7  making of said misrepresentations and fraudulent omissions, and such

8  Defendants made the misrepresentations and omissions to deceive and defraud

9  Plaintiffs as detailed herein and for the purpose of fraudulently inducing

10  Plaintiffs to act in reliance thereupon and to entrust and/or convey their property

11  and interests to such Defendants and such Defendants' affiliates, and to induce a

12  sufficient number of the Holder LPs to approve the Sale and Exchange

13  Transaction, and to prevent Plaintiffs from making further inquiry.

14          300.   As a proximate cause of the justified reliance upon these

15  misrepresentations and omissions by a sufficient number of Plaintiffs and other

16  Independent Limited Partners, and the subsequent conduct of Defendants named

17  in Paragraph 297 and such Defendants' affiliates, as described herein, Plaintiffs

18  suffered economic damages in an amount to be proven at trial.

19          301.   As to each of the fraudulent acts alleged herein prior to 2013,

20  Plaintiffs did not have actual or constructive knowledge of the facts constituting

**COMPLAINT**

1   the fraud, nor were they aware of facts giving rise to a duty of inquiry to

2   uncover said facts.  Moreover, Defendants Allen and HKAllen had an

3   affirmative duty of full and fair disclosure of said facts, thus such Defendants'

4   and such Defendants' affiliates' failure to disclose the facts constitutes

5   fraudulent concealment of same such that Plaintiffs' delayed discovery of the

6   facts is excusable.

7       302.   In performing the acts herein alleged, the Defendants named in

8   Paragraph 297 acted fraudulently, maliciously, and oppressively, and with

9   behavior reflecting a callous disregard for Plaintiffs' rights where the conduct

10  was substantially certain to vex, annoy or injure, thereby justifying an award of

11  punitive damages in an amount according to proof.

12      303.   Under California Civil Code section 3345, the Defendants named in

13  Paragraph 297 are liable to the California-resident Seller LPs and Holder LPs for

14  punitive damages in an amount up to three times greater than the amount the

15  trier of fact would otherwise impose because such Defendants' conduct was

16  directed to each of these Plaintiffs, and such Defendants knew or should have

17  known that one or more of these Plaintiffs was, at all relevant times, a senior

18  citizen.

19

20

**COMPLAINT**

## FOURTH CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty and Constructive Fraud

(All Plaintiffs Against Defendants Hall Keen Investments, Burnes, HK Allen Inc., HallKeen LLC, HKM, ERI Parties, HKN Danville House LLC and HKN Manager LLC)

304.   Plaintiffs reallege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

**Purchases by Hall Keen Investments:**

305.   HK Allen Inc., Hall Keen Investments and Burnes knew that Defendant HKAllen owed a fiduciary duty to the Seller LPs and their predecessors in interest, because HKAllen was a general partner of the Partnership.

306.   HK Allen Inc., Hall Keen Investments and Burnes knew that Defendant HKAllen violated its fiduciary duties to each of Hamill and McKinney by, among other things, engaging in the conduct set forth in the First Cause of Action.

307.   HK Allen Inc., Hall Keen Investments and Burnes knew or should have known that HKAllen's herein-described breaches of fiduciary duty also

**COMPLAINT**

1   constituted constructive fraud against Hamill and McKinney and their

2   predecessors in interest.

3        308.   Knowingly and intentionally, HK Allen Inc., Hall Keen

4   Investments and Burnes substantially assisted and encouraged Defendant

5   HKAllen in its breaches of its fiduciary duties and commission of constructive

6   fraud as alleged herein, including by, among other actions: (i) in the case of Hall

7   Keen Investments, purchasing one LP Unit from each of Hamill and McKinney

8   for the nominal price of only $100.00 per LP Unit, when Hall Keen Investments

9   was an affiliate of HKAllen and the profits Hall Keen Investments would reap

10   from this purchase came at the expense of Hamill and McKinney and would, by

11   virtue of the relationship between HKAllen and Hall Keen Investments, benefit

12   many, if not all, of the same individuals who would benefit if HKAllen had

13   purchased the LP Units directly; (ii) in the case of HK Allen Inc., acting in its

14   capacity as general partner of HKAllen to cause HKAllen approve Hall Keen

15   Investments' purchase of LP Units from each of Hamill and McKinney; (iii) in

16   the case of Burnes, upon information and belief, communicating with and/or

17   directing the communication with each of Hamill and Burnes to induce them to

18   sell their LP Units, preparing and sending to each of Hamill and McKinney the

19   documents by which Hall Keen Investments purchased their LP Units, and

20   signing each of the Hamill Assignment and the McKinney Assignment both in

**COMPLAINT**

his capacity as Manager of Hall Keen Investments and as President of HK Allen Inc., which was the general partner of HKAllen, to evidence HKAllen's consent to the assignments.

309.   HK Allen Inc., Hall Keen Investments and Burnes therefore aided and abetted HKAllen's breaches of its fiduciary duties and commissions of constructive fraud connected with the purchase by Hall Keen Investments of LP Units from Hamill and McKinney.  As a result, HK Allen Inc., Hall Keen Investments and Burnes are jointly responsible with HKAllen for the damages proximately caused and resulting from those breaches and acts.

310.   As a direct result of substantial assistance that HK Allen Inc., Hall Keen Investments and Burnes provided to HKAllen in its breaches of its fiduciary duties and constructive fraud, Hamill and McKinney were fraudulently induced into selling their LP Units for far less than their real value, and each of Hamill and McKinney lost his rights to future income, capital gains and other benefits from those LP Units.

**Purchases by ERI Parties:**

311.   HK Allen Inc., HKM, HallKeen LLC, Burnes and the ERI Parties knew that Defendant HKAllen owed a fiduciary duty to the Seller LPs and their

**COMPLAINT**

1  predecessors in interest, because HKAllen was a general partner of the

2  Partnership.

3     312.  HK Allen Inc., HKM, HallKeen LLC, Burnes and the ERI Parties

4  knew that Defendant HKAllen violated its fiduciary duties to each of the Seller

5  LPs by, among other things, engaging in the conduct set forth in the First Cause

6  of Action.

7     313.  HK Allen Inc., HKM, HallKeen LLC, Burnes and the ERI Parties

8  knew or should have known that HKAllen's herein-described breaches of

9  fiduciary duty also constituted constructive fraud against the Seller LPs and their

10 predecessors in interest.

11    314.  Knowingly and intentionally, HK Allen Inc., HKM, HallKeen LLC,

12 Burnes and the ERI Parties substantially assisted and encouraged Defendant

13 HKAllen in its breaches of its fiduciary duties and commission of constructive

14 fraud as alleged herein, including by, among other actions: (i) in the case of the

15 ERI Parties, soliciting the below-market and substantially unfair sales and

16 agreeing to transfer a portion of the interests acquired thereby to HKAllen at the

17 same low rates, as described in detail herein; (ii) in the case of HK Allen Inc.,

18 acting in its capacity as general partner of HKAllen to cause HKAllen approve

19 every purchase of LP Units made by any of the ERI Parties; (iii) in the case of

20 HallKeen LLC and Burnes, sending the 2005 Burnes Letter; (iv) in the case of

**COMPLAINT**

1   Burnes, signing the General Partner Consent for every purchase of LP Units

2   made by any of the ERI Parties; and (v) in the case of HKM, mismanaging the

3   Property by, among other things, overpaying for salary, wage and benefits

4   expenses, without disclosing such overpayment to the Limited Partners, which

5   undisclosed overpayment caused the Partnership to pay approximately $60,000

6   more per year in operating expenses than was necessary and enabled Burnes and

7   HallKeen LLC to employ in the 2005 Burnes Letter the false premise that the

8   Partnership was close to the point where it would be unable to meet it operating

9   expenses and debt service obligations.

10          315.   HK Allen Inc., HKM, HallKeen LLC, Burnes and the ERI Parties

11   therefore aided and abetted HKAllen's breaches of its fiduciary duties and

12   commissions of constructive fraud.  As a result, HK Allen Inc., HKM, HallKeen

13   LLC, Burnes and the ERI Parties are jointly responsible with HKAllen for the

14   damages proximately caused and resulting from those breaches and acts.

15          316.  As a direct result of substantial assistance that HK Allen Inc.,

16   HKM, HallKeen LLC, Burnes and the ERI Parties provided to HKAllen in its

17   breaches of its fiduciary duties and constructive fraud, the Seller LPs and their

18   predecessors in interest were fraudulently induced into selling their LP Units for

19   far less than their real value, and the Seller LPs lost their rights to future income,

20   capital gains and other benefits from those LP Units.

**COMPLAINT**

1

2  **Sale and Exchange:**

3      317.   HKN Danville House LLC, HKN Manager LLC, HKM and Burnes

4  knew throughout 2015 that Defendant HKAllen owed and still owes a fiduciary

5  duty to the Holder LPs, because HKAllen was and is the sole general partner of

6  the Partnership.

7      318.   HKN Danville House LLC, HKN Manager LLC, HKM and Burnes

8  knew that Defendant HKAllen violated its fiduciary duties to each of the Holder

9  LPs as alleged herein, including by, among other things, engaging in the conduct

10  set forth in the First Cause of Action.

11      319.   HKN Danville House LLC, HKN Manager LLC, HKM and Burnes

12  knew or should have known that HKAllen's herein-described breaches of

13  fiduciary duty also constituted constructive fraud against the Holder LPs.

14      320.   Knowingly, intentionally and with malice, HKN Danville House

15  LLC, HKN Manager LLC, HKM and Burnes substantially assisted and

16  encouraged Defendant HKAllen in its breach of its fiduciary duties and

17  commission of constructive fraud as alleged herein, including by, among other

18  actions: (i) in the case of HKN Danville House LLC, executing, as borrower, the

19  New Loan, and by taking and holding title to the Property, which enabled

20  HKAllen to reduce dramatically the financial benefits the Limited Partners

**COMPLAINT**

1  would receive from the Property and the Limited Partners' ability to participate

2  in the governance and management of the Property; (ii) in the case of HKN

3  Manager LLC, controlling the operations and activities of HKN Danville House

4  LLC so that the Sale and Exchange was completed, and thereby enabling

5  HKAllen to arrange a transaction that funneled millions of dollars to its own

6  affiliate at the expense of the Limited Partners while providing no compensation

7  at all to the Limited Partners; (iii) in the case of HKM, assisting HKN Danville

8  House LLC, HKN Manager LLC and HKAllen to obtain the new HUD-

9  guaranteed mortgage loan that was part of the Sale and Exchange; and (iv) in the

10  case of Burnes, sending the Confirmation of Consent and controlling each of

11  HKAllen, HKN Danville House LLC and HKN Manager LLC.

12      321.   HKN Danville House LLC, HKN Manager LLC, HKM and Burnes

13  therefore aided and abetted HKAllen's breaches of fiduciary duties and

14  commissions of constructive fraud. As a result, HKN Manager LLC, HKM and

15  Burnes are jointly responsible with HKAllen for the damages proximately

16  caused and resulting from those breaches and acts.

17      322.   As a direct result of the substantial assistance that HKN Danville

18  House LLC, HKN Manager LLC, HKM and Burnes provided to HKAllen in its

19  breaches of fiduciary duty and constructive fraud, the Sale and Exchange was

20

**COMPLAINT**

1   technically, though not properly, approved and then completed, which caused

2   the Holder LPs to suffer a substantial devaluation of their LP Units.

3       323.   In performing the acts herein alleged, HK Allen Inc., Hall Keen

4   Investments, Burnes, HKM, the ERI Parties, HKN Danville House LLC and

5   HKN Manager LLC acted fraudulently, maliciously, and oppressively, thereby

6   justifying an award of attorney fees and punitive damages in an amount

7   according to proof.

8       324.   Under California Civil Code section 3345, HK Allen Inc., Hall

9   Keen Investments, Burnes, HKM, the ERI Parties, HKN Danville House LLC

10  and HKN Manager LLC are liable to the California-resident Seller LPs and

11  Holder LPs for punitive damages in an amount up to three times greater than the

12  amount the trier of fact would otherwise impose because the conduct of

13  Defendants HK Allen Inc., Hall Keen Investments, Burnes, HKM, the ERI

14  Parties, HKN Danville House LLC and HKN Manager LLC was directed to

15  each of these Plaintiffs, and such Defendants knew or should have known that

16  one or more of these Plaintiffs was, at all relevant times, a senior citizen.

17

18

19

20

**COMPLAINT**

# FIFTH CAUSE OF ACTION

## Breach of Contract

(All Plaintiffs Against Defendant Allen)

325.   Plaintiffs reallege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

326.   During the periods of time alleged herein, Defendant Allen occupied the positions of general partner, agent, and fiduciary to Plaintiffs.

327.   In March 1989, Pfeiffer breached the Partnership Agreement by failing to pay the seventh and final installment of his capital contribution. Defendant Allen neither exercised his option to purchase Pfeiffer's LP Units nor completed a purchase of Pfeiffer's LP Units within thirty days after the date of Pfeiffer's default.  He also never notified the non-defaulting Limited Partners of Pfeiffer's default.  Instead, he and Myerson, his co-general partner, bought Pfeiffer's LP Units nearly two years after Pfeiffer's default.  By failing to disclose to the Limited Partners that Pfeiffer had defaulted, and failing to disclose to the Limited Partners that the Limited Partners had a right to purchase Pfeiffer's interest for an amount determined by a formula in the Partnership Agreement, Allen violated his contractual obligation under section 5.2 of the Partnership Agreement.

**COMPLAINT**

328.   All of the Plaintiffs suffered damages as a proximate cause of the breach because, if not for Defendant's breach, they would have had the option to purchase some or all of Pfeiffer's valuable 0.5 LP Unit for a price of $100 per 0.5 LP Unit and thereafter realized substantial gains in the value of that interest. Some or all of the Plaintiffs would have taken advantage of this opportunity. Plaintiffs' actual damages are to be determined at trial.

329.   In performing the acts herein alleged, Defendant Allen acted fraudulently, maliciously, and oppressively, and with behavior reflecting a callous disregard for Plaintiffs' rights where the conduct was substantially certain to vex, annoy or injure, thereby justifying an award of punitive damages in an amount according to proof.

330.   As to each of the offending acts alleged herein, Plaintiffs did not have actual or constructive knowledge of the facts constituting the breach, nor were they aware of facts giving rise to a duty of inquiry to uncover said facts. Moreover, Defendant Allen had an affirmative duty of full and fair disclosure of said facts, thus Defendant's failure to disclose the facts constitutes fraudulent concealment of same such that Plaintiffs' delayed discovery of the facts is excusable.

**COMPLAINT**

1

## SIXTH CAUSE OF ACTION

2

### Constructive Trust

3

(All Plaintiffs Against Defendants Allen, HKN Allen, Hall Keen Investments,

4

Carlen, Franklin 81 Associates, Newton Fund, Milton Fund, Belmont Fund,

5

HKAllen, HKN Danville House LLC and HKN Manager LLC)

6

331.    Plaintiffs reallege here and incorporate by reference into this Cause

7

of Action all preceding Paragraphs of this Complaint.

8

332.    At such times as are set forth herein, Allen and HKAllen had, and

9

HKAllen still has, a fiduciary and/or confidential relationship upon which the all

10

Plaintiffs, or their predecessors in interest, as the case may be, justifiably relied

11

to their detriment.

12

333.    By virtue of the relationship between each of Allen and HKAllen,

13

on the one hand, and each of the Plaintiffs or their predecessors in interest on the

14

other, a fiduciary duty existed.  Pursuant to said duty, each of Allen and

15

HKAllen owed the utmost good faith and fairness to each of the Plaintiffs, or

16

their predecessors in interest, in all matters pertaining to such Defendants'

17

conduct with respect to the Plaintiffs, or their predecessors in interests' rights in

18

their Partnership-related investments and the profits and benefits related thereto.

19

20

**COMPLAINT**

334.    Defendants Allen and HKAllen, and each of them, accepted the reliance of Plaintiffs, or their predecessors in interest, on the fiduciary and/or confidential relationship.

335.    Defendants Allen and HKAllen, and each of them, breached the aforesaid duty as alleged herein, and in so doing gained an advantage over Plaintiffs, or their predecessors in interest, in matters relating to the management of control of Plaintiffs' assets.  In particular and without limiting the generality of the foregoing, Defendants, and each of them, are required to disgorge their profits, and Plaintiffs are entitled to an award in the amount of these profits and interest on such sums from the date of injury.

336.    By virtue of the wrongful acts of Allen and HKAllen set forth herein, and the substantial active participation, aid, and assistance that each of HKN Allen, Hall Keen Investments, Newton Fund, Carlen, Franklin 81 Associates, Milton Fund, Belmont Fund, HKN Danville House LLC and HKN Manager LLC provided to Allen and HKAllen in support of such wrongful acts, each of Allen, HKN Allen, Hall Keen Investments, Carlen, Franklin 81 Associates, Newton Fund, Milton Fund, Belmont Fund, HKAllen, HKN Danville House LLC and HKN Manager LLC is now in possession of real property and/or LP Units and/or monies that rightfully belong to Plaintiffs. Specifically:

**COMPLAINT**

a.      Allen and HKN Allen are in possession of 0.4975 LP Units that Myerson and Allen wrongfully obtained from Pfeiffer, and which all persons who were Limited Partners in April 1989 have a right to purchase at the rate of $100.00 per 0.5 LP Unit;

b.      Hall Keen Investments is in possession of 2.0 LP Units that it wrongfully obtained from Hamill and McKinney, and which rightfully belong to Hamill and McKinney;

c.      Newton Fund, Carlen and Franklin 81 Associates were, as of July 1, 2014, in possession of 1.5 LP Units that Newton Fund wrongfully obtained from Sherman, Leuschel and Hirokawa, and which rightfully belong to Sherman, Leuschel and Hirokawa.  If and to the extent that Newton Fund transferred any LP Units to or on behalf of HKAllen after July 1, 2014, then those LP Units were wrongfully acquired by HKAllen or a party related to it, and they still rightfully belong to Sherman, Leuschel and Hirokawa;

d.      Milton Fund is in possession of 0.75 LP Units that it wrongfully obtained from Adelman and from the Richards Family Trust, and which rightfully belong to Adelman and to the Richards Family Trust.  If and to the extent that Milton Fund transferred any LP Units to or on behalf of HKAllen after July 1, 2014, then those LP Units were wrongfully acquired by HKAllen or

**COMPLAINT**

1  a party related to it, and they still rightfully belong to Adelman and the Richards

2  Family Trust;

3         e.      Belmont Fund is in possession of 1.0 LP Unit that it

4  wrongfully acquired from the Weide Family Trust, and which rightfully belongs

5  to the Weide Family Trust.  If and to the extent that Belmont Fund transferred

6  all or any portion of this LP Unit to or on behalf of HKAllen after July 1, 2014,

7  then those LP Units were wrongfully acquired by HKAllen or a party related to

8  it, and they still rightfully belong to the Weide Family Trust;

9         f.      HKAllen is in possession of monies that it wrongfully

10  obtained from the Partnership, including, without limitation, approximately $1.8

11  million that the Partnership paid to HKAllen from the proceeds from the loan

12  that HKN Danville House LLC executed on or about September 10, 2015, which

13  monies rightfully belong to the Limited Partners other than Pfeiffer;

14         g.      HKN Danville House LLC is in possession of the

15  Property, which HKN Danville House LLC wrongfully obtained from the

16  Partnership in connection with the Sale and Exchange, and which rightfully

17  belongs to the Partnership; and

18         h.      HKN Manager LLC is, upon information and belief, in

19  possession of monies it has wrongfully obtained in connection with the Property,

20

**COMPLAINT**

the Partnership and/or the Sale and Exchange, all of which monies rightfully belong to the Limited Partners other than Pfeiffer.

337.   Plaintiffs are informed and believe and thereupon allege that by reason of the manner by which Defendants have obtained such property, and the receipts and profits thereon, Defendants are involuntary trustees holding such property, and the receipts and profits thereon, in a constructive trust for Plaintiffs with the duty to reconvey the same to Plaintiffs forthwith.

338.   With regard to the reconveyance of the property identified in Paragraphs 336(a) through 336(e) above, if the Court consents to use its equitable powers to impose a constructive trust and reconvey the LP Units to their rightful owners, such rightful owners hereby declare themselves to be, and for all purposes in this Complaint shall be, included in the definition of Holder LPs, such that they join the other Holder LPs in asserting each and every cause of action asserted by the Holder LPs in this Complaint.

339.   In performing the acts herein alleged, Defendants acted fraudulently, maliciously, and oppressively, and with behavior reflecting a callous disregard for Plaintiffs' rights where the conduct was substantially certain to vex, annoy or injure, thereby justifying an award of punitive damages in an amount according to proof.

**COMPLAINT**

340.   As to each of the offending acts alleged herein prior to 2013, Plaintiffs did not have actual or constructive knowledge of the facts constituting the wrongful conduct, nor were they aware of facts giving rise to a duty of inquiry to uncover said facts.  Moreover, Defendants Allen and HKAllen had an affirmative duty of full and fair disclosure of said facts, thus their failure to disclose the facts constitutes fraudulent concealment of same such that Plaintiffs' delayed discovery of the facts is excusable.

## SEVENTH CAUSE OF ACTION

## Civil Theft under California Penal Code § 496

(Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners and Lippman Trust Against Defendants HKAllen, Burnes, ERI Parties, HKM, HallKeen LLC and HKN Manager LLC)

341.   Plaintiffs reallege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

342.   Defendants HKAllen, Burnes, HallKeen LLC and the ERI Parties, acting in concert with each other, and by means of false and fraudulent representation and pretense, defrauded the Seller LPs of their money and interests in the Partnership as described herein.  Specifically, and without limiting the generality of the foregoing, HKAllen, Burnes, HallKeen LLC and

**COMPLAINT**

1  the ERI Parties conspired to mislead the Limited Partners to believe that their

2  LP Units had little or no value so as to induce each of the California-resident

3  Seller LPs to sell its LP Units to one of the ERI Parties at abusively low prices,

4  thereby causing HKAllen, Burnes, HallKeen LLC and the ERI Parties to profit

5  at the expense of such Seller LPs, all as set forth in detail in this Complaint.

6      343.   In performing the acts herein alleged, Defendants HKAllen,

7  Burnes, HallKeen LLC and the ERI Parties injured the California-resident Seller

8  LPs through theft by false pretense and fraudulent representation.

9      344.   Defendants HKAllen, HKN Manager LLC, HKM and Burnes,

10  acting knowingly and designedly, in concert with each other, and by means of

11  false and fraudulent representation and pretense, defrauded the Holder LPs of

12  their money and of more than half of the value of their LP Units, all as set forth

13  in detail in this Complaint.  Specifically, Defendants HKAllen, HKN Manager

14  LLC, HKM and Burnes used false and fraudulent means, including, without

15  limitation, the Consent Request, Update Number One, Update Number Two,

16  Update Number Three and the Confirmation of Consent, to obtain technical,

17  though substantively improper, approval of the Sale and Exchange under the

18  terms of the Partnership Agreement.  Defendants HKAllen, HKN Manager LLC,

19  HKM and Burnes then proceeded to complete the Sale and Exchange, and in so

20  doing, such Defendants took and fraudulently appropriated money and other

**COMPLAINT**

1  valuable property from the Holder LPs in exchange for no consideration

2  whatsoever.  The wrongful takings include, without limitation, a payment of

3  approximately $1.8 million to HKAllen completed on or about September 10,

4  2015, a commitment to pay one half of the Priority Return to HKAllen, and a

5  grant to HKN Manager LLC of the right to receive to 50% of the future cash

6  flow and capital proceeds payments related to the Property.

7      345.   In performing the acts herein alleged, Defendants HKAllen, HKN

8  Manager LLC, HKM and Burnes injured the California-resident Holder LPs

9  through theft by false pretense and fraudulent representation.

10      346.   As to each of the offending acts alleged herein prior to 2013,

11  Plaintiffs did not have actual or constructive knowledge of the facts constituting

12  the theft, nor were they aware of facts giving rise to a duty of inquiry to uncover

13  said facts.  Moreover, Defendants had an affirmative duty of full and fair

14  disclosure of said facts, thus Defendants' failure to disclose the facts constitutes

15  fraudulent concealment of same such that Plaintiffs' delayed discovery of the

16  facts is excusable.

17      347.   As a direct and proximate result, California-resident Holder LPs

18  and California-resident Seller LPs suffered actual damages in an amount to be

19  proven at trial.

20

**COMPLAINT**

348.    Under California Penal Code section 496, Defendants are liable to the California-resident Seller LPs and California-resident Holder LPs for three times the amount of said Plaintiffs' actual damages, costs of suit, and attorney fees.

349.    In performing the acts herein alleged, Defendants acted fraudulently, maliciously, and oppressively, and with behavior reflecting a callous disregard for Plaintiffs' rights where the conduct was substantially certain to vex, annoy or injure, thereby justifying an award of punitive damages in an amount according to proof.

350.    Under Civil Code section 3345, Defendants are liable to the California-resident Seller LPs and California-resident Holder LPs for punitive damages in an amount up to three times greater than the amount the trier of fact would otherwise impose because Defendants knew that their conduct was directed to these Plaintiffs, and Defendants knew or should have known that one or more of these Plaintiffs was, at all relevant times, a senior citizen.

//

//

//

**COMPLAINT**

# EIGHTH CAUSE OF ACTION

## Civil Theft under North Carolina General Statutes Section 1-538.2

(Plaintiff Guy Against Defendants HKAllen, HKN Manager LLC, HKM and Burnes)

351.    Plaintiffs reallege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

352.    Defendants HKAllen, HKN Manager LLC, HKM and Burnes, acting knowingly and designedly, in concert with each other, and by means of false and fraudulent representation and pretense, defrauded Plaintiff Guy of his money and of more than half of the value of his LP Units, all as set forth in detail in this Complaint.  Specifically, and without limiting the generality of the foregoing, Defendants HKAllen, HKN Manager LLC, HKM and Burnes used false and fraudulent means, including, without limitation, the Consent Request, Update Number One, Update Number Two, Update Number Three and the Confirmation of Consent, to obtain technical, though substantively improper, approval of the Sale and Exchange under the terms of the Partnership Agreement.  Defendants HKAllen, HKN Manager LLC, HKM and Burnes then proceeded to complete the Sale and Exchange, and in so doing, such Defendants took and fraudulently appropriated money and other valuable property from Plaintiff Guy in exchange for no consideration whatsoever.  The wrongful

**COMPLAINT**

1  takings include, without limitation, a payment of approximately $1.8 million to

2  HKAllen completed on or about September 10, 2015, a commitment to pay one

3  half of the Priority Return to HKAllen, and a grant to HKN Manager LLC of

4  right to receive to 50% of the future cash flow and capital proceeds payments

5  related to the Property.

6      353.   In performing the acts herein alleged, Defendants HKAllen, HKN

7  Manager LLC, HKM and Burnes injured Plaintiff Guy through theft by false

8  pretense, in violation of North Carolina Gen. Stat. § 14-100(a) and giving rise to

9  civil liability under North Carolina Gen. Stat. § 1-538.2.

10     354.   As a direct and proximate result, Plaintiff Guy suffered actual

11 damages in an amount to be proven at trial.

12     355.   Under North Carolina Gen. Stat. § 1-538.2, Defendants are liable to

13 Plaintiff Guy for the loss of value to his LP Units, as well as consequential

14 damages, punitive damages, and attorney fees.

15     356.   In performing the acts herein alleged, Defendants acted

16 fraudulently, maliciously, and oppressively, and with behavior reflecting a

17 callous disregard for Plaintiff Guy's rights where the conduct was substantially

18 certain to vex, annoy or injure, thereby justifying an award of punitive damages

19 in an amount according to proof.

20

**COMPLAINT**

## NINTH CAUSE OF ACTION

### Rescission

(Plaintiffs Sherman, Richards Family Trust, Weide Family Trust, Takahashi,

McKinney, Hamill, Leuschel and Adelman Against Defendants Hall Keen

Investments, Newton Fund, Milton Fund and Belmont Fund)

357.   Plaintiffs reallege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

358.   As alleged herein, Seller LPs and their predecessors in interest were induced by means of Defendants' false and fraudulent pretenses and withholding of material information to sell their LP Units for abusively low prices that were far below market value.  Those of Defendants who were fiduciaries to the Seller LPs were under a duty to disclose the material information that was withheld, and those of Defendants who knowingly assisted such fiduciaries in breaching their fiduciary duties were under a duty not to assist such breaches.

359.   Seller LPs are prepared to return to each respective purchaser everything of value Seller LPs received under the terms of the disputed sales and by this Complaint, hereby tender offer to do so.

360.   Seller LPs are entitled to a rescission of the assignments of their LP Units from Hall Keen Investments, Newton Fund, Milton Fund and Belmont Fund, because those assignments were induced by false and fraudulent

**COMPLAINT**

1 | pretenses.  Each of Hall Keen Investments, Newton Fund, Milton Fund and

2 | Belmont Fund knew or reasonably should have known that the price it paid for

3 | each assignment of LP Units was far below market value; further, each of them

4 | assisted in the presentation of false pretenses to the Seller LPs, had actual notice

5 | of the false pretenses under which the assignments were induced or were on

6 | constructive notice of the need for a reasonable inquiry which would have

7 | revealed same.  As such, none of Hall Keen Investments, Newton Fund, Milton

8 | Fund or Belmont Fund is a bona fide purchaser.

9

10 | **TENTH CAUSE OF ACTION**

11 | **Elder Financial Abuse**

12 | (Plaintiffs Richards Family Trust, Weide Family Trust, Takahashi, Devor, and

13 | Wapners Against Defendants HKAllen, HKN Allen, HKN Manager LLC, HKM,

14 | HallKeen LLC, Burnes, and the ERI Parties)

15 | 361.   Plaintiffs reallege here and incorporate by reference into this Cause

16 | of Action all preceding Paragraphs of this Complaint.

17 | 362.   As alleged in detail in this Complaint, Defendants HKAllen, HKN

18 | Allen, HKN Manager LLC, HKM, HallKeen LLC, Burnes, and the ERI Parties

19 | conspired to harm and defraud the Seller LPs, or their predecessors in interest,

20 | who resided in California and were 65 years of age or older at the time of the

**COMPLAINT**

1    relevant conduct, by inducing them under false pretenses to sell their LP Units to

2    one of Newton Fund, Milton Fund or Belmont Fund for far below market value.

3        363.   By operation of this concerted action and their own fraudulent and

4    constructively fraudulent conduct, Defendants HKAllen, HKN Allen, HKM,

5    HallKeen LLC, Burnes, and the ERI Parties have wrongfully taken, secreted,

6    and/or appropriated money and property from Seller LPs and their predecessors

7    in interest.  Defendants HKAllen, HKN Allen, HKM, HallKeen LLC, Burnes

8    and the ERI Parties furthermore hold or have control of property that rightfully

9    belongs to, or is in constructive trust for, Seller LPs.

10       364.   Defendants HKAllen, HKN Manager LLC, HKM and Burnes, by

11   false and fraudulent representations and pretenses, constructive fraud and

12   fraudulent omissions, and undue influence wrongfully obtained or assisted in the

13   wrongful acquisition of personal property and property rights rightfully owned

14   by the Holder LPs who resided in California and were at least 65 years of age

15   when HKM, on behalf of HKAllen, sent the Consent Request to the Limited

16   Partners.  Specifically, Defendants HKAllen, Burnes and HKM used false and

17   fraudulent representations and pretenses and undue influence, as described

18   herein, to induce the California-resident Holder LPs 65 years of age and older

19   not to oppose the Sale and Exchange so that HKAllen could obtain a $1.8

20   million cash distribution on or about September 10, 2015, and so that HKAllen

**COMPLAINT**

1    and its affiliate HKN Manager LLC could obtain rights to fifty percent of all

2    cash flows and capital proceeds from the Property that rightfully belong to the

3    Holder LPs.

4        365.   The conduct of Defendants, and each of them, constituted elder

5    financial abuse under California Welfare and Institutions Code sections 15657.5

6    and 15610.30.

7        366.   As to each of the offending acts alleged herein prior to 2013,

8    Plaintiffs did not have actual or constructive knowledge of the facts constituting

9    the theft, nor were they aware of facts giving rise to a duty of inquiry to uncover

10   said facts.  Moreover, Defendants had an affirmative duty of full and fair

11   disclosure of said facts, thus Defendants' failure to disclose the facts constitutes

12   fraudulent concealment of same such that Plaintiffs' delayed discovery of the

13   facts is excusable.

14       367.   As a direct and proximate result, Seller LPs and Holder LPs

15   suffered actual damages in an amount to be proven at trial.

16       368.   Under California Welfare and Institutions Code § 15657.5,

17   Defendants are liable to the California-resident Seller LPs and Holder LPs who

18   were 65 or older at the time of the relevant conduct for the amount of said

19   Plaintiffs' actual damages, costs of suit, and reasonable attorney fees.

20

**COMPLAINT**

1    369.   In performing the acts herein alleged, Defendants and each of them

2    were guilty of recklessness, oppression, fraud, and malice within the meaning of

3    California Welfare and Institutions Code § 15657.5 and California Civil Code §

4    3294.  An award of punitive and exemplary damages is therefore justified in an

5    amount according to proof.  An award of attorneys' fees and costs is also

6    justified.

7    370.   Under Civil Code section 3345, Defendants are liable to the

8    California-resident Seller LPs and Holder LPs who were, at the relevant time, 65

9    or older, for punitive damages in an amount up to three times greater than the

10   amount the trier of fact would otherwise impose, because Defendants knew that

11   their conduct was directed to these Plaintiffs, and Defendants knew or should

12   have known that one or more of the above-listed Plaintiffs was, at all relevant

13   times, a senior citizen.

14

15                          **PRAYER FOR RELIEF**

16   371.   WHEREFORE, Plaintiff demands judgment against Defendants for

17   the following:

18      a.      For an accounting to determine the amount of improper Partnership

19   expenditures and/or Partnership debt for which Defendants must reimburse

20   Plaintiffs;

**COMPLAINT**

1    b.    For imposition of constructive trusts over property belonging to one or

2    more Plaintiffs that is wrongfully held be one or more Defendants;

3    c.    For rescission of the wrongful transactions as set forth above;

4    d.    For compensatory damages according to proof;

5    e.    For pre-judgment and post-judgment interest;

6    f.    For general damages according to proof;

7    g.    For punitive damages;

8    h.    For enhancement of punitive damages pursuant to California Civil

9    Code § 3345;

10    i.    For an injunction: (i) compelling HKAllen to resign immediately as

11    general partner of the Partnership; (ii) compelling HKN Manager LLC to resign

12    immediately as managing member of HKN Danville House LLC; (iii) compelling

13    HKM to resign as Managing Agent of the Property; (iv) compelling all Defendants,

14    and all principals and affiliates of each, immediately to waive any and all claims

15    any of them may have to receive any monies whatsoever from the Property, the

16    Partnership or HKN Danville House LLC; (v) compelling all Defendants to take all

17    actions reasonably necessary to effectuate a smooth transition of control of the

18    Property and its operations to an entity duly approved by the Independent Limited

19    Partners; (vi) appointing a receiver to oversee the operations and management of

20    HKN Danville House LLC, the Partnership and the Property until such time as the

**COMPLAINT**

1  Independent Limited Partners determine how the Property will be held and

2  managed; and (vii) prohibiting all Defendants, and all principals and affiliates of

3  each, from exercising any control over any aspect of the Property, the Partnership

4  or HKN Danville House LLC other than as expressly approved by a majority of the

5  Independent Limited Partners to achieve the aims of item (v) above.

6        j.     For attorney fees and costs of suit incurred herein; and

7        k.     For such other and further relief as the court may deem just and

8  proper.

9

10  **JURY TRIAL DEMAND**

11      Plaintiffs request a jury trial on all issues so triable.

12  RESPECTFULLY SUBMITTED:

13

14  Dated:     November 23, 2015     BALL LAW CORPORATION

15

16                        By:   /s/ Jonathan S. Ball
                             Jonathan S. Ball

17                        Jonathan S. Ball (SBN 264107)

18                        BALL LAW CORPORATION
                      One Market / Spear Tower, 36th Floor

19                        San Francisco, CA  94105
                      Telephone:  415-349-0721
                      Facsimile:  415-520-6864

20                        Email:    jb@ball-lawcorp.com

**COMPLAINT**

1

2    Adam B. Wolf (SBN 215914)
     PEIFFER ROSCA WOLF
     ABDULLAH
3    CARR & KANE, APLC
     9696 Culver Blvd., Suite 301
4    Culver City, CA 90232
     Telephone:  415-766-3545
5    Facsimile:   415-402-0058
     Email:         awolf@prwlegal.com
6
     Tracey B. Cowan (SBN 250053)
7    PEIFFER ROSCA WOLF
     ABDULLAH
8    CARR & KANE, APLC
     4 Embarcadero Center, Suite 1400
9    San Francisco, CA 94111
     Telephone:  415-426-5641
10   Facsimile:   415-402-0058
     Email:         tcowan@prwlegal.com
11

12   Joseph C. Peiffer (PHV pending)
     PEIFFER ROSCA WOLF
13   ABDULLAH
     CARR & KANE, APLC
14   201 St. Charles Ave., Suite 4610
     New Orleans, LA 70170
15   Telephone:  504-586-5259
     Facsimile:   504-523-2464
16   Email:         jpeiffer@prwlegal.com

17   *Attorneys for Plaintiffs*

18

19

20

**COMPLAINT**